No. 23-1731

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔠𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 𝔣𝔬𝔯 𝔱𝔥𝔢 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

CENTRIPETAL NETWORKS, LLC,
*Appellant,*

v.

PALO ALTO NETWORKS, INC.,
*Appellee.*

Appeal from the United States Patent and Trademark Office,
Patent Trial and Appeal Board in No. IPR2021-01158

**OPENING BRIEF FOR
APPELLANT CENTRIPETAL NETWORKS, LLC**

Paul J. Andre
James Hannah
KRAMER LEVIN NAFTALIS
 & FRANKEL LLP
333 Twin Dolphin Dr., Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700

Jeffrey Price
KRAMER LEVIN NAFTALIS
 & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100

Scott M. Kelly
Bradley C. Wright
John R. Hutchins
BANNER & WITCOFF, LTD.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000

*ATTORNEYS FOR CENTRIPETAL NETWORKS, LLC*

## REPRESENTATIVE PATENT CLAIMS AT ISSUE
## PURSUANT TO FED. CIR. R. 32(A)(3)

U.S. Patent No. 10,503,899

1.  A method comprising:

receiving a plurality of event logs;

determining, by a computing device, a reportability likelihood for each event log based on at least one algorithm, wherein the reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator;

sorting an event queue of the plurality of event logs based on the reportability likelihood of each of the plurality of event logs; and

transmitting, by the computing device and to an analysis system, the plurality of event logs sorted in the event queue based on the reportability likelihood of each of the plurality of event logs.

11.  A method comprising:

receiving, by a computing device, a plurality of event logs;

determining, by the computing device, a first reportability likelihood for each event log based on a human designed algorithm;

determining, by the computing device, a second reportability likelihood for each event log based on a machine-learned algorithm;

determining, by the computing device, a combined reportability likelihood for each event log based on the first reportability likelihood and the second reportability likelihood;

sorting the plurality of event logs based on the combined reportability likelihoods of each of the plurality of event logs; and

storing, in an event queue, the plurality of event logs sorted in the event queue based on the combined reportability likelihood of each of the plurality of event logs,

wherein the combined reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator.

# <u>CERTIFICATE OF INTEREST</u>

Counsel for Centripetal Networks, LLC certifies the following:

1.  The full name of every entity represented by us is:

    Centripetal Networks, LLC

2.  The name of the real party in interest for the entity.  Do not list
    the real party if it is the same as the entity:

    Not applicable.

3.  All parent corporations and any other publicly held companies
    that own 10 percent or more of the stock of the party or amicus
    curia represented by us are listed below:

    CNI Holdings, Inc.

4.  The names of all law firms, and the partners or associates that
    have not entered an appearance in the appeal, and (a) appeared
    for the entity in the lower tribunal; or (b) are expected to appear
    for the entity in this court:

    Blair A. Silver of Irell & Manella LLP

5.  Other than the originating case number(s), any related or prior
    cases in this or any other court or agency that will directly affect
    or be directly affected by this court's decision in the pending
    appeal.

    *Centripetal Networks, LLC v. Palo Alto Networks, Inc.*, No. 2:21-
    cv-00137 (E.D. Va.).

6.  All information required by Fed. R. App. P. 26.1(b) and (c) in
    criminal cases and bankruptcy cases.

    None.

Dated: August 21, 2023        By:  */s/ James Hannah*
                                                Paul J. Andre
                                                James Hannah
  KRAMER LEVIN NAFTALIS
   & FRANKEL LLP
  333 Twin Dolphin Drive, Suite 700
  Redwood Shores, CA 94065
  Telephone: (650) 752-1700
  Facsimile: (650) 752-1800
  pandre@kramerlevin.com
  jhannah@kramerlevin.com

  Jeffrey Price
  KRAMER LEVIN NAFTALIS
   & FRANKEL LLP
  1177 Avenue of the Americas
  New York, NY 10036
  Telephone: (212) 715-9100
  jprice@kramerlevin.com

  Scott M. Kelly
  Bradley C. Wright
  John R. Hutchins
  BANNER & WITCOFF, LTD.
  1100 13th Street, NW Suite 1200
  Washington, DC 20005
  Telephone: (202) 824-3000
  Facsimile: (202) 824-3001
  skelly@bannerwitcoff.com
  bwright@bannerwitcoff.com
  jhutchins@bannerwitcoff.com

  *Attorneys for Appellant*
  Centripetal Networks, LLC

iv

<u>**TABLE OF CONTENTS**</u>

STATEMENT OF RELATED CASES ....................................................... 1

JURISDICTION ................................................................................ 2

STATEMENT OF THE ISSUES .............................................................. 3

INTRODUCTION ............................................................................... 4

STATEMENT OF THE CASE AND FACTS ............................................... 9

    A.    The '899 Patent .......................................................... 9

    B.    The Church Reference................................................. 12

    C.    The Amsler-003 Reference........................................... 13

    D.    The Fellin Reference .................................................. 15

    E.    The Board's Final Written Decision ....................................... 15

        1.    The Board Did Not Construe "Reportability Likelihood" ....................................................... 16

        2.    The Board Ignored Centripetal's Hindsight Argument in Favor of a Strawman ............................. 20

        3.    The Board Found a "Combined Reportability Likelihood" Based on the Combination of Factors that Are Not Individual "Reportability Likelihoods" ......................................... 21

SUMMARY OF THE ARGUMENT ......................................................... 24

ARGUMENT .................................................................................... 27

    A.    Standard of Review .............................................................. 27

    B.    The Board Erroneously Declined to Construe "Reportability Likelihood" as Requiring a Probability that a Detected Threat Event Would be Reported .............................................................. 28

1.    The Board Impermissibly Declined to Construe "Reportability Likelihood" ........................... 30

2.    "Reportability Likelihood" Requires a Probability that a Detected Threat Event Would be Reported ....................................... 34

3.    Under the Proper Construction, Church Does Not Disclose a "Reportability Likelihood" .................................................. 37

C.    Impermissible Hindsight Drove the Board's Conclusion that it Would Have Been Obvious to Use a Threat Rating as a "Reportability Likelihood" ................................................. 41

D.    The Prior Art, Alone or in Combination, Does Not Teach Determining a Combined Reportability Likelihood ................................................. 47

1.    The Board Made Inconsistent Findings Regarding Which Prior Art Reference Taught the Combined Reportability Likelihood .................................................. 48

2.    Church Does Not Teach or Suggest the Combined Reportability Likelihood Limitation .................................................. 51

CONCLUSION ....................................................... 54

# TABLE OF AUTHORITIES

**Page(s)**

Cases

*Beachcombers v. WildeWood Creative Prods., Inc.,*
   31 F.3d 1154 (Fed. Cir. 1994) ........................................................ 31, 33

*Homeland Housewares, LLC v. Whirlpool Corp.,*
   865 F.3d 1372 (Fed. Cir. 2017) ........................................................... 34

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. 398 (2007) ............................................................................ 41

*Mintz v. Dietz & Watson, Inc.,*
   679 F.3d 1372 (Fed. Cir. 2012) ..................................................... 45, 46

*OSI Pharms., LLC v. Apotex Inc.,*
   939 F.3d 1375 (Fed. Cir. 2019) ........................................................... 28

*Pers. Web Techs., LLC v. Apple, Inc.,*
   848 F.3d 987 (Fed. Cir. 2017) ....................................................... 27, 28

*Personalized Media Commc'ns, LLC v. Apple Inc.,*
   952 F.3d 1336 (Fed. Cir. 2020) ........................................................... 27

*Qualcomm Inc. v. Intel Corp.,*
   6 F.4th 1256 (Fed. Cir. 2021) .............................................................. 29

*Renishaw PLC v. Marposs Societa' per Azioni,*
   158 F.3d 1243 (Fed. Cir. 1998) ........................................................... 36

*SAS Ins't., Inc. v. Complementsoft, LLC.,*
   825 F.3d 1341 (Fed. Cir. 2016) ........................................................... 29

*SAS Inst., Inc. v. Iancu,*
   138 S. Ct. 1348 (2018) ........................................................................ 29

*University of Strathclyde v. Clear-Vu Lighting LLC,*
   17 F.4th 155 (Fed. Cir. 2021) .............................................................. 28

*WL Gore & Assocs., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983) ................................................... 42, 46

## Statutes

5 U.S.C. § 706(2)(A),(E) ........................................................... 28

28 U.S.C. § 1295(a)(4)(A) ............................................................ 2

35 U.S.C. § 282(b) ..................................................................... 27

## Other Authorities

37 C.F.R. § 42.65(a) ................................................................. 40

37 C.F.R. § 42.100(b) ............................................................... 27

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Centripetal Networks, LLC states that:

(1) no appeal other than the current appeal has been taken in or from the United States Patent and Trademark Office, Patent Trial and Appeal Board's decision in Case No. IPR2021-01158.

(2) Centripetal Networks, LLC and Palo Alto Networks, Inc., are parties to *Centripetal Networks, LLC v. Palo Alto Networks, Inc.*, No. 2:21-cv-00137 (E.D. Va.).

(3) no other cases may be directly affected by the Court's decision in this appeal.

## JURISDICTION

The Patent Trial and Appeal Board (the "Board") issued on March 13, 2023, a Final Written Decision in IPR2021-01158 (Appx1-43). Patent Owner, Centripetal Networks, LLC timely filed a Notice of Appeal on March 31, 2023 (Appx635-639). This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

1.    Did the Board commit reversible error by failing to construe the claim term "reportability likelihood" as requiring a probability that a detected threat event would be reported for further analysis, as both parties proposed and is supported by the patent specification.

2.    Did the Board commit reversible error by using its incorrect interpretation of "reportability likelihood" to ignore unrebutted, dispositive arguments and evidence.

3.    Did hindsight infect the Board's conclusion that the prior art could be used as a "reportability likelihood" limitation when the concept of a "reportability likelihood" was admittedly unknown in the art at the time of the invention.

4.    Did the Board commit reversible error by utilizing internally inconsistent reasoning to combine references that, even taken together, do not teach or suggest "determining . . . a combined reportability likelihood" as required by Claim 11.

# INTRODUCTION

The task of protecting a computer network from threats is both vast and tedious. Network protection systems implement complex processes to identify potential threats. But the work does not end once a threat is identified. Cyberanalysts painstakingly study detected threats so that they can be understood, neutralized, and—hopefully—avoided in the future. The '899 Patent is directed to admittedly novel methods for optimizing the cyberanalyst's workflow.

Rather than ordering the cyberanalyst's workflow sequentially (*e.g.*, on a first-in-first-out basis) or based on the level of perceived threat (*e.g.*, using risk or threat scores), the claimed invention prioritizes threats based on how likely it is that a cyberanalyst would *report* the threat event if analyzed. Prioritizing the cyberanalyst's workflow according to this "reportability likelihood" ensures that the analyst investigates those threats most likely to be reportable first and wastes no time analyzing threats that are unlikely to warrant a report. Appx53-54 ('899 Patent, Abstract), Appx65 ('899 Patent, 1:35-46).

Importantly, the "reportability likelihood" of a detected network threat is not one-in-the-same with how severe a threat is. Indeed, it is

not difficult to imagine a scenario in which a severe threat is not likely to be reported. For example, take a computer virus that, if executed, could cause catastrphophic network damage for an organization. The first time the virus is identified, it may be highly likely that a cyberanalyst would report it for further mitigation. However, once the threat is addressed— for example, the virus is blocked from the server, an e-mail is sent through the organization advising of the virus and how to avoid it, and remedial actions undertaken to neutralize the virus – it would be highly inefficient for a cyberanalyst to expend time and effort further investigating and reporting the exact same threat if detected again.

In such a scenario, even a threat with the most severe consequence may not have a high likelihood of being reported because it is redundant within the network security system. In contrast, a network threat that has a relatively lower severity rating but that has never before been investigated may have a higher likelihood of being reported to an authority for further investigation and remedial action. Accordingly, while a "reportability likelihood" could, in certain circumstances, *correlate with* a threat rating, the two values measure entirely different things.

Here, the Board's decision should be overturned because the Board improperly misapplied in its claim construction and obviousness conclusions the distinct concepts of the probability that a network threat will be ***reported***, as opposed to merely a determination of the severity of a threat.

First, the Board improperly rejected the parties' shared claim construction position that the "reportability likelihood" represents a "probability" that a detected threat would/should be reported, but simultaneously refused to formally construe the term *because of* the parties' agreement. Then, when considering Centripetal's primary argument that the prior art's threat rating is not a "probability" that a cyberanalyst would report the threat, the Board determined that the "reportability likelihood" need not be expressed as a probability at all. As a result, the Board declined to consider unrebutted testimony explaining why the prior art's threat rating is not, and could not possibly be used as, a probablity that a cyberanalyst would/should report the threat.

Second, there is no evidence to support the Board's obviousness conclusion under any reasonable interpretation of the "reportability likelihood" limitation because its conclusion was the product of

impermissible hindsight.    Regardless of whether the "reportability likelihood" must be expressed as a probability (it does), the prior art's threat rating is admittedly not a "reportability likelihood."  In concluding that it would nevertheless be obvious to use the prior art's threat rating *as* a "reportability likelihood," the Board imbued the hyopthetical person of ordinary skill in the art ("POSITA") with the theretofore unknown concept of a "reportability likelihood."    That reasoning is rife with hindsight because it improperly uses the inventor's contribution to the art against its teacher.

Third, the Board erred in its consideration of the the "combined reportability likelihood" recited in Independent Claim 11 and Dependent Claims 12-14.  Appx74 ('899 Patent, Claims 12-14).  As a primary matter, the Board utilized internally inconsistent reasoning to combine references that, even taken together, do not teach or suggest this limitation.

In addition, the "combined reportability likelihood" combines the reportability likelihood calculated by a human-designed ("H/D") algorithm with a reportability likelihood calculated by a machine-learing ("M/L") algorithm.  *Id.* ('899 Patent, Claim 11).  These two algorithms

both estimate the same type of value—a "reportability likelihood"—in ways that provide complementary benefits. Appx70 ('899 Patent, 11:3-8). On the other hand, the Board pointed to factors used to calculate the prior art's "threat rating," which are not themselves "reportability likelihoods." Appx36-37.

## STATEMENT OF THE CASE AND FACTS

**A.    The '899 Patent**

Examples of threats to computer networks abound, ranging from computer viruses to unauthorized requests or data transfers, malware, large volumes of network traffic designed to overwhelm network resources, and the like.  Appx65 ('899 Patent, 1:6-17).  Certain services provide reports about computers associated with network threats, including a list of network threat indicators (e.g., network addresses, uniform resource identifiers, etc.), threat signatures (e.g., malicious software ("malware") identifiers), or threat behaviors (e.g., characteristic patterns of advanced persistent threats).  *Id.*

Once identified threats are logged, cyberanalysts investigate the nature and severity of the threat and recommend remedial actions.  Appx65 ('899 Patent, 1:24-28).  Of the immense number of network threats detected and logged, typically only a small fraction requires reporting to appropriate authorities for further action.  Appx65 ('899 Patent, 1:28-35).  A significant problem at the time of the invention was that the volume and creation rate of network threat event logs overwhelmed human cyberanalysts' ability to investigate the detected

9

events.   Appx65 ('899 Patent, 1:35-40), Appx66 ('899 Patent, 3:8-13).
Simply adding more cyberanalysts to investigate the deluge of threats
was not a practical means to address this problem.  Appx66 ('899 Patent,
3:23-26).

The '899 Patent improved on the state of the art with an admittedly
novel approach for accelerating a cyberanalyst's workflow that orders
threat events based on the likelihood that the cyberanalyst would report
a particular detected threat event.   Appx65 ('899 Patent, 1:40-45),
Appx66 ('899 Patent, 3:32-40) (disclosing "a way to ensure that a
cyberanalyst does not spend any time investigating events that would be
deemed not reportable," and "only investigates events that will be
determined to be reportable," in order to "significantly reduce[]" "average
workflow cycle time").  This cyberanalysis workflow acceleration involves
generating an event log for each detected threat event, estimating the
likelihood, or probability, that a cyberanalyst would report the threat
event, and ordering the cyberanalyst's work queue in order of the
"reportability likelihood."  Appx65 ('899 Patent, 1:35-45; 2:9-30).

Accordingly, the '899 Patent discloses calculating a "reportability
likelihood" for each logged threat event.  The "reportability likelihood"

refers to the probability that a detected threat event would be reported if investigated by a cyberanalyst. Appx53-54 ('899 Patent, Abstract) ("tasks in the queue are ordered by the likelihood, or probability, that cyberanalysts will determine the associated events to be reportable findings"); Appx66 ('899 Patent, 3:36-66), Appx67 ('899 Patent, 5:9-22). The event is then "inserted into the queue in sorted order." Appx66 ('899 Patent, 3:46-55).

Events with a low likelihood of reportability may be "removed from the queue" so that they are "never [] investigated by cyberanalysts." Appx66 ('899 Patent, 3:46-55), Appx70 ('899 Patent, 12:4-19) (explaining that event logs are sorted by "reportability likelihood"and provided to a "Forensic Analysis Application device" for review by human cyberanalysts). By removing these low "reportability likelihood"events from the queue, the "service time for such events is zero" and "the average workflow cycle time for queued events is reduced, resulting in workflow acceleration." Appx66 ('899 Patent, 3:46-55), Appx68-69 ('899 Patent, 8:44-9:2), Appx70 ('899 Patent, 12:40-57).

The '899 Patent discloses a "Reportability Likelihood Estimator" that determines, for each event log, a "reportability likelihood"

11

estimating whether the event is reportable. Appx69 ('899 Patent, 10:65-11:3). The "Reportability Likelihood Estimator" uses "human-designed (H/D) algorithms" and "machine-learned (M/L) algorithms" to "provide complementary benefits." Appx70 ('899 Patent, 11:3-8). Thus, while H/D algorithms may initially be more accurate in determining a reportability likelihood, M/L algorithms are trained so that their accuracy improves over time. *Id.* at 11:8-53. A "reportability likelihood" based on a human-designed algorithm and a "reportability likelihood" based on a machine-learned algorithm may be combined into a combined reportability likelihood. *Id.* at 11:53-12:3.

**B.** **The Church Reference**

The Church reference is a patent entitled "Threat Scoring System and Method for Intrusion Detection Security Networks." Appx2312-2336. The Board confirmed that Church does not disclose a "reportability likelihood." Appx22 ("Although Church does not explicitly disclose determining a 'reportability likelihood . . .'").

Rather, Church discloses a security expert system that "analyze[s] incoming security events and generate[s] a threat rating that indicates the likelihood of an event or a series of events being a threat." Appx2312;

Appx2324 (Church, 7:44-46) ("a threat rating . . . indicates the severity or seriousness of the attack"); Appx2323 (Church, 5:56-58) ("each threat rating can be tailored to accurately reflect the true severity of a potential security threat"); *id.* at 6:2-3 ("The aggressiveness of an attacker may affect the severity of an attack and hence its threat rating . . . .").

Church further describes its threat rating as "indicat[ing] the likelihood of an event being a threat to the network, and the subjective value of loss if the event is not responded to (i.e., no defensive or corrective action is taken."). Appx2324 (Church at 8:23-28). In one embodiment, Church's threat rating is expressed as a value normalized to have a range between 0 and 100. *Id.*. This normalized value is not a probability that a threat will be reported.

## C.    The Amsler-003 Reference

Amsler-003 is a patent entitled "Internet Security Cyber Threat Reporting System and Method." Appx2337-2353. Amsler-003 discloses "a method that comprises collecting threat incident data, weighing the data, sorting the data based on severity or reliability, providing the sorted data to an analyst, analyzing the data, transmitting a report of analyzed data, and updating a database with the report data." Appx16

(citing Appx2348 (Amsler-003, 3:7-25), Appx2350 (Amsler-003, 8:21-40), Appx2346 (Amsler-003, Fig. 8)).

Amsler-003 focuses on the "severity" of an incident, not "reportability." Appx3643-3644 (Orso Decl., ¶ 129) (quoting Appx2349 (Amsler-003, 5:10-11) ("the list is sorted comparing severity by severity . . ."), *id.* at 6:5-8 ("Information like most severe incidents identified . . . act as starting points for drilldown"), Appx2350 (Amsler-003, 8:28-30 ("sorting the cyber threat data 104 by  severity and reliability for providing indicators for the incident")).

Importantly, Amsler-003 requires a human analyst to receive all incidents before they are routed to an analyst as detected threat events. Appx2350 (Amsler-003 at 7:17-21); Appx3642-3644 (Orso Decl., ¶¶ 127-129). This is contrary to the '899 Patent's approach of determining a "reportability likelihood" so that only certain threats are reported. Appx3643 (Orso Decl., ¶ 128).

Amsler-003 does not disclose a "reportability likelihood." Appx21-28 (Final Written Decision discussing Church alone regarding the "reportability likelihood" limitation). Nor did Appellee in the Petition rely on Amser-003 as disclosing Claim 11's step of "determining . . . a

14

combined reportability likelihood" or a "first reportability likelihood . . . based on human designed algorithm." Appx63; Appx142-143; Appx148; Appx3642 (Orso Decl., ¶ 125); Appx74.

**D.    The Fellin Reference**

Fellin is a publication entitled "Preventing Mistraining of Anomaly-Based IDSs through Ensemble Systems." Appx2724-2726. Fellin discloses "a method of implementing both static and machine-learned algorithms in an [intrusion detection system] to identify potential threats." Appx17.

As with Amsler-003, Fellin does not disclose and was not relied on by Appellee as satisfying the limitations of a "reportability likelihood," "determining . . . a combined reportability likelihood," or a "first reportability likelihood . . . based on human designed algorithm." Appx21-28, Appx63, Appx142-143; Appx148; Appx3642 (Orso Decl., ¶ 125).

**E.    The Board's Final Written Decision**

On March 13, 2023, the Board issued the Final Written Decision finding Claims 1-20 of the '899 Patent unpatentable. Appx2. Specifically, the Board found Claims 1, 7-10, 15, 19 and 20 obvious over Church and

Amsler-003 (Appx8, Appx17-18) and Claims 2-6, 11-14, and 16-18 obvious over Church, Amsler-003 and Fellin.  Appx8, Appx33.

## 1.    The Board Did Not Construe "Reportability Likelihood"

Both parties proposed a construction of the claimed "reportability likelihood" that explicitly required a *probability* that a detected threat event would/should be reported.  Nevertheless, when the Board conducted its obviousness analysis, it determined that the "reportability likelihood" need not be expressed as a probability.  Neither party advocated for this interpretation, the Board provided no intrinsic or extrinsic support for its conclusion, and the Board did not provide the parties with an opportunity to address it.

The '899 Patent repeatedly discloses that the "reportability likelihood" represents the probability that a threat would be deemed reportable.  Appx53-54 ('899 Patent, Abstract) ("tasks in the queue are ordered by the likelihood, or probability, that cyberanalysists will determine the associated events to be reportable findings"), Appx66 ('899 Patent, 3:42-46) ("the events in the queue may be ordered, or sorted, by the likelihood of reportability (a probability value in [0,1])"), Appx69 ('899 Patent, 10:67-11:3) ("The Reportability Likelihood Estimator 132

computes a likelihood, or probability value in [0,1], that the cyberanalysts or cyberanalysis system will determine that the event is a reportable finding"), Appx70 ('899 Patent, 11:63-64), Appx71 ('899 Patent, 14:44-46).

Consistent with these disclosures, PAN proposed that the term "reportability likelihood" should be construed to mean "likelihood, *or probability*, that cyberanalysts will determine that a threat event should be reported to an authority." Appx100 (emphasis added). In support of its proposed construction, PAN quoted the '899 Patent Abstract which states: "[i]n order to improve the efficiency of the workflow process, tasks in the queue are ordered by the likelihood, or probability, that cyberanalysts will determine the associated threat events to be reportable findings." *Id.* (citing Appx53-54 ('899, Abstract)).

Centripetal similarly proposed that "reportability likelihood" be construed to mean "*a probability* that a threat event would be reported if investigated by a cyberanalyst." Appx190 (emphasis added). Centripetal quoted the '899 Patent disclosure that the "reportability likelihood" may be expressed with a "probability value between 0 and 1." Appx190-191 ("Before inserting the event log in the queue, the event's reportability likelihood, *a probability value between 0 and 1*, may be individually

17

computed . . .".) (citing Appx67 ('899 Patent, 6:18-20)) (emphasis added); *see also* Appx66 ('899 Patent, 3:36-66), Appx67 ('899 Patent, 5:9-22); Appx3603-3604 (Orso Decl., ¶ 43).

Because the differences between the parties' proposed constructions of "reportability likelihood" were irrelevant to the arguments raised by the parties, the Board declined to formally construe the term. Appx11-12. However, when considering the applicability of Church's threat rating to the claimed "reportability likelihood," the Board determined that the "reportability likelihood" need not be expressed as a probability. Appx25-26 ("Patent Owner contends that this normalized value is not a probability (PO Resp. 38–39), but the claim language does not require the 'reportability likelihood' to be expressed in any particular manner.").

The only support for the Board's abrupt shift away from the agreed-upon construction of the "reportability likelihood" term was a single sentence of attorney argument in PAN's Reply. Appx25-26 (citing Appx460) ("To the extent PO intends to imply that the claimed 'reportability likelihood' must be expressed in a particular manner, such position finds no support in the '899 claims, which impose no such

requirement."). Notably, however, PAN made this statement in the context of its argument that Church's "normalized" threat rating *is* a probability, not whether the "reportability likelihood" is a probability. *Id*. The parties (and the intrinsic and extrinsic evidence) are all in agreement that the terms "likelihood" and "probability" mean the same thing. *Id*.; Appx561 (Hearing Tr. at 9:1-2) (PAN's counsel stating that the specification does not distinguish "between probability and likelihood").

Upon abandoning the parties' agreement that the "reportability likelihood" refers to a "probability" that a cyberanalyst would/should report a threat event, the Board entirely disregarded Centripetal's argument that Church's threat rating is not "a probability of anything, let alone the probability that a cyberanalyst would find a particular threat event reportable." *Compare* Appx362, Appx398-400 *with* Appx28 (the Board declined to consider this argument based on its informal construction of the term). The Board also disregarded detailed, unrebutted testimony establishing why Church's threat rating could not possibly be "used as" a reportability likelihood for the same reason. Appx3632-3633 (Orso Decl., ¶¶ 104-106).

2.    **The Board Ignored Centripetal's Hindsight Argument in Favor of a Strawman**

The Board conceded that Church does not disclose determining a "reportability likelihood." Appx22. Indeed, the Board assumed for purposes of its analysis that Church's threat rating indicated only the severity of a threat. Appx23. However, the Board reasoned that because the determination of whether a threat is reportable may depend on context, and because threat severity in some contexts may correlate to a "reportability likelihood," then it would have been obvious to use Church's threat rating as "reportability likelihood," at least in certain environments. Appx23-24.

The Board, however, disregarded Centripetal's argument that the Petition's grounds were tainted by hindsight. *See* Appx389-392. Centripetal showed this hindsight through evidence including the admitted fact that the "entire *concept* of estimating a detected threat event's reportability of missing from Church and all of the prior art considered to date." Appx390 (citing Appx3625-3626 (Orso Decl., ¶ 88); Appx2324 (Church, 8:28-31)) ("Critically, it also does not mean that it would have been obvious at the time of the invention to determine a reportability likelihood *at all*."). Instead of evaluating *this* argument, the

20

Board addressed a strawman. Appx26 ("Patent Owner's argument relates to its contention that the '899 patent distinguishes reportability from the severity of a threat."). While Centripetal made (and stands by) that argument elsewhere, its hindsight argument did not rely on this distinction.

The Board further found that Church's normalized value range between 0-100 provided the requisite "likelihood," notwithstanding that the value represented a measure of the likelihood of an event being a threat to the network *and* the subjective value of the loss if not properly mitigated, not the likelihood that an investigated threat would be reported. Appx25-26. In reaching this conclusion, the Board did not reference or evaluate unrebutted testimony establishing that while that a threat rating is not, and never could, represent such a likelihood. Appx28.

### 3. The Board Found a "Combined Reportability Likelihood" Based on the Combination of Factors that Are Not Individual "Reportability Likelihoods"

The Board determined that a combination of Church, Amsler-003 and Fellin render obvious Claim 11.d's limitation of "determining . . . a combined reportability likelihood . . . ." Appx39. The Board's conclusion,

however, contradicts its own statements elsewhere in the Final Written Decision that make clear PAN relied exclusively on Church as satisfying this claim limitation, and that the combined prior art references do not teach or suggest this limitation.

The Board's further found the "combined reportability likelihood" limitation obvious based on the combination of ratings in Church that are not individually "reportability likelihoods." Appx36-39. Specifically, the Board accepted PAN's argument that Church's Attack Validation, Target Exposure Analysis and Attacker Rating each determine an individual threat rating, which is then combined into a final threat rating. Appx36-37. The Board, however, failed to explain how any of these factors constitute a reportability likelihood. *See id.*

Rather, each of these factors measures something other than the likelihood of whether a threat would be reported. According to Church itself, and confirmed by Centripetal's expert, Dr. Orso, these factors measure as follows:

- Church's Attack Validation generates a rating the extent to which an attack was successful. Appx406 (citing Appx2326 (Church, 11:13-19); Appx3638 (Orso Decl., ¶ 117));

- Church's Target Exposure Analysis generates a rating indicating how exposed a particular computer is to attacks. Appx405 (citing Appx2326 (Church, 11:24-28); Appx3638 (Orso Decl., ¶ 117)); and

- Church's Attacker Rating rates attackers based on their characteristics, like aggressiveness. Appx405 (citing Appx2326 (Church, 11:31-33); Appx3638 (Orso Decl., ¶ 117)).

The Board generally concluded because one of these "threat ratings" (i.e., Attacker Rating) can use criteria that is taken into consideration for determining a "reportability likelihood," then the final threat rating can somehow be used to render obvious the claimed "reportability likelihood." Appx37.

## SUMMARY OF THE ARGUMENT

The Board's decision should be reversed because the Board committed multiple errors in its claim construction and obviousness analysis.

First, the Board declined to construe the disputed "reportability likelihood" limitation to require a probability that a detected threat would be reported, despite the parties' agreement on this point. Instead, the Board adopted a new, informal interpretation of the term that diverged from the agreed-upon construction. The Board then used that construction to disregard Centripetal's key argument and the unrebutted evidence underlying that argument establishing that Church's "threat rating" is not a probability of anything, let alone a probability that a threat is reportable.

Second, the Board's decision should be reversed because it was based on impermissible hindsight. PAN and the Board acknowledge that Church does not disclose a "reportability likelihood." In such circumstances, a patent challenger is required to show that the difference between the prior art and the claims would have been obvious to a POSITA at the time of the invention. The Board made no such finding

24

(and PAN made no such argument).  Instead, the Board framed the issue in terms of whether it would have been obvious "to use Church's threat rating as a reportability likelihood."  But this framing erases the inventive contribution and *assumes* that a POSITA would have had the motivation to use such a value in the first place.  Under this Court's precedent, imbuing the POSITA with knowledge of the invention—as the Court did here—represents a form of impermissible hindsight.

Third, the Board used internally inconsistent reasoning to combine references that, even taken together, do not teach or suggest the step of "determining . . . a combined reportability likelihood" as required by Independent Claim 11.d.  The Board generally lumped Church, Amsler-003 and Fellin together to broadly conclude that they, in combination, taught the claim limitation.  However, this conclusion is contradicted by the Board's own statements elsewhere in its decision that confirm not only that none of these references taught the claim limitation, but that even PAN did not rely on the references as found by the Board for arguing obviousness.

Moreover, the Board erred in failing to apply even its own informal interpretation of the term "reportability likelihood" when determining

whether the factors that go into calculating Church's threat rating are, themselves, reportability likelihoods.  Instead, the Board performed a bank-shot analysis whereby (i) each of these three different factors can be considered a threat rating (as long as it's the only factor) and (ii) a threat rating can be a reportability likelihood (in certain circumstances). Following this syllogism, the Board reasoned that each factor could individually be considered a "reportability likelihood."

There are two plain flaws in this wayward syllogism: (1) the relied-upon edge case, where only one factor is used to determine the threat rating, does not apply here because the invalidity grounds rely on combining two factors together; and (2) whereas the claims combine like values together (a first and second reportability likelihood) to arrive at another like value (a combined reportability likelihood), Church combines *different* factors (Validation Ratings, Exposure Ratings, and Attacker Ratings) to arrive at a *different* value (a threat rating).  Because none of those factors even facially read on the "reportability likelihood" under any reasonable construction, the Court should reverse.

# ARGUMENT

## A.   Standard of Review

**Claim Construction:**   This Court reviews "de novo the Board's ultimate claim constructions and any supporting determinations based on intrinsic evidence," while reviewing "any subsidiary factual findings involving extrinsic evidence for substantial evidence." *Personalized Media Commc'ns, LLC v. Apple Inc.*, 952 F.3d 1336, 1339 (Fed. Cir. 2020) (citation omitted).  "In an *inter partes* review proceeding, a claim of a patent . . . shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. [§] 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent."  37 C.F.R. § 42.100(b).

**Obviousness:**   This   Court   reviews   "the   Board's   ultimate determination   of   obviousness   de   novo   and   its   underlying   factual determinations for substantial evidence." *Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 991 (Fed. Cir. 2017) (citation omitted).  "The substantial evidence standard asks 'whether a reasonable fact finder

could have arrived at the agency's decision,' and 'involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision.'" *University of Strathclyde v. Clear-Vu Lighting LLC*, 17 F.4th 155, 160 (Fed. Cir. 2021) (quoting *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381-82 (Fed. Cir. 2019)).

**Compliance with the Administrative Procedure Act**: This Court reviews "the Board's IPR decisions to ensure that they are not 'arbitrary, capricious, an abuse of discretion, . . . otherwise not in accordance with law . . . [or] unsupported by substantial evidence.'" *Personalized Web Techs.*, 848 F.3d at 992 (quoting 5 U.S.C. § 706(2)(A),(E)) (further citation omitted).

**B.    The Board Erroneously Declined to Construe "Reportability Likelihood" as Requiring a Probability that a Detected Threat Event Would be Reported**

The Board's decision not to formally construe "reportability likelihood" constitutes reversible error because one critical leg of its obviousness determination relied on its determination that the "reportability likelihood" need not be a probability. Appx11-12. This tacit, informal interpretation was at odds with both parties' proposed constructions of the term. Appx11. Under the correct construction of the

term, the Final Written Decision must be reversed because it relied on the Board's new, incorrect construction to disregard unrebutted evidence firmly establishing that the prior art's threat rating is not, and cannot, be used as a "reportability likelihood."

Given the Board's eleventh-hour about face, the Court must *at least* vacate the Final Written Decision because the Board "diverged from the agreed-upon" construction without "provid[ing] notice of and an adequate opportunity to respond to its construction." *Qualcomm Inc. v. Intel Corp.*, 6 F.4th 1256, 1263 (Fed. Cir. 2021); *see also SAS Ins't., Inc. v. Complementsoft, LLC.*, 825 F.3d 1341, 1351 (Fed. Cir. 2016), reversed and remanded on other grounds by *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018). Throughout the proceedings, the parties agreed that the "reportability likelihood" represents a "probability" that a threat event would/should be reported and presented arguments for and against patentability based on that shared understanding. The Board's choice to apply a different interpretation of the term in its Final Written Decision violated the Administrative Procedure Act, particularly because neither party advocated for the construction and it is inconsistent with the intrinsic evidence.

1.    **The Board Impermissibly Declined to Construe "Reportability Likelihood"**

Both parties proposed a construction of the claimed "reportability likelihood" that explicitly required a *probability* that a detected threat event would or should be reported:

| PAN's Construction | Centripetal's Construction |
|---|---|
| "likelihood, *or probability,* that cyberanalysts will determine that a threat event *should be reported* to an authority"<br><br>(Appx100) (emphasis added) | "*a probability* that a threat event *would be reported* if investigated by a cyberanalyst"<br><br>(Appx190) (emphasis added) |

The parties and their experts consistently agreed throughout the proceedings that a "reportability likelihood" represents a probability. Appx100, Appx190, Appx372-376, Appx487, Appx2186 (Lee Decl., ¶ 102), Appx3141-3142 (Orso Tr. at 92:21-93:9), Appx3610-3612 (Orso Decl., ¶¶ 57, 61), Appx3713 (Lee Tr. at 20:8-19).

*In view of this agreement*, the Board reasoned that it did not need to construe the "reportability likelihood" term:

> In papers filed during trial, the parties agree that arguments regarding whether the claims are unpatentable for obviousness do not turn on whether the Board adopts Petitioner's or Patent Owner's proposed construction. *See* Pet. Reply 3 n.2; PO Sur-reply 3. We agree with the parties' assessment, and therefore we determine it is

> unnecessary for us to construe the term expressly
> to resolve the controversy before us.

Appx11-12. This misses the mark.

Regardless of whether there is a dispute over the scope of the claims, the first step in any obviousness analysis "involves the proper interpretation of the claims." *Beachcombers v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1160 (Fed. Cir. 1994). The fact that Centripetal argued that it would prevail under either party's construction of "reportability likelihood" (because both required a probability that a threat would be reported) did not negate the Board's obligation to accurately construe the term because the parties disputed *whether the prior art's threat rating is a probability. Id.*; Appx449, Appx487.

The Board did not accurately construe the term. Instead, during its obviousness analysis, the Board stated that "the claim language does not require that the 'reportability likelihood' be expressed in any particular manner." Appx25-26 (dismissing Centripetal's arguments after finding that the "reportability likelihood" does not need to be expressed as a probability). The Board did not cite any evidence— intrinsic or extrinsic—in support of this interpretation. *Id.* Nor did the

31

Board refer to or otherwise evaluate the parties' arguments and evidence in support of their shared view that a "reportability likelihood" is a "probability." Nor did it otherwise attempt to justify its eleventh-hour switch. *Id.*

The only support for the Board's crucial conclusion to depart from the parties' settled expectations about the scope of the claims came from attorney argument in PAN's Reply Brief. Appx25-26 (citing Appx460). Critically, however, PAN's argument was meant to establish that Church's threat rating *is* a probability, even if it is represented as a "normalized value" between 0 and 100. Appx460. Contrary to the Board's interpretation of PAN's statement, PAN explicitly maintained through the Oral Hearing that the word "likelihood" is synonymous with "probability." Appx560-561 (Hearing Tr. at 8:24-9:2), Appx570-571 (Hearing Tr. at 18:22-19:2).

Critically, the Board expressly disregarded Centripetal's arguments and evidence based on its new, unsupported interpretation of the claims:

> Patent Owner contends that this normalized value is not a probability (PO Resp. 38–39), but the claim language does not require the "reportability

likelihood" to be expressed in any particular manner.

Appx25-26 (citing Appx460). But Centripetal's argument did not rely on the way that Church's threat rating was *expressed*. Instead, Centripetal argued that the prior art's threat rating does not *represent* the probability of anything, let alone the probability that a threat event would or should be reported. Appx398-399. Centripetal supported that argument with unrebutted, and ultimately unexamined, expert testimony about what Church's threat rating represents and why it does not and cannot represent a probability in general or a "reportability likelihood" in particular. Appx3632-3633 (Orso Decl., ¶¶ 105-106).

The Board's failure to establish the "proper interpretation of the claims" before moving on to its obviousness analysis requires, at the very least, that the Court vacate the Board's Final Written Decision. *Beachcombers*, 31 F.3d at 1160. However, for the reasons that follow, this Court should construe the "reportability likelihood" term to require a "probability" that a cyberanalyst would/should report the threat event and reverse the Board's determination that the Challenged Claims are unpatentable.

2.   "Reportability Likelihood" Requires a Probability that a Detected Threat Event Would be Reported

Because the Board did not rely on any extrinsic evidence in interpreting the "reportability likelihood term," the Court should construe it and determine that Church does not disclose, or otherwise render obvious, the determination of a reportability likelihood. *Homeland Housewares, LLC v. Whirlpool Corp.*, 865 F.3d 1372, 1375, (Fed. Cir. 2017) ("[g]iven that the Board did not rely on extrinsic evidence here as to claim construction, we can determine the correct construction . . . and then determine whether" the prior art meets the limitations of the claim).

The term "reportability likelihood" means "a probability that a threat event would be reported if investigated by a cyberanalyst." This construction is consistent with the '899 Patent's use of the term "probability" as an appositive for the term "likelihood."

In particular, the '899 Patent includes the following disclosures illustrating that the terms likelihood and probability are intended to be synonymous:

> In order to improve the efficiency of the workflow process, tasks in the queue are ordered by the ***likelihood, or probability***, that cyberanalysts will

> determine the associated threat events to be reportable findings.

Appx100 (citing Appx53-54 ('899 Patent, Abstract)) (emphasis added).

> [T]asks in the queue are ordered by the *likelihood, or probability,* that cyberanalyists will determine the associated events to be reportable findings.

Appx53-54 ('899 Patent, Abstract) (emphasis added);

> [T]he events in the queue may be ordered, or sorted, by the likelihood of reportability (a probability value in [0, 1]).

Appx66 ('899 Patent, 3:42-46).

> Before inserting the event log in the queue, the event's reportability likelihood, *a probability value between 0 and 1*, may be individually computed . . .

Appx67 ('899 Patent, 6:18-20) (emphasis added).

> The Reportability Likelihood Estimator 132 computes a likelihood, or probability value in [0, 1], that the cyberanalysts or cyberanalysis system will determine that the event is a reportable finding.

Appx69-70 ('899 Patent, 10:67-11:3).

> [A]nd because it is a likelihood, or probability, . . .

Appx70 ('899 Patent, 11:63-64).

> Thus, the output of M/L algorithm [] may be interpreted as a probability, or likelihood, that the input event log is a reportable finding.

Appx71 ('899 Patent, 14:44-46). It was on the basis of these disclosures

that both parties agreed that the "reportability likelihood" represented a

"probability."

Further, the parties' agreement that a likelihood is a probability

"stays true to the claim language and most naturally aligns with the

patent's description of the invention." *Renishaw PLC v. Marposs Societa'*

*per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998) (citations omitted). The

'899 Patent explains that the purpose of using a "reportability likelihood"

is to accelerate workflow in a cyberanalysis system by "ensur[ing] that a

cyberanalyst does not spend any time investigating events that would be

deemed not reportable." Appx66 ('899 Patent, 3:32-36); Appx3610 (Orso

Decl., ¶ 58). Determining a "reportability likelihood" facilitates such

acceleration by prioritizing threat events *most likely to be reportable* and

removing from the analyst's workflow threat events that are not likely to

be reportable. Appx66 ('899 Patent, 3:46-55); Appx3610-3611 (Orso Decl.,

¶ 59).

The Court need only determine that the term "likelihood" is

synonymous with the term "probability" to conclude that the Board's

informal construction of the term was in error. The parties' other

disputes over the meaning of this term are irrelevant to the obviousness inquiry.[1] Because the Board's conclusion that a "reportability likelihood" does not require a probability that a threat would/should be reported is inconsistent with the plain language of the term, the '899 Patent's disclosures, and the considered opinions of both parties, the Board's Decision should be vacated.

### 3.    Under the Proper Construction, Church Does Not Disclose a "Reportability Likelihood"

Unrebutted and ignored evidence establishes that it would not have been obvious to use Church's "threat rating" as the claimed "reportability likelihood" because the threat rating is not a probability at all, let alone a probability that a threat would be reported if investigated.

Church's "threat rating" is a "a value normalized to have a range between 0 and 100," which represents "the likelihood of an event being a

---

[1] In its Petition, PAN argued that it "may argue in the EDVA suit that the claims are indefinite for requiring human input into the claimed method." Appx101 n.5. In response, Centripetal noted PAN's proposed construction incorrectly assumes a threat event for which a reportability likelihood is being determined will be reviewed by a cyberanalyst, whereas Centripetal's construction recognizes that the '899 Patent's workflow acceleration depends on cyberanalysts not wasting time analyzing events that are unlikely to be reportable. Appx372-376.

threat to the network.     Appx2324 (Church, 8:24-28).     According to
Church, a threat rating of "0-30 may indicate no to little threat, whereas
all ranges above 30 may indicate" events with a medium or high threat.
*Id.* (Church, 8:28-31).     During trial, PAN focused solely on the first part
of this definition "the likelihood of an event being a threat to the network"
to insinuate that the threat rating represents a "likelihood" or
"probability."     Appx460.     But the threat rating *also* conveys "the
subjective value of loss if the event is not responded to (i.e. no defensive
or corrective action is taken)," which is not a probabilistic value.
Appx2324 (Church, 8:24-28).

In view of Church's plain disclosures, Centripetal's expert, Dr.
Alexander Orso, testified that this "normalized value" is neither the
probability of an event being a threat nor the probability of the event
being reportable.     Appx3633 (Orso Decl., ¶ 106).     As Dr. Orso explained,
a normalized threat value of 30 does not represent a 30% probability that
the event is a threat (because all events with a threat rating over 0 are
threats).     *Id.*     Nor, does a normalized threat value of 30 mean that a
cyberanalyst would report the threat three times out of ten, which is what
it would mean for Church's threat rating to be used as a reportability

likelihood.  *Id.* (citing Appx2324 (Church 8:21-30)).  The Board ignored this argument on the basis that the "reportability likelihood" need not be a probability.  Appx25-26.

PAN's discussion of Church's threat rating confirms Dr. Orso's analysis.  According to PAN, a cyberanalyst "may elect to view only events with a medium or high threat rating, thereby eliminating all low threat events (in the example discussed above, those with a threat rating 0-30)."  Appx106.  In this illustrative example, an event with a threat rating of 30 would not have a 30% chance of being reported.  Such an event would have a 0% reportability likelihood because such events would never be analyzed in the first place.  This is why, even assuming that the severity of a threat *correlates* with the reportability likelihood, one would still need an algorithm to estimate the reportability likelihood based on the severity of the threat.  Appx388-389 (citing Appx3623-3625 (Orso Decl., ¶¶ 84-85)).

Neither PAN nor the Board identified such an algorithm or argued that it would have been obvious to develop one.  *See* § Argument (C) at 41-47, *infra* (addressing the Board's hindsight reasoning, which assumed that a POSITA would have had reason to determine a "reportability

likelihood" despite there being no evidence that the concept was known in the art).

PAN did not attempt to address the substance of this argument or rebut the underlying evidence. Appx460. Instead, PAN asked the Board to give Dr. Orso's testimony "no weight" because his testimony allegedly "just parrots the [patent owner's response]." *Id.* The Board correctly declined to adopt this argument because there is no basis to disregard testimony grounded in record evidence just because that testimony aligns with the argument made in the brief. Indeed, there is no, and can be no, allegation that Dr. Orso failed to "disclose the underlying facts or data on which the opinion is based" given that his testimony was explicitly based on the aspects of Church he opined upon. 37 C.F.R. § 42.65(a); Appx3621-3625 (Orso Decl., ¶¶ 81-86).

The Board nevertheless obliged in PAN's request to disregard this key, unrebutted testimony, not because it found Dr. Orso's testimony conclusory, unsupported, or contrary to the record evidence, but as a result of its errant claim construction. Appx25-26. Under the correct construction of "reportability likelihood," unrebutted evidence establishes that Church's threat rating could not possibly be used as a

"reportability likelihood." The Court should, therefore, reverse the Final Written Decision and find all Challenged Claims not unpatentable.

**C.    Impermissible Hindsight Drove the Board's Conclusion that it Would Have Been Obvious to Use a Threat Rating as a "Reportability Likelihood"**

The Court should also reverse the Final Written Decision because the Board relied on impermissible hindsight to find that it would have been obvious to use Church's threat rating as a "reportability likelihood."

It is undisputed that the very concept of a reportability likelihood was unknown at time of invention. Appx109; Appx22. Accordingly, it was incumbent on PAN to establish how and why a POSITA would have modified the art to reach the Challenged Claims. *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 420 (2007) ("The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art.").

PAN made no such argument. Instead, PAN insisted that it would have been obvious to use Church's threat rating *as* a "reportability likelihood." Appx109-110. That argument assumes, however, that a POSITA would have been motivated to determine a reportability likelihood in the first place. Because there is no record evidence or

argument to support such a conclusion, this Court should reverse the Final Written Decision.

By assuming that a POSITA would have had reason to determine a reportability likelihood in the first place, it is apparent that the Board improperly "imbue[d] one of ordinary skill in the art with knowledge of the invention in suit," which is an impermissible form of hindsight reasoning. *WL Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983). The inventors explicitly devised the concept of a "reportability likelihood" to "ensure that a cyberanalyst only investigates events that will be determined to be reportable" so that "the average workflow cycle time can be significantly reduced." Appx66 ('899 Patent, 3:36-40). The '899 Patent goes on to describe the determination of a "reportability likelihood" as a key component of cyberanalysis workflow acceleration. *Id.* ('899 Patent, 3:56-58) ("A critical component of cyberanalysis workflow acceleration is the design of algorithms that compute an event's reportability likelihood.").

This entire concept of estimating a detected threat event's "reportability likelihood" is admittedly missing from Church. Appx22

42

(Board stating Church does not disclose determining a reportability likelihood); Appx109 (PAN stating same).

Nevertheless, the Board rejected Centripetal's hindsight bias argument stating it disagreed with the "underlying premise" that the '899 Patent distinguishes between reportability and severity. Appx26; *see also* Appx23 ("[W]e do not agree with Patent Owner's premise that such information cannot be used to determine the claimed reportability likelihood."). The Board again missed the mark. Whether or not a POSITA would find Church's threat ratings *useful* once she has decided to calculate a "reportability likelihood" is irrelevant to the question of whether it would have been obvious to calculate a "reportability likelihood"in the first place. Appx379.

Indeed, Centripetal never argued that information like Church's threat rating "cannot be used to determine the claimed reportability likelihood." Appx23. To the contrary, Centripetal consistently maintained that severity can be one factor used to determine a "reportability likelihood." Appx380-381; Appx492. For example, Centripetal likened Church's threat rating to the claimed "risk score," which similarly represents the severity of a particular threat, and which

43

must be fed into an algorithm that estimates a "reportability likelihood," *even if* it is the only factor fed into the algorithm. Appx387-388. Accordingly, Centripetal does not (and never did) dispute that a reportability rating could, in some circumstances, "correlate" with the severity of a threat. Appx24. That still does not make it obvious to use a severity rating as a "reportability likelihood."

Returning to PAN's example, where a cyberanalyst "may elect to view only events with a medium or high threat rating, thereby eliminating all low threat events (in the example discussed above, those with a threat rating 0-30)." Appx106. In this example, the cyberanalyst uses a threshold to determine which events she will analyze, with the result being that all events with threat ratings between 0 and 30 would never be analyzed or reported. In order to "use" the threat rating "as" a "reportability likelihood," therefore, one would need to apply an algorithm that transforms any threat rating between 0 and 30 into a 0% reportability likelihood.

Thus, even if threat severity were the *only* factor that went into determining a "reportability likelihood," an algorithm would still be required to transform the severity level into a "reportability likelihood."

44

But neither PAN nor the Board identify such an algorithm or claim that it would have been obvious to apply one in order to calculate a "reportability likelihood."  In fact, the only algorithm identified in the Final Written Decision is the algorithm that outputs a threat rating, which is not—and which is not asserted to be—an algorithm that outputs a "reportability likelihood."  Appx24-25.

The Board's "statement of the problem"—i.e. whether it would be obvious to use the prior art threat rating *as* the theretofore unknown "reportability likelihood"—"represents a form of prohibited reliance on hindsight."  *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1377 (Fed. Cir. 2012) ("Often the inventive contribution lies in defining the problem in a new revelatory way.  In other words, when someone is presented with the identical problem and told to make the patented invention, it often becomes virtually certain that the artisan will succeed in making the invention.").  By framing the obviousness issue in terms of whether it would be obvious to use a threat rating as a "reportability likelihood," the Board lost sight of the fact that the inventors defined their contribution to the art of cyberanalysis workflow acceleration "in a new revelatory way," one that focuses on the *reportability* of a threat.  *Id.*

45

The Board also lost sight of what a petitioner must show to meet its burden that a patent claim is obvious. *Id.* at 1377-78 (a patent challenger must show "that a person of ordinary skill in the [art] at the time of the invention would have recognized the . . . problem recognized by the inventors and found it obvious to produce the . . . structure disclosed in the . . . patent to solve that problem."). Neither PAN nor the Board allege that a POSITA would have recognized a problem with prior art solutions to cyberanalysis workflow acceleration or that a POSITA would have "found it obvious" to determine a "reportability likelihood" as the solution. *Id.*

The Board's leap in logic to use Church's severity threat rating as a proxy for "reportability likelihood" fails to account for the '899 Patent's inventive contribution—namely, evaluating the probability that a detected threat event would be reported if investigated by a cyberanalyst in order to accelerate workflow management. Appx65 ('899 Patent, 1:40-45); Appx66 ('899 Patent, 3:32-40). The Board is not entitled to make such leaps. *WL Gore & Assocs.*, 721 F.2d at 1553 ("To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that

46

knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.").

The Court should, therefore, reverse the Final Written Decision because the Board's conclusion that it would have been obvious to use a threat rating as a reportability likelihood was the product of impermissible hindsight.

**D.    The Prior Art, Alone or in Combination, Does Not Teach Determining a Combined Reportability Likelihood**

The Board further erred in determining that the combination of Church, Amsler-003 and Fellin taught the limitation of "determining . . . a combined reportability likelihood" of Independent Claim 11.d.   In particular, the Board (i) broadly relied on the combination of these references to conclude that the claim limitation was satisfied, but made inconsistent findings regarding which reference purportedly taught the element and (ii) improperly combined Church's threat ratings, which are not individual reportability likelihood, to determine they could be constitute a "combined reportability likelihood."

1.    **The Board Made Inconsistent Findings Regarding Which Prior Art Reference Taught the Combined Reportability Likelihood**

The Board began its analysis by stating that PAN relied on Church alone as satisfying the "combined reportability likelihood" limitation. Appx36 ("Finally, with respect to [11.d], Petitioner contends that Church teaches a reportability likelihood that combines first and second reportability likelihoods when it calculates a final threat rating by combining different types of threat ratings.") (citations omitted). Indeed, the Board nowhere cites Amsler-003 as teaching "determining  . . . a combined reportability likelihood." *See generally* Appx36-39 (citing Amsler-003 only for use of machine-learned algorithms in network security systems). And the Board explicitly states that PAN "does not rely on Fellin for teaching combining the outputs of the two algorithms." Appx39.

The Board's conclusion that PAN relied on any reference other than Church as satisfying this limitation is erroneous. Appx38. Indeed, the Board explicitly confirmed that the Petition cites only Church's final threat rating as satisfying the determination of a combined reportability likelihood limitation. *Id.* ("To be sure, the Petition cites Church's final

threat rating (step 413) for teaching determining a combined reportability likelihood based on first and second reportability likelihoods, as recited in limitation [11.d].").

Recognizing that Church alone does not teach this limitation (as explained in more detail below), the Board then erroneously stated that PAN referred to a combination of Church with Amsler-003 and Fellin as satisfying this limitation in other claims. Appx38. This is incorrect.

In fact, PAN in the Petition relied only on Church for the concept of a combined reportability likelihood as recited in other claims. Appx148 (Petitioner relied on Church alone as satisfying the combined reportability likelihood limitation of Claims 2.c, 11.d and 16.c); *see also* Appx465-470 (relying only on Church alone for teaching a combined reportability likelihood). Contrary to the Board's unsupported conclusion, "using both types of algorithms in the same network security system" is not the same as determining a combined reportability likelihood based on static and machine learned algorithms. Appx38. The Board itself confirmed these concepts are not the same in discussing Fellin:

> But Petitioner does not rely on Fellin for teaching combining the outputs of two algorithms. []

> Rather, Petitioner cites Fellin only for teaching the use of both types of algorithms in the same network security system.

Appx39 (citations omitted).

The Board's own statements, therefore, confirm that the prior art references cannot be combined to cure the shortfalls of Church in satisfying this claim limitation. Specifically, (i) Church does not teach generating two threat ratings based on a "human designed algorithm" and a "machine-learned algorithm" and combining them (Appx38); (ii) Amsler-003 does not teach and was not relied upon for teaching using a human designed algorithm or determining a combined reportability likelihood (*id.*); and (iii) Fellin does not teach and was not relied upon as disclosing combining the outputs of both types of algorithms, but only using both types of algorithms in the same security system. Appx39.

Thus, the Board's decision should be vacated because the Board used internally inconsistent reasoning to combine these references that, even taken together, do not disclose "determining . . . a combined reportability likelihood."

2.    **Church Does Not Teach or Suggest the Combined Reportability Likelihood Limitation**

Each claim reciting a "combined reportability likelihood" (i.e., Claims 11, 12-14) is patentable for the same reasons articulated above: Church's threat rating is not, and cannot be used as, a "reportability likelihood." The Board further erred in determining that individual factors used to determine Church's threat rating are *also* reportability likelihoods. Indeed, the Board never established that any of those individual factors, including the Attack Validation, Target Exposure Analysis, and Attacker Rating, met any reasonable construction of the term "reportability likelihood."

Similar to how Church's threat rating and the claimed "reportability likelihood" represent two distinct concepts (even though their values might correlate under the right conditions), each of the factors used to *determine* the threat rating represents *another* different concept. Church's Attack Validation generates a rating the extent to which an attack was successful. Appx406 (citing Appx2326 (Church, 11:13-19); Appx3638-3639 (Orso Decl., ¶ 117)). The Target Exposure Analysis generates a rating indicating how exposed a particular computer is to attacks. Appx405 (citing Appx2326 (Church, 11:24-28);

Appx3638-3639 (Orso Decl., ¶ 117)). An Attacker Rating rates attackers based on their characteristics, like aggressiveness. Appx405 (citing Appx2326 (Church, 11:31-33); Appx3638-3639 (Orso Decl., ¶ 117)).

None of these factors even facially represents a probability that a cyberanalyst would find the event reportable, *even if* these ratings ultimately correlate with the likelihood that a cyberanalyst would report the threat. Appx3638-3639 (Orso Decl., ¶ 117). Indeed, the Board never even purported to apply its own incorrect interpretation of the claimed "reportability likelihood" to these three factors. Appx36-37. That was reversible error.

Rather than apply the correct construction to determine whether Church's Validation Ratings, Exposure Ratings, and Attacker Ratings are actually "reportability likelihoods," the Board reasoned that there were some edge cases where those ratings represent Church's "threat rating." Appx36-37 ("Thus, the final threat rating could be equal to one of the individual ratings if two are assigned weights of zero and the third is assigned a weight of one, showing that any one of the individual ratings in Church could itself be a threat rating."). Indeed, Church also does not anticipate giving any of these factors zero weight, as the Board's analysis

assumes.  Appx2329 (Church, 18:33-42 (disclosing weights *"between* 0 and 1, 1, 123, etc.).")  If the range "between" 0 and 1 were meant to be inclusive, it would make no sense to also list "1" as an exemplary weight.

Of course, that edge case does not apply here because the PAN's invalidity ground requires combining two of those factors together to calculate the "final threat score (*i.e.* threat rating)."  Appx140-141.

The foregoing discussion also illustrates another plain error in the Board's analysis.  The '899 Patent combines two like values (i.e. a first and second reportability likelihood) to arrive at another like value (*i.e.* a combined reportability likelihood).

Church, on the other hand, combines three unlike values (*i.e.* a Validity Rating, a Target Rating, and an Attacker Rating) to arrive at yet another unlike value (*i.e.* a threat rating).  This is further confirmation that these ratings are not (and cannot be used as) "reportability likelihoods", and there is no evidence or argument that it would have been obvious to modify these values to represent a "reportability likelihood" rather than the different things they actually represent.

The Final Written Decision should be reversed because Church's threat, validation, exposure, and attacker ratings do not satisfy any

reasonable interpretation a "reportability likelihood" that could be combined into a "combined reportability likelihood."

## CONCLUSION

Centripetal respectfully requests that the Court reverse the Board's Final Written Decision and find patentable Claims 1-20 of the '899 Patent. In the alternative, Centripetal respectfully requests that the Court vacate the Board's Final Written Decision and remand for further proceedings.

Respectfully submitted,

Dated: August 21, 2023    By:  */s/ James Hannah*

Paul J. Andre
James Hannah
KRAMER LEVIN NAFTALIS
 & FRANKEL LLP
333 Twin Dolphin Drive, Suite 700
Redwood Shores, CA 94065
Telephone: (650) 752-1700
Facsimile: (650) 752-1800
pandre@kramerlevin.com
jhannah@kramerlevin.com

Jeffrey Price
KRAMER LEVIN NAFTALIS
 & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Telephone: (212) 715-9100
Facsimile: (212) 715-8302
jprice@kramerlevin.com

Scott M. Kelly
Bradley C. Wright
John R. Hutchins
BANNER & WITCOFF, LTD.
1100 13th Street, NW Suite 1200
Washington, DC 20005
Telephone: (202) 824-3000
Facsimile: (202) 824-3001
skelly@bannerwitcoff.com
bwright@bannerwitcoff.com
jhutchins@bannerwitcoff.com

*Attorneys for Appellant*
Centripetal Networks, LLC

## ADDENDUM – TABLE OF CONTENTS

| Date | Document Description | Appx No. |
|---|---|---|
| 03/13/2023 | Final Written Decision – IPR2021-01158 | Appx1 |
| | U.S. Patent No. 10,503,899 | Appx53 |

Trials@uspto.gov                                      Paper 39
571-272-7822                               Date: March 13, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

PALO ALTO NETWORKS, INC.,
Petitioner,

v.

CENTRIPETAL NETWORKS, LLC,
Patent Owner.

————————

IPR2021-01158
Patent 10,503,899 B2

————————

Before BRIAN J. McNAMARA, LYNNE E. PETTIGREW, and
JON M. JURGOVAN, *Administrative Patent Judges*.

PETTIGREW, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 314*

IPR2021-01158
Patent 10,503,899 B2

# I. BACKGROUND

Petitioner, Palo Alto Networks, Inc., challenges claims 1–20 ("the challenged claims") of U.S. Patent No. 10,503,899 B2 (Ex. 1001, "the '899 patent"). We have jurisdiction under 35 U.S.C. § 6, and we issue this Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. For the reasons discussed below, Petitioner has shown, by a preponderance of the evidence, that claims 1–20 of the '899 patent are unpatentable.

## A. Procedural History

Petitioner filed a Petition for *inter partes* review of the challenged claims. Paper 2 ("Pet."). Patent Owner, Centripetal Networks, LLC,[1] filed a Preliminary Response. Paper 6. With our authorization, Petitioner filed a Preliminary Reply (Paper 7) and Patent Owner filed a Preliminary Sur-reply (Paper 8) to address Board discretion under 35 U.S.C. § 314(a). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we instituted an *inter partes* review of the challenged claims. Paper 10 ("Institution Decision" or "Inst. Dec.").

Following institution, Patent Owner filed a Patent Owner Response (Paper 19, "PO Resp."), Petitioner filed a Reply (Paper 23, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 25, "PO Sur-reply"). An oral hearing was held on November 30, 2022, and a copy of the hearing transcript has been entered into the record. Paper 33.

---

[1] Patent Owner filed a notice indicating that, on December 30, 2022, its corporate name changed from Centripetal Networks, Inc. to Centripetal Networks, LLC. Paper 34.

IPR2021-01158
Patent 10,503,899 B2

### B. Real Parties-in-Interest

Petitioner identifies Palo Alto Networks, Inc. as the real party-in-interest. Pet. 3. Patent Owner identifies Centripetal Networks, LLC as the real party-in-interest. Paper 34, 1.

### C. Related Matters

Petitioner and Patent Owner identify the following district court proceeding involving the '899 patent: *Centripetal Networks, Inc. v. Palo Alto Networks, Inc.*, No. 2:21-cv-00137 (E.D. Va., filed Mar. 12, 2021). Pet. 3; Paper 3, 1.

### D. Overview of the '899 Patent

The '899 patent relates to accelerating workflow in a cyberanalysis system. Ex. 1001, 1:56–57. According to the '899 patent, a major issue with conventional cybersecurity systems is that threat events are generated at a higher rate than cyberanalysts can investigate them, which may compromise cybersecurity. *Id.* at 3:7–19. Because it is not practical in typical environments to increase the number of cyberanalysts, the '899 patent describes a method for accelerating cyberanalysis workflow. *Id.* at 3:27–30. Specifically, it focuses on "a way to ensure that a cyberanalyst does not spend any time investigating events that would be deemed not reportable" to proper authorities, such as management, network security operations, or regulatory authorities, and instead "only investigates events that will be determined to be reportable" in order to reduce the "average workflow cycle time." *Id.* at 3:32–40; *see id.* at 2:40–44.

As explained in the '899 patent, cyberanalysis workflow involves storing information in an event log for each detected threat event. *Id.* at 2:9–25. Event logs are stored in a work queue that may be presented to a cyberanalyst or cyberanalysis system via a user interface so that events can

IPR2021-01158
Patent 10,503,899 B2

be investigated. *Id.* at 2:26–33. The '899 patent discloses calculating for each detected threat event a "reportability likelihood," which has a value between 0 and 1 and is the probability that "the cyberanalysts or cyberanalysis system will determine that the event is a reportable finding." *Id.* at 11:1–3; *see id.* at code (57). Events are inserted into the work queue in order of reportability likelihood so that the cyberanalyst or cyberanalysis system may investigate events with a higher probability of being reported before those with a lower likelihood, which may never be investigated and ultimately may be removed from the queue. *Id.* at code (57), 3:40–55.

Figure 3 of the '899 patent, reproduced below, illustrates a process for accelerating cyberanalysis workflow:



Illustrative functional environment for a cyberanalysis workflow application process

As shown in Figure 3 above, cyber threat intelligence (CTI) gateway 120 detects threat communications, or threat events, and provides event logs to Cyberanalysis Application System 130. *Id.* at 6:10–18,

IPR2021-01158
Patent 10,503,899 B2

10:36–49. CTI Enrichment apparatus 131 adds data to the event logs, including, for example, the class or category of the potential threat. *Id.* at 10:50–64. Reportability Likelihood Estimator 132 receives the enriched event logs and determines a reportability likelihood for each event log. *Id.* at 10:65–11:3. "The Reportability Likelihood Estimator 132 uses two types of algorithms to determine estimated reportability likelihoods: (1) heuristic, human-designed (H/D) algorithms; and (2) machine-learned (M/L) algorithms. The two types of algorithms may provide complementary benefits." *Id.* at 11:3–8. Although H/D algorithms initially may be more accurate in determining reportability likelihood, M/L algorithms learn based on received training data and become more accurate over time. *Id.* at 11:9–47. The Reportability Likelihood Estimator may combine determinations made by the two different algorithms to produce a single reportability likelihood. *Id.* at 11:53–12:3.

Event logs then are placed in Cyberanalysis Work Queue 135, sorted by reportability likelihood, and provided to the cyberanalysts or cyberanalysis system. *Id.* at 12:4–14. The cyberanalyst may use Forensics Analysis Apparatus 136 to investigate an event and determine whether the event is a reportable finding (137). *Id.* at 12:15–24. If so, Report Generator 138 creates a report, which may include remedial actions, and sends the report to Authority System Network Devices 140, which may be operated by entities responsible for compliance enforcement or authorized to execute remedial actions. *Id.* at 12:24–34. Analyzed events are stored in Training Data Storage 171 to be used to train the M/L algorithm. *Id.* at 12:34–39.

IPR2021-01158
Patent 10,503,899 B2

*E. Challenged Claims*

Challenged claims 1, 11, and 15 are independent, claims 2–10 depend directly or indirectly from claim 1, claims 12–14 depend directly or indirectly from claim 11, and claims 16–20 depend directly or indirectly from claim 15. Claims 1 and 11 are illustrative of the claimed subject matter and are reproduced below:

1. A method comprising:

[1.a] receiving a plurality of event logs;

[1.b] determining, by a computing device, a reportability likelihood for each event log based on at least one algorithm,

[1.c] wherein the reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator;

[1.d] sorting an event queue of the plurality of event logs based on the reportability likelihood of each of the plurality of event logs; and

[1.e] transmitting, by the computing device and to an analysis system, the plurality of event logs sorted in the event queue based on the reportability likelihood of each of the plurality of event logs.

Ex. 1001, 18:44–62 (annotated to include Petitioner's identification of limitations).

11. A method comprising:

[11.a] receiving, by a computing device, a plurality of event logs;

[11.b] determining, by the computing device, a first reportability likelihood for each event log based on a human designed algorithm;

IPR2021-01158
Patent 10,503,899 B2

[11.c] determining, by the computing device, a second reportability likelihood for each event log based on a machine-learned algorithm;

[11.d] determining, by the computing device, a combined reportability likelihood for each event log based on the first reportability likelihood and the second reportability likelihood;

[11.e] sorting the plurality of event logs based on the combined reportability likelihoods of each of the plurality of event logs;

[11.f] storing, in an event queue, the plurality of event logs sorted in the event queue based on the combined reportability likelihood of each of the plurality of event logs; and

[11.g] wherein the combined reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator.

Ex. 1001, 19:58–20:19 (annotated to include Petitioner's identification of limitations).

IPR2021-01158
Patent 10,503,899 B2

### F. Asserted Grounds of Unpatentability

We instituted *inter partes* review of the challenged claims based on the following grounds of unpatentability asserted by Petitioner:

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1, 7–10, 15, 19, 20 | 103 | Church,[2] Amsler-003[3] |
| 2–6, 11–14, 16–18 | 103 | Church, Amsler-003, Fellin[4] |

Inst. Dec. 2, 7; *see* Pet. 6.

### G. Testimonial Evidence

In support of the unpatentability contentions in its Petition, Petitioner relies on a declaration of Dr. Wenke Lee. *See* Ex. 1004. Patent Owner cross-examined Dr. Lee via deposition. *See* Ex. 2012.

In support of its Patent Owner Response, Patent Owner relies on a declaration of Dr. Alessandro Orso. *See* Ex. 2011. Petitioner cross-examined Dr. Orso via deposition. *See* Ex. 1054.

## II. DISCUSSION

### A. Principles of Law

A claim is unpatentable under § 103 if the differences between the claimed subject matter and the prior art are such that the subject matter, as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations,

---

[2] U.S. Patent No. 7,594,270 B2, issued Sept. 22, 2009 (Ex. 1005, "Church").
[3] U.S. Patent No. 9,392,003 B2, issued July 12, 2016 (Ex. 1006, "Amsler-003").
[4] Conor Fellin & Michael Haney, *Preventing Mistraining of Anomaly-Based IDSs through Ensemble Systems*, 2014 IEEE 10th World Congress on Services (2014) (Ex. 1017, "Fellin").

IPR2021-01158
Patent 10,503,899 B2

including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective indicia of non-obviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

To prevail on its challenges to Patent Owner's claims, Petitioner must demonstrate by a preponderance of the evidence that the claims are unpatentable. 35 U.S.C. § 316(e); 37 C.F.R. § 42.1(d). "In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the grounds for the challenge to each claim")).

## B. Level of Ordinary Skill in the Art

Petitioner asserts that a person of ordinary skill in the art would have had "a bachelor's degree in computer science, electrical engineering, or a related field, and approximately two years of professional experience or equivalent study in network security and the use of machine-learning algorithms." Pet. 13 (citing Ex. 1004 ¶ 30). Petitioner further asserts that "[a]dditional graduate education could substitute for professional experience, or significant experience in the field could substitute for formal education." *Id.* (citing Ex. 1004 ¶ 30).

In the Institution Decision, we noted that Patent Owner did not dispute Petitioner's assessment of the level of ordinary skill in the art, and we adopted Petitioner's assessment for purposes of institution based on the information presented in the Petition and Dr. Lee's testimony. Inst. Dec. 16 (citing Pet. 13; Ex. 1004 ¶ 30). Patent Owner does not dispute the level of

IPR2021-01158
Patent 10,503,899 B2

ordinary skill in the art proposed by Petitioner and adopted at institution.
*See* PO Resp.

On the complete record, we maintain the definition of the level of
ordinary skill in the art adopted at institution, which is consistent with the
'899 patent and the prior art of record.

### C. Claim Construction

In this *inter partes* review, we apply the same claim construction
standard that would be used in a civil action under 35 U.S.C. § 282(b).
37 C.F.R. § 42.100(b). In applying this standard, we generally give claim
terms their ordinary and customary meaning as would be understood by a
person of ordinary skill in the art at the time of the invention and in the
context of the entire patent disclosure. *See id.*; *Phillips v. AWH Corp.*,
415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc).

Petitioner proposes constructions of "reportability likelihood" and
"event log," recited in all of the independent claims of the '899 patent, and
"packet rule dispositions," recited in dependent claim 9. Pet. 14–17. Patent
Owner proposes a construction of "reportability likelihood" and argues that
"event log" should be given its plain and ordinary meaning. PO
Resp. 12–17.

We address the parties' arguments regarding "reportability likelihood"
and "event log" below. No other claim terms in the '899 patent require
construction for purposes of this Decision. *See Realtime Data LLC v. Iancu*,
912 F.3d 1368, 1375 (Fed. Cir. 2019) ("The Board is required to construe
'only those terms . . . that are in controversy, and only to the extent
necessary to resolve the controversy." (quoting *Vivid Techs., Inc. v. Am. Sci.
Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

IPR2021-01158
Patent 10,503,899 B2

### *1. "reportability likelihood"*

Claim 1 recites "determining, by a computing device, a reportability likelihood." Ex. 1001, 18:46–47. Independent claims 11 and 15 recite substantially similar limitations. *Id.* at 19:62–63, 20:44. Petitioner contends that the term "reportability likelihood" should be construed to mean "likelihood, or probability, that cyberanalysts will determine that a threat event should be reported to an authority." Pet. 15 (citing Ex. 1004 ¶¶ 100–102). Petitioner's proposed construction is based on the statement in the abstract of the '899 patent that "[i]n order to improve the efficiency of the workflow process, tasks in the queue are ordered by the likelihood, or probability, that cyberanalysts will determine the associated threat events to be reportable findings." Ex. 1001, code (57); *see* Pet. 15.

Patent Owner proposes that the term "reportability likelihood" should be construed as "a probability that a detected threat event would be reported if investigated by a cyberanalyst." PO Resp. 9–12. Patent Owner contends that its construction is consistent with the specification of the '899 patent without improperly injecting human input into the claimed method. *Id.* at 11–12.

In our Institution Decision, we noted that the parties' proposed constructions differ slightly, but we determined it was unnecessary for us to construe "reportability likelihood" to decide whether to institute this *inter partes* review. Inst. Dec. 17. In papers filed during trial, the parties agree that arguments regarding whether the claims are unpatentable for obviousness do not turn on whether the Board adopts Petitioner's or Patent Owner's proposed construction. *See* Pet. Reply 3 n.2; PO Sur-reply 3. We agree with the parties' assessment, and therefore we determine it is

IPR2021-01158
Patent 10,503,899 B2

unnecessary for us to construe the term expressly to resolve the controversy before us. *See Realtime Data*, 912 F.3d at 1375.

### 2. *"event log"*

Claim 1 recites "receiving a plurality of event logs," and independent claims 11 and 15 recite substantially similar limitations. Ex. 1001, 18:45, 19:60–61, 20:43. Petitioner contends that the term "event log" should be construed to mean "aggregation of data associated with a detected threat event." Pet. 14 (citing Ex. 1004 ¶¶ 97–99). For support, Petitioner relies on the following description in the '899 patent:

> Upon threat detection, the monitoring device may log the packet, may aggregate the packet log into an event log for the associated communication, and may designate the communication as a threat event. The log may also include context information, such as the detection criteria, environmental information (e.g., time stamps, interface IDs, directionality), any actions applied to the packet by the monitoring device, or modifications to the packet made by the monitoring device.

Ex. 1001, 2:9–11; *see* Pet. 14–15.

Patent Owner asserts that no construction of "event log" is necessary to resolve any controversy because the claims are not unpatentable even under Petitioner's construction. PO Resp. 16. Patent Owner, however, agrees with Petitioner that "event logs must be associated with threat events." *Id.* Patent Owner further argues that "the term should be given its plain and ordinary meaning, which requires receiving the event logs associated with the detected threat events before determining the reportability likelihood for each event log." *Id.* (citing Ex. 2011 ¶ 66).

We agree with Petitioner's construction of "event log" as "aggregation of data associated with a detected threat event," which the

IPR2021-01158
Patent 10,503,899 B2

written description of the '899 patent supports. Patent Owner does not challenge this construction of "event log," arguing instead that steps involving event logs recited in claim 1 must be performed in a certain manner. PO Resp. 16–17 (citing Ex. 2011 ¶¶ 66–68). We see no basis for importing other language of the claims into the construction of the term "event log" itself. To the extent those claim steps require construction, we consider the meaning of the claim language in the context of our obviousness analysis below.

### D. Overview of Asserted Prior Art References

#### 1. Church

Church discloses a security expert system (SES) that analyzes incoming security events and generates threat ratings indicating the likelihood that events are threats. Ex. 1005, code (57). In Church's SES, receiving servers receive data from intrusion detection system (IDS) sensors, which detect threat events such as packets or communications that may be of interest to the security system because, for example, they match an event signature (e.g., a unique identifier for an event that may indicate its origin and type of behavior) or meet or cause a defined level of abnormality (e.g., abnormal network behavior). *Id.* at 6:20–26, 8:63–9:6, 10:1–19. The receiving servers transmit data collected by the sensors, such as detected events, to database servers for storage. *Id.* at 6:55–58. In one embodiment, a queuing server may be used to improve speed. *Id.* at 6:58–59. Expert system servers retrieve events from the database servers and analyze them to generate threat ratings. *Id.* at 7:19–20, 7:54–62. The expert system servers transmit the threat ratings to web servers that display event threat ratings to users through a user interface. *Id.* at 7:10–16.

IPR2021-01158
Patent 10,503,899 B2

Figure 2 of Church, reproduced below, illustrates how the SES analyzes event data to generate threat ratings:



FIG. 2

Figure 2 above shows Church's expert system 201 retrieving and analyzing event 203. *Id.* at 7:54–62. Expert system 201 analyzes the event according to expert rules from knowledge base 202 and may consider various data, including historical data 205 and learned data 206, to generate threat rating 204. *Id.* at 7:63–8:18. A "threat rating indicates the likelihood of an event being a threat to the network, and the subjective value of loss if the event is not responded to (i.e., no defensive or corrective action is taken)." *Id.* at 8:25–28. In one embodiment, a threat rating, also referred to in Church as a threat score, is a value normalized to have a range between 0 and 100. *Id.* at 8:23–24. For instance, a threat rating between 0 and 30 may indicate no to little threat, whereas a threat rating greater than 30 may indicate an elevated level of threat. *Id.* at 8:28–31. An end user viewing threat ratings through a user interface may elect, for example, to view only events with a medium to high threat rating. *Id.* at 8:33–36.

IPR2021-01158
Patent 10,503,899 B2

A portion of Church's Figure 4, reproduced below, illustrates processing steps performed by the SES for determining a threat rating according to embodiments described in Church:



Pet. 22 (reproducing excerpt of Church's Figure 4). Expert system servers receive event data and may determine ratings associated with an event by applying Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410 processes, which can operate independently in parallel. Ex. 1005, 11:10–13. Attack Validation 408 can generate a validation rating based on, for example, the likelihood an event is an actual attack and the likelihood of success for the attack. *Id.* at 11:13–23, 12:1–14:23, Fig. 5. Target Exposure Analysis 409 can generate a target exposure rating based on the likelihood a target will be attacked and the likelihood that an attack will

IPR2021-01158
Patent 10,503,899 B2

be successful. *Id.* at 11:24–30, 14:24–16:3, Fig. 6. Attacker Rating 410 can generate an attacker rating based on the likelihood that an attacker is a returning attacker and whether the attacker is an aggressive attacker. *Id.* at 11:31–38, 16:4–17:55, Fig. 7. At step 413, the SES calculates a final threat rating based on the validation rating, target exposure rating, and attacker rating according to user-defined weights. *Id.* at 11:50–53, 18:27–19:9.

Based on the final threat rating of an event, the SES may generate an incident and may automatically take one or more defensive or corrective actions. *Id.* at 9:29–30, 11:53–67, Figs. 3, 4. The SES sends final threat ratings to a central database server, which may transmit them to web servers for display via a web interface. *Id.* at 9:21–29, Fig. 3. A user viewing threat ratings via the user interface may request defensive or corrective actions or configuration changes to address threat events. *Id.* at 9:25–29, Fig. 3.

### 2. Amsler-003

Amsler-003 describes a system and method for detecting, evaluating, and reporting network threats. Ex. 1006, 1:22–24. Specifically, Amsler-003 discloses a method that comprises collecting threat incident data, weighing the data, sorting the data based on severity or reliability, providing the sorted data to an analyst, analyzing the data, transmitting a report of analyzed data, and updating a database with the report data. *Id.* at 3:7–25, 8:21–40, Fig. 8. The system performs "machine learning and human analysis" to sort threat incidents based on factors such as severity, believability, reliability, and timing of incident discovery. *Id.* at 6:18–25. Providing incidents to analysts in ranked order allows prioritization of events for analysis. *See id.* at 6:30–33.

Amsler-003 describes a machine learning algorithm that is trained by input provided by a human analyst. *Id.* at 7:1–16. When an analyst selects

IPR2021-01158
Patent 10,503,899 B2

an incident to analyze from the incident list, the system provides all known information about the incident to the analyst. *Id.* at 4:12–14. The analyst uses that information to determine, among other things, whether the incident was a false positive. *Id.* at 6:3–8, 7:10–12, 8:34–36. Once the analyst finishes analyzing the incident data, the analyst transmits a report of findings to a database for use in teaching the machine learning algorithm and to the client. *Id.* at 4:63–5:7, 7:1–16, 8:36–40.

### 3. Fellin

Fellin discloses a method of implementing both static and machine-learned algorithms in an IDS to identify potential threats. Ex. 1017, 66.[5] Fellin explains that IDSs using machine learning may be susceptible to being "mistrained" by an adversary to allow specific attacks. *Id.* To address this problem, Fellin teaches using a static algorithm and a machine-learned algorithm in the same system. *Id.* at 67. If the static algorithm detects anomalous traffic when the machine-learned algorithm does not, the system increments an internal counter. *Id.* When the counter reaches a threshold, the system determines the IDS is being mistrained and may reset it to its original baseline. *Id.*

### E. Obviousness over Church and Amsler-003

Petitioner contends that claims 1, 7–10, 15, 19, and 20 of the '899 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Church and Amsler-003. Pet. 17–53. Patent Owner disagrees, arguing that the combined references do not teach or suggest all the claim limitations. PO Resp. 18–42, 56–62. For the reasons discussed below, we determine that Petitioner has demonstrated by a preponderance of the evidence that

---

[5] We cite to the original page numbers rather than the exhibit page numbers added by Petitioner.

IPR2021-01158
Patent 10,503,899 B2

claims 1, 7–10, 15, 19, and 20 are unpatentable for obviousness over Church
and Amsler-003.

### 1. Independent Claim 1

### a. Limitation [1.a]

The first limitation of claim 1 recites "receiving a plurality of event
logs." Ex. 1001, 18:45. Petitioner asserts that Church teaches IDS sensors
detecting events (i.e., packets or communications) of interest to the security
expert system and transmitting the detected event data via receiving servers
and database servers to Church's expert system server. Pet. 29 (citing
Ex. 1005, 9:3–6, 10:19–25, 6:55–58, 7:7–9, 9:21–24, 7:19–22, Fig. 1).
Supported by the testimony of Dr. Lee, Petitioner asserts that Church teaches
that an IDS sensor collects and aggregates data associated with a single
event (i.e., an "event log") and that data may be received from a plurality of
IDS sensors in parallel (i.e., "receiving a plurality of event logs"). *Id.* at 30
(citing Ex. 1005, 10:3–12, 10:26–36); *see* Ex. 1004 ¶¶ 132–133. Petitioner
contends it would have been obvious to a person of ordinary skill in the art
that certain events that are of interest to Church's network security system,
and thus are detected by IDS sensors, would be threat events because
Church's objective is to identify and assess network security threats. Pet. 31
(citing Ex. 1005, 1:19–20; Ex. 1004 ¶ 134).

Patent Owner disputes that Church teaches "receiving a plurality of
event logs." PO Resp. 56–62. First, Patent Owner argues that Church's
events do not correspond to the claimed "event logs." *Id.* at 57–58.
Specifically, Patent Owner argues that the event data from Church's IDS
sensors are not "data associated with a *detected threat event*," as required
under Petitioner's claim construction, because "Church's events include
'anything that can be monitored in the network traffic (e.g., a network

IPR2021-01158
Patent 10,503,899 B2

packet) that may be of interest to the security expert system.'" *Id.* at 57 (quoting Ex. 1005, 10:11–13; Pet. 14) (citing Ex. 2011 ¶¶ 136–137); *see supra* § II.C.2. In other words, Patent Owner argues, Church indicates that "'events' correspond to 'all internal network traffic' that is 'mirrored to an IDS sensor,' and that such data is 'collected by an IDS sensor' and 'transmitted . . . to a receiving end (e.g., receiving servers 130),'" after which the expert system calculates a threat rating. PO Resp. 58 (quoting Ex. 1005, 6:33–39) (citing Ex. 1005, 7:19–22, 8:23–31; Ex. 2011 ¶ 139). Thus, Patent Owner concludes, Church's events "do not correspond to a 'detected threat event'; they are used to detect whether an event represents a threat in the first place." *Id.*

We disagree with Patent Owner's understanding of Church. As the Petition explains, Church's IDS sensors detect incoming "events" and transmit them to the expert system server, which analyzes those events and generates a threat rating. *See* Pet. 19–20 (citing Ex. 1005, 7:19–29, 7:54–62); Pet. Reply 18. Church explains that an IDS is an "intrusion detection system" that is "designed to look for signs of intrusions in network traffic and generate security alarms accordingly." Ex. 1005, 1:33–35. As the Petition further explains, Church's IDS sensors detect events that may be "of interest" to the security system because, for example, they match a signature or a defined level of abnormality. *Id.* at 10:9–16; *see* Pet. 18; Pet. Reply 18. Church also repeatedly refers to the events analyzed by its security expert system as "security events." Ex. 1005, code (57), 3:17–18, 3:36–37, 4:36, 7:28, 8:57. In view of these disclosures, we agree with Petitioner that Church's IDS sensors detect and log threat events, and thus Church's "events" are "detected threat events," which the system then analyzes to assign threat scores. *See* Pet. 29, 31; Pet. Reply 19. Therefore,

IPR2021-01158
Patent 10,503,899 B2

we find that data associated with Church's events are "event logs" as claimed.

Second, Patent Owner argues that Church does not teach "receiving a plurality of event logs" because "Church's process deals with each event on a per-event basis, rather than by first receiving a plurality of event logs."  PO Resp. 59 (citing Ex. 2011 ¶ 141).  Specifically, Patent Owner contends that Church starts with an event being detected by a sensor and ends with a defensive or corrective action being taken or an incident being created for that event, and then repeats the entire process for the next event.  *Id.* (citing Ex. 1005, 10:1–11:67, Fig. 4; Ex. 2011 ¶ 141).  Patent Owner argues that such "per-event processing" does not meet the claim language, which in Patent Owner's view requires receiving a *plurality* of event logs, as recited in limitation [1.a], prior to determining a reportability likelihood, as recited in limitation [1.b], for the first event log received.  *Id.* at 59–62.

As an initial matter, we disagree with Patent Owner's position that the claim language does not encompass receiving and processing one event at a time.  "Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."  *Interactive Gift Express, Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001).  Here, claim 1 does not indicate that the "receiving a plurality of event logs" step must be completed before the "determining" step for a single event log begins.  We are not persuaded by Patent Owner's argument that the language in limitation [1.b] ("determining . . . a reportability likelihood *for each event log*") requires, "for antecedent basis reasons," receiving a plurality of event logs before determining a reportability likelihood for the first event log received.  *See* PO Resp. 16–17.  Moreover, as Petitioner notes, the written description of the '899 patent discloses receiving a single event log and then

IPR2021-01158
Patent 10,503,899 B2

determining a reportability likelihood for that event log. Ex. 1001, 6:14–28; *see* Pet. Reply 25. Patent Owner's declarant, Dr. Orso, acknowledges that this description of receiving and processing a single event log in the '899 patent is within the scope of claim 1. *See* Ex. 1054, 28:22–29:22.

In any event, as the Petition sets forth in detail, Church teaches first receiving a plurality of event logs before any single event log is further processed. *See* Pet. 30 (citing Ex. 1005, 10:26–36). Specifically, Church discloses that "[t]he receiving server can be configured to receive events from a plurality of sensors in a parallel fashion." Ex. 1005, 10:34–36. This occurs in step 403 of the flow diagram in Church's Figure 4, prior to the determination of threat ratings beginning in steps 408, 409, and 410. *Id.* at 10:32–40, Fig. 4. Thus, Church discloses "receiving a plurality of event logs" before "determining . . . a reportability likelihood" for any event log.

For these reasons, we are persuaded by Petitioner's arguments and supporting evidence that Church teaches or suggests limitation [1.a]. Patent Owner's arguments do not undermine Petitioner's persuasive showing.

### b. Limitation [1.b]

Limitation [1.b] recites "determining, by a computing device, a reportability likelihood for each event log based on at least one algorithm." Ex. 1001, 18:46–49. Petitioner asserts that Church teaches that each expert system server is a "computing device" that may individually determine a threat rating of an event. Pet. 31–32 (citing Ex. 1005, 7:19–20, 22:7–12, 8:15–36, Fig. 1). Petitioner also asserts that Church's threat rating is based on an algorithm comprising Attack Validation, Target Exposure Analysis, and Attacker Rating processes, the results of which can be combined according to user-defined weights. *Id.* at 33–34 (citing Ex. 1005, 11:50–51, 18:15–41, 4:10–16, 7:54–60, 10:1–3, Fig. 4).

IPR2021-01158
Patent 10,503,899 B2

Although Church does not explicitly disclose determining a
"reportability likelihood," Petitioner contends it would have been obvious to
a person of ordinary skill in the art to use Church's threat rating as a
"reportability likelihood." *Id.* at 24–25, 34 (citing Ex. 1004 ¶¶ 117–118,
135–138). Petitioner asserts that Church teaches automatically taking
defensive or corrective action, such as modifying a client's network
equipment, based on the threat rating of an event. *Id.* at 24–25 (citing
Ex. 1005, 11:55–58). Petitioner also asserts that Church teaches that an
analyst (i.e., a user viewing event data and final threat ratings via a web
interface) may request defensive or corrective actions to address threat
events. *Id.* at 24 (citing Ex. 1005, 7:10–18, 9:21–35). In an environment in
which an action is taken based on a threat rating, Petitioner contends it
would have been obvious that the likelihood of the event being a threat
would be considered when deciding whether to take or request the action.
*Id.* at 25 (citing Ex. 1004 ¶ 118). Petitioner further contends it would have
been obvious that the analyst would report to an authority, such as a client's
management or network security operations, any threat that required action
on the client's network. *Id.* at 24–25 (citing Ex. 1004 ¶¶ 117–118).

Patent Owner argues that it would not have been obvious to use
Church's threat rating as a reportability likelihood for a number of reasons,
which we address in turn. PO Resp. 18–42. First, Patent Owner argues that
Church's threat rating indicates the severity of a threat event, not its
reportability. *Id.* at 20–25. Patent Owner contends that the '899 patent
explicitly distinguishes reportability from severity because the severity of an
event is only one factor that a cyberanalyst might consider when determining
whether to report the threat event. *Id.* at 20 (citing Ex. 1001, 2:33–46;
Ex. 2011 ¶ 75). For example, Patent Owner argues that the '899 patent

discloses a "risk score" associated with an event as one factor that can be fed into one or more algorithms to calculate the event's reportability likelihood. *Id.* at 21 (citing Ex. 1001, 4:24–34, 10:54–64; Ex. 2011 ¶ 75). Thus, Patent Owner contends that, "although information related to the severity of a threat event is one piece of data that may be used to calculate a reportability likelihood," a person of ordinary skill in the art would have understood that "information representing the severity of a network threat cannot simply be *used* as the reportability likelihood because, as the '899 Patent explains, severe threats may not be reported, and reported threats may not be severe." *Id.* (citing Ex. 1001, 3:56–4:18; Ex. 2011 ¶ 76).

Even assuming Patent Owner is correct that Church's threat rating indicates the severity of a threat event, we do not agree with Patent Owner's premise that such information cannot be used to determine the claimed reportability likelihood. As Petitioner points out, the '899 patent provides examples linking reportability likelihood to threat risk or severity. *See* Pet. Reply 5 (citing Ex. 1001, 3:30–32 (stating that an event "determined to be low-risk" is "therefore not reportable"), 15:1–9 (referring to features "designed to measure or quantify a human's perception of the threat risk, and therefore reportability likelihood, of an event")). Petitioner also persuasively argues that whether an event is reportable depends on context. *See* Pet. 15 n.5; Pet. Reply 4. For instance, the '899 patent expressly states that "events considered reportable in one environment may not be considered reportable in a different environment, due to differing considerations about what events may be considered reportable," and further states that the significance of an event may depend on the particular industry or organization. Ex. 1001, 4:2–6, 5:57–65; *see* Pet. Reply 4. Patent Owner's declarant, Dr. Orso, agrees that context plays a role in whether an

IPR2021-01158
Patent 10,503,899 B2

event is reportable.  Ex. 1054, 40:1–6, 44:11–12, 44:20–45:3, 49:6–8, 50:10–53:19; Pet. Reply 4.

In view of these disclosures in the '899 patent and Dr. Orso's testimony, we are persuaded that the reportability likelihood of an event may correlate to threat severity, at least in some contexts.  Thus, Patent Owner's argument that Church's threat rating indicates the severity of an event does not undermine Petitioner's showing that it would have been obvious to use Church's threat rating as a reportability likelihood in an environment in which a threat to a client's network requires corrective action.  *See* Pet. 25; Ex. 1004 ¶ 118.

Next, Patent Owner argues that a reportability likelihood is an *output* of an algorithm, whereas Church's threat rating is akin to a "risk score," which the '899 patent describes as an *input* to the algorithm for determining a reportability likelihood.  PO Resp. 25–29 (citing Ex. 1001, 2:48–53, 4:24–50, 10:50–11:3, 12:4–14, Fig. 3; Ex. 2011 ¶¶ 81–86).  Patent Owner's attempt to distinguish Church's threat rating from the claimed reportability likelihood on this basis is unavailing.  As discussed in the next subsection, limitation [1.c] requires the reportability likelihood to be determined based on at least one of several listed factors, including "a risk score of the event threat indicator."  Ex. 1001, 18:48–55.  The '899 patent describes the "risk score" of a threat indicator as a score assigned by a threat intelligence provider that supplied the threat indicator to the cyberanalysis system.  *Id.* at 4:33–34, 10:58–64.  In contrast, Church's expert system calculates a threat rating based on a user-weighted combination of the results of several processes—Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410—which themselves have inputs.  Ex. 1005, 11:10–53, 12:1–17:55, Figs. 4–7; *see* Pet. 21–23.  Therefore, Church's threat

IPR2021-01158
Patent 10,503,899 B2

rating is the output of an algorithm and is not equivalent to the risk score input described and claimed in the '899 patent.

Moreover, Church calculates a threat rating using some of the same criteria that claim 1 of the '899 patent recites as inputs for determining a reportability likelihood. As discussed in more detail in the next subsection analyzing limitation [1.c], the Petition asserts that certain inputs to Church's Attacker Rating 410 process are based on "a type of the event threat indicator" and "an age of the event threat indicator," which are among the factors recited in claim 1 upon which a reportability likelihood is based. *See* Pet. 34–35 (citing Ex. 1005, 16:14–22, 16:49–53, 16:67). Notably, Patent Owner does not dispute Petitioner's showing that Church teaches limitation [1.c]. *See* PO Resp. 18–42. That Church discloses the same criteria used and claimed in the '899 patent for determining a reportability likelihood supports a finding that Church's threat rating is an algorithm output and further supports Petitioner's showing that Church's threat rating renders obvious the claimed "reportability likelihood."

Patent Owner also argues that Church's threat rating cannot be used as a reportability likelihood because it is not a probability. PO Resp. 38–40 (citing Ex. 2011 ¶¶ 105–106). We disagree. Church expressly states that its "threat rating indicates the *likelihood* of an event being a threat to the network, and the subjective value of loss if the event is not responded to (i.e., no defensive or corrective action is taken)." Ex. 1005, 8:25–28 (emphasis added); *see also* Ex. 1056, 2 (dictionary defining "likelihood" as "probability"). Church also provides that a threat rating may be "a value normalized to have a range between 0 and 100." Ex. 1005, 8:23–24. Patent Owner contends that this normalized value is not a probability (PO

IPR2021-01158
Patent 10,503,899 B2

Resp. 38–39), but the claim language does not require the "reportability likelihood" to be expressed in any particular manner. *See* Pet. Reply 14.

Additionally, Patent Owner argues that Petitioner relies on hindsight to conclude that it would have been obvious to use Church's threat rating as a reportability likelihood. PO Resp. 29–32. Patent Owner's argument relates to its contention that the '899 patent distinguishes reportability from the severity of a threat. *See id.* at 30 ("The '899 Patent achieves its goal by determining a 'reportability likelihood' for each event log rather than relying upon 'severity determinations,' which may have no correlation to the event's reportability." (internal citation omitted) (citing Ex. 2011 ¶ 89; Ex. 1001, 2:48–53)). As discussed above, however, we are not persuaded that the '899 patent makes such a distinction between reportability and severity within the context of the challenged claims. Thus, we do not agree with the underlying premise of Patent Owner's hindsight argument.

Next, Patent Owner argues that Church teaches away from cyberanalyst review and reporting of a threat event. PO Resp. 33–38. Specifically, Patent Owner argues that Church "expressly teach[es] away from Petitioner's obviousness theory" that an analyst would report findings to an authority because Church disparages prior intrusion detection-based systems that rely on human experts and identifies a need for automating the reasoning process performed by human security experts. *Id.* at 33–34 (citing Ex. 1005, 1:55–58, 2:29–35, 3:4–9, 3:15–20; Ex. 2011 ¶¶ 94–95). Patent Owner asserts that Church's actions are taken automatically, which "remov[es] human decision-making from the process," and "negates any reason for determining a reportability likelihood by a human analyst." *Id.* at 35 (citing Ex. 1005, 11:55–65; Ex. 2011 ¶ 97).

IPR2021-01158
Patent 10,503,899 B2

As an initial matter, we agree with Petitioner that the claims do not require a cyberanalyst to analyze and report events under either party's proposed construction of "reportability likelihood." *See* Pet. Reply 15 & n.7. Therefore, Patent Owner's assertion that Church teaches away from cyberanalyst review and reporting, even if accurate, would not demonstrate that the prior art teaches away from the claimed invention.

In any event, we do not find that Church expressly teaches away from cyberanalyst review and reporting, as Patent Owner argues. As discussed above, Church teaches that a user viewing threat ratings generated by the security expert system can request that defensive or corrective actions be taken to address threat events. *See* Ex. 1005, 7:10–18, 8:33–55, 9:25–29. Thus, we agree with Petitioner that Church expressly contemplates human involvement. *See* Pet. Reply 16. We also agree that Patent Owner's arguments to the contrary overlook disclosures from Church. *See id.* For instance, Patent Owner argues, without citation, that Church "specifically requires an automated analysis with respect to its threat rating, negating any use for a reportability likelihood." PO Resp. 36. Far from requiring automatic action, however, Church discloses automatically generating defensive and corrective actions only "[i]n one embodiment." *See* Ex. 1005, 3:50–51, 9:29–30; *see also id.* at 11:55–58 ("[B]ased on the threat score of an event, one or more defensive and/or corrective actions *may be* automatically taken . . . ." (emphasis added)). Patent Owner also asserts that "Church's 'action requests' are, by design, performed 'automatically' so that there is no need for a human to request any particular action." PO Resp. 37. But Church specifically discloses action requests taken by a user. *See* Ex. 1005, 9:25–29 (describing central database for "storing action requests . . . provided by a user via Web interface 303").

27

IPR2021-01158
Patent 10,503,899 B2

Finally, Patent Owner argues that Church does not teach a
"reportability likelihood for each event log" because Church's threat rating
is not a rating for a "detected threat event," as required under Petitioner's
construction of the term "event log." PO Resp. 40–42. This argument is
essentially the same as Patent Owner's argument with respect to limitation
[1.a] that Church does not teach "event logs" because Church's events are
not "detected threat events." For the same reasons discussed above, we find
that Church's events are detected threat events, and therefore Church's threat
rating is a reportability likelihood for an "event log."

For these reasons, we are persuaded by Petitioner's arguments and
supporting evidence that Church teaches or suggests limitation [1.b]. Patent
Owner's arguments do not undermine Petitioner's persuasive showing.

### c. Limitation [1.c]

Claim 1 further recites:

wherein the reportability likelihood for each event log is based
on at least one of: a fidelity of an event threat indicator, a type
of the event threat indicator, an age of the event threat indicator,
threat intelligence provider data associated with the event threat
indicator, reputation data of at least one threat intelligence
provider, or a risk score of the event threat indicator.

Ex. 1001, 18:48–55. For this limitation, Petitioner asserts that Church
teaches determining a reportability likelihood (i.e., Church's threat rating)
based on "a type of the event threat indicator" (e.g., an event's signature or
IP address). Pet. 35. Specifically, Petitioner contends that Church teaches
determining an attack rating based on factors including "the severity
associated with an event's signature," which "refers to a unique identifier for
an event, indicating its system and/or subcomponent of origin and, when
applicable, a specific type of behavior being represented by the event," and

IPR2021-01158
Patent 10,503,899 B2

an IP address identifying where an attack originated. *Id.* at 35–36 (citing Ex. 1005, 16:49–53, 16:67–17:3, 16:22–24). Petitioner also asserts that Church teaches determining a threat rating based on "the age of a threat indicator" by differentiating among an attacker's previous attacks based on when they occurred. *Id.* at 34–35 (citing Ex. 1005, 16:14–22).

Patent Owner does not advance any arguments regarding this limitation beyond those addressed above with respect to limitation [1.b]. *See* PO Resp. 18–42. Having considered Petitioner's arguments and supporting evidence, we are persuaded that Church teaches limitation [1.c].

### d. Limitation [1.d]

Limitation [1.d] recites "sorting an event queue of the plurality of event logs based on the reportability likelihood of each of the plurality of event logs." Ex. 1001, 18:56–58. Petitioner first cites Church's disclosures that a user may elect to view only medium to high threat events while lower level threat events are sorted out and that "[d]ifferentiating the threat score based on target criticality allows . . . triage and allocation of security resources by focusing first on the higher-valued resources, and then on the lower-valued resources." Pet. 36 (emphasis omitted) (quoting Ex. 1005, 15:45–49) (citing Ex. 1005, 8:23–36, 8:53–55). Petitioner contends that, in view of these disclosures, it would have been obvious to a person of ordinary skill in the art to sort events by threat rating before transmitting them to the web interface. *Id.* at 37 (citing Ex. 1004 ¶¶ 143–145).

Petitioner also relies on Amsler-003 for explicitly disclosing sorting threat data before transmitting it to an analyst. *Id.* at 37–38 (citing Ex. 1006, 8:21–30, 5:8–12, 6:18–33, 6:32–35). For instance, Amsler-003 describes sorting cyber threat data by severity and reliability. Ex. 1006, 8:21–30. Petitioner contends that a person of ordinary skill in the art would have been

29

IPR2021-01158
Patent 10,503,899 B2

motivated to modify Church's expert server system in view of Amsler-003 to sort event logs based on threat rating, used as a "reportability likelihood," before providing them to an analyst via web server in order to allow the analyst to analyze the highest priority events immediately, thereby increasing system efficiency.  Pet. 38 (citing Ex. 1004 ¶¶ 147–148). Petitioner also contends that a person of ordinary skill in the art would have had a reasonable expectation of success in using Amsler-003's known teachings in implementing Church's network security system.  *Id.* at 28 (citing Ex. 1004 ¶ 128).

Patent Owner does not advance any arguments regarding limitation [1.d] or the motivation to combine Church and Amsler-003.  *See* PO Resp. 18–42, 56–62.  Having considered Petitioner's arguments and supporting evidence, we are persuaded that the combination of Church and Amsler-003 teaches or suggests this limitation and that a person of ordinary skill in the art would have combined the references in the manner asserted.

*e. Limitation [1.e]*

The last limitation of claim 1 recites "transmitting, by the computing device and to an analysis system, the plurality of event logs sorted in the event queue based on the reportability likelihood of each of the plurality of event logs." Ex. 1001, 18:59–62.  Petitioner asserts that Church discloses transmitting a threat rating and associated event data (the claimed "event logs") to a web interface for display to a user.  Pet. 38–40 (citing Ex. 1005, 9:21–29, 8:34–36, 7:54–59, Figs. 1, 3).  Petitioner contends that Church discloses an "analysis system" (an analyst presented with event data via web server and software providing web interface) similar to the analysis system in the '899 patent comprising an analyst using software applications.  *Id.* at 41 (citing Ex. 1001, 8:28–33; Ex. 1004 ¶ 151).  Petitioner also contends it

IPR2021-01158
Patent 10,503,899 B2

would have been obvious in view of Amsler-003 to sort events by threat ratings before transmitting them to the analysis system, as discussed in connection with limitation [1.d]. *Id.* (citing Ex. 1004 ¶ 152).

Patent Owner does not advance any arguments regarding limitation [1.e] or the combination of Church with Amsler-003. *See* PO Resp. 18–42, 56–62. Having considered Petitioner's arguments and supporting evidence, we are persuaded that the combination of Church and Amsler-003 teaches or suggests this limitation and that a person of ordinary skill in the art would have combined the references in the manner asserted.

### f. Conclusion for Claim 1

For the reasons explained above, we are persuaded that the combination of Church and Amsler-003 teaches or suggests all the limitations of claim 1 and that a person of ordinary skill in the art would have combined Church and Amsler-003 in the manner asserted in the Petition. The parties do not present arguments or evidence regarding objective indicia of non-obviousness as set forth in the fourth *Graham* factor. *See* Pet. 70; PO Resp. Having considered the evidence of obviousness under the first three *Graham* factors, we determine that Petitioner has shown by a preponderance of the evidence that claim 1 of the '899 patent is unpatentable under 35 U.S.C. § 103 as obvious over the combination of Church and Amsler-003.

### 2. Independent Claim 15

The preamble of independent claim 15 recites "[o]ne or more non-transitory computer-readable media having instructions stored thereon that, when executed by one or more computing devices, cause the one or more computing devices" to perform most of the steps recited in claim 1. Ex. 1001, 20:39–42. Petitioner asserts that Church discloses that its system

IPR2021-01158
Patent 10,503,899 B2

and method can be implemented by programming one or more computer systems and devices with computer-executable instructions embodied in a computer-readable medium.  Pet. 28 (citing Ex. 1005, 22:7–19).

The body of claim 15 recites limitations substantially similar to limitations [1.a], [1.b], [1.c], and [1.d], and Petitioner presents the same analysis discussed above with respect to claim 1.  Pet. 29–38.  Claim 15 additionally recites "stor[ing], in an event queue, the plurality of event logs sorted in the event queue based on the reportability likelihood of each of the plurality of event logs."  Ex. 1001, 20:55–57.  Petitioner contends that Church teaches organizing events in a "queuing server" to improve speed and that it would have been obvious to a person of ordinary skill in the art to store sorted event logs in such a queuing server prior to transmitting them to the web interface.  Pet. 37 (citing Ex. 1005, 6:58–61); *see* Ex. 1004 ¶ 144.

Patent Owner does not present arguments regarding claim 15 beyond those presented for claim 1.  *See* PO Resp. 18–42, 56–62.  Accordingly, having considered Petitioner's arguments and supporting evidence with respect to the additional limitations of claim 15, and for the reasons discussed above with respect to claim 1, we determine that Petitioner has shown by a preponderance of the evidence that claim 15 of the '899 patent is unpatentable under 35 U.S.C. § 103 as obvious over the combination of Church and Amsler-003.

### 3. Dependent Claims 7–10, 19, and 20

Claims 7–10 depend from independent claim 1, and claims 19 and 20 depend from independent claim 15.  Petitioner contends that the combination of Church and Amsler-003 teaches or suggests the additionally-recited limitations of these claims.  Pet. 41–53.  Patent Owner does not advance any

IPR2021-01158
Patent 10,503,899 B2

arguments regarding these claims other than those discussed above with respect to claims 1 and 15. *See* PO Resp. 18–42, 56–62.

Based on Petitioner's arguments and supporting evidence, we are persuaded that the combination of Church and Amsler-003 teaches or suggests the limitations of claims 7–10, 19, and 20 and that a person of ordinary skill in the art would have combined the references as asserted in the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 7–10, 19, and 20 of the '899 patent are unpatentable over Church and Amsler-003.

*F. Obviousness over Church, Amsler-003, and Fellin*

Petitioner contends that claims 2–6, 11–14, and 16–18 of the '899 patent are unpatentable under 35 U.S.C. § 103(a) as obvious over Church, Amsler-003, and Fellin. Pet. 55–70. Patent Owner disagrees, arguing that the combined references do not teach or suggest all the claim limitations. PO Resp. 42–56. For the reasons discussed below, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–6, 11–14, and 16–18 are unpatentable for obviousness over Church, Amsler-003, and Fellin.

*1. Independent Claim 11*

Claim 11 is a method claim reciting limitations similar to those discussed above with respect to claims 1 and 15. Ex. 1001, 19:58–20:19. But instead of determining a reportability likelihood for each event log, claim 11 recites "determining . . . a first reportability likelihood for each event log based on a human designed algorithm" (limitation [11.b]), "determining . . . a second reportability likelihood for each event log based on a machine-learned algorithm" (limitation [11.c]), and "determining . . . a combined reportability likelihood for each event log based on the first

IPR2021-01158
Patent 10,503,899 B2

reportability likelihood and the second reportability likelihood" (limitation [11.d]). *Id.* at 19:62–20:4.

For determining a first reportability likelihood based on a human designed algorithm (limitation [11.b]), Petitioner relies on Church's disclosure that predetermined user-defined rules and weights may be used to calculate threat ratings based on the ratings determined by the Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410 processes. Pet. 57–58 (citing Ex. 1005, 11:4–5, 12:8–18, 3:25–28, 3:17–20, 11:10–13, 12:1–2, 14:3–14, 15:50–52, 17:35–42).

For determining a second reportability likelihood based on a machine-learned algorithm (limitation [11.c]), Petitioner cites the combination of Church and Amsler-003 for teaching the use of a machine-learned algorithm to determine threat ratings. *Id.* at 58–62. First, Petitioner cites Church's disclosure of using historical and learned data and "trained information from learned data" to improve and optimize performance of its network security system. *Id.* at 58–59 (emphasis omitted) (citing Ex. 1005, 7:32–35, 7:62–8:18, 10:60–67). Although Church does not explicitly disclose using learned, trained, and historical data to determine threat ratings at steps 408–410, Petitioner argues it would have been obvious to a person of ordinary skill in the art to apply such data to one or more of those steps in view of Church's disclosure that "[l]earned data can be optionally implemented in embodiments of the SES disclosed herein to enhance performance," which directly precedes Church's description of steps 408–410. *Id.* at 59–60 (emphasis omitted) (citing Ex. 1005, 10:60–67; Ex. 1004 ¶ 197).

Petitioner also relies on Amsler-003's express disclosure of using machine learning algorithms to improve sorting of threat incidents. *Id.* at 60–61 (citing Ex. 1006, 6:18–29, 6:32–35, 7:1–16). Petitioner contends that

IPR2021-01158
Patent 10,503,899 B2

Amsler-003 confirms that implementing a machine-learned algorithm to improve or optimize processes in network security systems was well known. *Id.* at 61 (citing Ex. 1004 ¶ 200; Ex. 1006, 6:32–28, 13:11–17). Petitioner further contends that a person of ordinary skill in the art would have applied Amsler-003's known teachings of implementing machine-learned algorithms to use learned and trained data collected over time, such as that taught in Church, to gradually optimize a machine-learned algorithm to identify future potential threats. *Id.* at 61–62 (citing Ex. 1004 ¶ 200; Ex. 1005, 5:61–65, 10:56–62, 13:59–61, 14:44–50).

Petitioner further asserts that Church teaches examples of implementing different steps (i.e., Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410) using different algorithms that can operate in parallel and are independent of each other. *Id.* at 60 (citing Ex. 1005, 11:10–13). In view of these disclosures, Petitioner contends that it would have been "an obvious implementation choice" to determine a first reportability likelihood using a static, human-designed algorithm in one of steps 408–410 and a second reportability likelihood using a machine-learned algorithm in a different one of steps 408–410. *Id.* (citing Ex. 1004 ¶ 198).

Petitioner also relies on Fellin in combination with Church and Amsler-003 for teaching the use of a static, human-designed algorithm and a machine-learned algorithm in the same network security system. *Id.* at 62–63 (citing Ex. 1017, 66–67). Petitioner contends that a person of ordinary skill in the art would have been motivated to apply Fellin's teachings to Church's system for various reasons. *Id.* (citing Ex. 1004 ¶ 202). For example, Petitioner contends it would have been advantageous to implement a machine-learned algorithm for Church's attack validation rating process, so that the process updates as the nature of attacks changes,

35

IPR2021-01158
Patent 10,503,899 B2

and implement a static algorithm for Church's attacker rating process to assign a higher threat rating automatically to previously known attackers. *Id.* at 62–63 (citing Ex. 1004 ¶ 202; Ex. 1005, 11:13–19, 16:4–9).

Finally, with respect to limitation [11.d], Petitioner contends that Church teaches a reportability likelihood that combines first and second reportability likelihoods when it calculates a final threat rating by combining different types of threat ratings. *Id.* at 55–57, 63 (citing Ex. 1005, 11:10–12, 11:50–51, 18:27–41, Fig. 4). With reference to Figure 4, Petitioner contends that each of Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410 determines a threat rating, and step 413 determines a final threat rating by combining the individual threat ratings from steps 408, 409, and 410 according to user-defined rules and weights. *Id.* at 55–57 (citing Ex. 1005, 11:10–12, 11:50–51, 18:27–41, Fig. 4; Ex. 1004 ¶¶ 190–192).

Patent Owner contends that the combined prior art references do not teach a combined reportability likelihood based on a human-designed algorithm and a machine-learned algorithm, as required by limitations [11.b]–[11.d]. PO Resp. 42–56. Patent Owner first argues that the attacker rating, target rating, and validity rating determined by steps 408–410 in Church are not themselves "reportability likelihoods" or even "threat ratings." *Id.* at 43–46. We disagree. Petitioner persuasively shows that a person of ordinary skill in the art would have understood each of those ratings to be an individual threat rating. *See* Pet. 55–57; Pet. Reply 20–21. Church teaches determining a final threat rating at step 413 by combining the attacker rating, target rating, and validity rating, weighted according to user-defined numbers, which can be any number, including zero. Ex. 1005, 18:27–41; *see* Pet. 56–57; Pet. Reply 20. Thus, the final threat rating could

IPR2021-01158
Patent 10,503,899 B2

be equal to one of the individual ratings if two are assigned weights of zero and the third is assigned a weight of one, showing that any one of the individual ratings in Church could itself be a threat rating. *See* Pet. Reply 20. For the reasons discussed above with respect to limitation [1.b], Church's threat rating renders obvious the claimed "reportability likelihood." *See supra* § II.E.1.b. Moreover, as discussed previously with respect to limitation [1.c], Attacker Rating 410 uses the same criteria recited in claim 1 for determining a reportability likelihood, showing that at least the attacker rating teaches or suggests a "reportability likelihood." *See supra* § II.E.1.c; Pet. 34–36; Pet. Reply 20.

Patent Owner also argues that Church does not teach a second reportability likelihood based on a machine-based algorithm. PO Resp. 46–49. Patent Owner faults Petitioner for relying on "Church's generic discussion of optimizing performance based on 'learned,' 'trained,' or 'historical' data," which Patent Owner alleges has nothing to do with Church's threat score or its underlying factors. *Id.* at 47 (citing Pet. 58–59). But contrary to Patent Owner's argument, Church specifically teaches that its expert system can use trained information from learned data and that the same expert system executes Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410 processes to determine threat ratings. Ex. 1005, 7:62–8:6, 10:60–67, 11:10–67, Figs. 2–4. Thus, we agree with Petitioner that Church's disclosures teach or at least suggest using trained information from learned data (i.e., machine learning) in one or more of steps 408–410. *See* Pet. 58–60; Pet. Reply 22–23.

Moreover, Patent Owner's argument improperly attacks Church individually because Petitioner additionally relies on Amsler-003 for teaching using machine-learned algorithms in a network security system to

IPR2021-01158
Patent 10,503,899 B2

rate threats. *See* Pet. 60–62. *See In re Merck & Co.*, 800 F.2d 1091, 1097
(Fed. Cr. 1986); *In re Keller*, 642 F.2d 413, 426 (CCPA 1981) (noting that
one cannot show non-obviousness by attacking references individually
where the rejections are based on combinations of references). Patent
Owner does not dispute that Amsler-003 teaches using machine-learned
algorithms in network security systems or that a person of ordinary skill in
the art would have combined Amsler-003's teachings with those of Church.
*See id.*; PO Resp. 53–54. Instead, Patent Owner contends that Amsler-003
does not teach a "second reportability likelihood" for "each event log," but
Petitioner does not rely on Amsler-003 for teaching those aspects of the
claim language. *See* PO Resp. 53; Pet. 58–62.

Patent Owner argues next that Church does not teach generating two
threat ratings based on a "human designed algorithm" and a "machine-
learned algorithm" and combining them. PO Resp. 49–50. Petitioner,
however, does not rely only on Church for teaching this combination of
features. To be sure, the Petition cites Church's final threat rating (step 413)
for teaching determining a combined reportability likelihood based on first
and second reportability likelihoods, as recited in limitation [11.d]. Pet. 63.
But the Petition earlier cites Church in combination with Amsler-003 and
Fellin for teaching a first reportability likelihood based on a human-designed
algorithm, as recited in limitation [11.b], a second reportability likelihood
based on a machine-learned algorithm, as recited in limitation [11.c], and
using both types of algorithms in the same network security system. *Id.* at
57–63. Thus, Petitioner relies on the combined disclosures of Church,
Amsler-003, and Fellin for teaching the subject matter collectively recited in
limitations [11.b]–[11.d], and Patent Owner's argument attacking only
Church does not undercut Petitioner's showing.

IPR2021-01158
Patent 10,503,899 B2

Finally, Patent Owner argues that Fellin does not teach or provide any motivation for combining the outputs of a human-designed algorithm and a machine-learned algorithm. PO Resp. 54–56. But Petitioner does not rely on Fellin for teaching combining the outputs of the two algorithms. *See* Pet. 62–63. Rather, Petitioner cites Fellin only for teaching the use of both types of algorithms in the same network security system. *See id.* Thus, like Patent Owner's other arguments attacking references individually, Patent Owner's argument regarding Fellin does not challenge the combination of the references' teachings upon which Petitioner actually relies.

Therefore, notwithstanding Patent Owner's arguments, we are persuaded by Petitioner's arguments and supporting evidence that the combination of Church, Amsler-003, and Fellin teaches or suggests limitations [11.b]–[11.d] and that a person of ordinary skill in the art would have combined the references as asserted. We also find that the combined references teach or suggest the other limitations of claim 11 for the reasons discussed previously with respect to similar limitations in claims 1 and 15. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claim 11 of the '899 patent is unpatentable under 35 U.S.C. § 103 as obvious over the combination of Church, Amsler-003, and Fellin.

### 2. Dependent Claims 2 and 16

Claim 2 depends from independent claim 1 and further recites that "the reportability likelihood is a combined reportability likelihood" and that determining the reportability likelihood for each event log comprises determining "a first reportability likelihood for each event log based on a static algorithm," determining "a second reportability likelihood for each event log based on a machine-learned algorithm," and determining the combined reportability likelihood "based on the first reportability likelihood

IPR2021-01158
Patent 10,503,899 B2

and the second reportability likelihood." Ex. 1001, 18:63–19:17. Claim 16 depends from independent claim 15 and recites limitations similar to those in claim 2. *Id.* at 20:58–21:5.

Petitioner presents substantially the same analysis for claims 2 and 16 as for claim 11, arguing that Church's disclosure that user-defined rules and weights may be used to calculate threat ratings based on the ratings determined by the Attack Validation 408, Target Exposure Analysis 409, and Attacker Rating 410 processes teaches determining a reportability likelihood based on a "static algorithm" because they are pre-defined and do not change unless reprogrammed by the user. Pet. 55–63. Patent Owner advances the same arguments regarding claims 2 and 16 as those discussed above with respect to claim 11. *See* PO Resp. 42–56.

Based on Petitioner's arguments and supporting evidence, and for the reasons discussed with respect to claim 11, we are persuaded that the combination of Church, Amsler-003, and Fellin teaches or suggests the additionally-recited limitations of claims 2 and 16 and that a person of ordinary skill in the art would have combined the references as asserted in the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 2 and 16 of the '899 patent are unpatentable over Church, Amsler-003, and Fellin.

### 3. Dependent Claims 3–6, 12–14, 17, and 18

Claims 3–6 depend from claim 2, which depends from independent claim 1. Claims 12–14 depend from independent claim 11. Claims 17 and 18 depend from claim 16, which depends from independent claim 15. Petitioner contends that the combination of Church, Amsler-003, and Fellin teaches or suggests the additionally-recited limitations of these claims. Pet. 41–47, 64–70. Patent Owner does not advance any arguments regarding

40

IPR2021-01158
Patent 10,503,899 B2

these claims other than those discussed above with respect to independent claims 1, 11, and 15, and dependent claims 2 and 16. *See* PO Resp. 18–62.

Based on Petitioner's arguments and supporting evidence, we are persuaded that the combination of Church, Amsler-003, and Fellin teaches or suggests the limitations of claims 3–6, 12–14, 17, and 18 and that a person of ordinary skill in the art would have combined the references as asserted in the Petition. Accordingly, we determine that Petitioner has shown by a preponderance of the evidence that claims 3–6, 12–14, 17, and 18 of the '899 patent are unpatentable over Church, Amsler-003, and Fellin.

IPR2021-01158
Patent 10,503,899 B2

### III. CONCLUSION[6]

For the foregoing reasons, we determine Petitioner has shown by a preponderance of the evidence that claims 1–20 of the '899 patent are unpatentable. The chart below summarizes our conclusions:

| Claim(s) | 35 U.S.C. § | References/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1, 7–10, 15, 19, 20 | 103 | Church, Amsler-003 | 1, 7–10, 15, 19, 20 | |
| 2–6, 11–14, 16–18 | 103 | Church, Amsler-003, Fellin | 2–6, 11–14, 16–18 | |
| **Overall Outcome** | | | 1–20 | |

### IV. ORDER

Accordingly, it is

ORDERED that claims 1–20 of the '899 patent have been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to this proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[6] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2021-01158
Patent 10,503,899 B2

PETITIONER:

Scott A. McKeown
Mark Rowland
James R. Batchelder
Andrew Radsch
ROPES & GRAY LLP
scott.mckeown@ropesgray.com
mark.rowland@ropesgray.com
james.batchelder@ropesgray.com
andrew.rasch@ropesgray.com

PATENT OWNER:

James Hannah
Jeffrey H. Price
KRAMER LEVIN NAFTALIS & FRANKEL LLP
jhannah@kramerlevin.com
jprice@kramerlevin.com

Bradley C. Wright
Scott M. Kelly
John R. Hutchins
BANNER & WITCOFF, LTD.
bwright@bannerwitcoff.com
skelly@bannerwitcoff.com
jhutchins@bannerwitcoff.com



US010503899B2

(12) **United States Patent**
Moore et al.

(10) Patent No.:     **US 10,503,899 B2**
(45) **Date of Patent:**     **Dec. 10, 2019**

(54) **CYBERANALYSIS WORKFLOW ACCELERATION**

(71) Applicant: **Centripetal Networks, Inc.,** Portsmouth, NH (US)

(72) Inventors: **Sean Moore**, Hollis, NH (US); **Jonathan R. Rogers**, Hampton Falls, NH (US); **Jess Parnell**, Grayson, GA (US); **Zachary Ehnerd**, Atlanta, GA (US)

(73) Assignee: **Centripetal Networks, Inc.,** Portsmouth, NH (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/030,354**

(22) Filed: **Jul. 9, 2018**

(65) **Prior Publication Data**

US 2019/0012456 A1    Jan. 10, 2019

**Related U.S. Application Data**

(60) Provisional application No. 62/530,543, filed on Jul. 10, 2017.

(51) **Int. Cl.**
**H04L 29/06**     (2006.01)
**G06F 21/55**     (2013.01)
**G06N 20/00**     (2019.01)

(52) **U.S. Cl.**
CPC ........... **G06F 21/554** (2013.01); **G06N 20/00** (2019.01); **H04L 63/1416** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .. G06F 21/554; G06F 2221/034; G06F 21/55; G06N 99/005
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

6,098,172 A     8/2000 Coss et al.
6,147,976 A     11/2000 Shand et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU     2005328336 B2     9/2011
AU     2006230171 B2     6/2012
(Continued)

OTHER PUBLICATIONS

"Control Plane Policing Implementation Best Practices"; Cisco Systems; Mar. 13, 2013; <https://web.archive.org/web/20130313135143/http:www.cisco.com/web/about/security/intelligence/coppwp_gs_html>.
(Continued)

*Primary Examiner* — Evans Desrosiers
(74) *Attorney, Agent, or Firm* — Banner & Witcoff, Ltd.

(57)     **ABSTRACT**

A cyber threat intelligence (CTI) gateway device may receive rules for filtering TCP/IP packet communications events that are configured to cause the CTI gateway device to identify communications corresponding to indicators, signatures, and behavioral patterns of network threats. The CTI gateway device may receive packets that compose endpoint-to-endpoint communication events and, for each event, may determine that the event corresponds to criteria specified by a filtering rule. The criteria may correspond to one or more of the network threat indicators, signatures, and behavioral patterns. The CTI gateway may create a log of the threat event and forward the threat event log to a task queue managed by a cyberanalysis workflow application. Human cyberanalysts use the cyberanalysis workflow application to service the task queue by removing the task at the front of the queue, investigating the threat event, and deciding whether the event is a reportable finding that should be reported to the proper authorities. In order to improve the
(Continued)

| Reportability Likelihood | Indicator Type | Indicator Age (days) | CTI Score (normalized) |
|---|---|---|---|
| 0.8 | URL | Don't Care | Don't Care |
| 0.7 | FQDN | [0, 30) | High |
| 0.6 | FQDN | [30, 60) | Medium |
| 0.5 | FQDN | [60, 180) | Low |
| 0.4 | IP | [0, 30) | High |
| 0.3 | IP | [30, 60) | Medium |
| 0.2 | IP | [60, 180) | Low |
| 0.1 | IP or FQDN | [180, inf) | Don't Care |

Illustrative human-designed (H/D) heuristic algorithm for estimating reportability likelihood in a cyberanalysis workflow application process

**Palo Alto Ex. 1001**
**Palo Alto Networks v. Centripetal Networks**
**IPR2021-01158**
**Page 00001**

**US 10,503,899 B2**

Page 2

efficiency of the workflow process, tasks in the queue are ordered by the likelihood, or probability, that cyberanalysts will determine the associated threat events to be reportable findings; thus, high-likelihood events are investigated first likelihoods are computed using human-designed algorithms and machine-learned algorithms that are applied to characteristics of the events. Low-likelihood events may be dropped from the work queue to further improve efficiency.

**20 Claims, 7 Drawing Sheets**

(52) **U.S. Cl.**
CPC .... *G06F 2221/034* (2013.01); *H04L 63/1441* (2013.01); *H04L 63/166* (2013.01)

(58) **Field of Classification Search**
USPC ......................................................... 726/23
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,226,372 | B1 | 5/2001 | Beebe et al. |
| 6,279,113 | B1 | 8/2001 | Vaidya |
| 6,317,837 | B1 | 11/2001 | Kenworthy |
| 6,484,261 | B1 | 11/2002 | Wiegel |
| 6,611,875 | B1 | 8/2003 | Chopra et al. |
| 6,662,235 | B1 | 12/2003 | Callis et al. |
| 6,826,694 | B1 | 11/2004 | Dutta et al. |
| 6,971,028 | B1 * | 11/2005 | Lyle ...................... G06F 21/554 |
| | | | 709/224 |
| 7,089,581 | B1 | 8/2006 | Nagai et al. |
| 7,095,716 | B1 | 8/2006 | Ke et al. |
| 7,107,613 | B1 | 9/2006 | Chen et al. |
| 7,143,438 | B1 | 11/2006 | Coss et al. |
| 7,215,637 | B1 | 5/2007 | Ferguson et al. |
| 7,227,842 | B1 | 6/2007 | Ji et al. |
| 7,237,267 | B2 | 6/2007 | Rayes et al. |
| 7,263,099 | B1 | 8/2007 | Woo et al. |
| 7,296,288 | B1 | 11/2007 | Hill et al. |
| 7,299,353 | B2 | 11/2007 | Le Pennec et al. |
| 7,331,061 | B1 | 2/2008 | Ramsey et al. |
| 7,478,429 | B2 | 1/2009 | Lyon |
| 7,539,186 | B2 | 5/2009 | Aerrabotu et al. |
| 7,610,621 | B2 | 10/2009 | Turley et al. |
| 7,684,400 | B2 | 3/2010 | Govindarajan et al. |
| 7,710,885 | B2 | 5/2010 | Ilnicki et al. |
| 7,721,084 | B2 | 5/2010 | Salminen et al. |
| 7,792,775 | B2 | 9/2010 | Matsuda |
| 7,814,158 | B2 | 10/2010 | Malik |
| 7,814,546 | B1 | 10/2010 | Strayer et al. |
| 7,818,794 | B2 | 10/2010 | Wittman |
| 7,913,303 | B1 | 3/2011 | Rouland et al. |
| 7,954,143 | B2 | 5/2011 | Aaron |
| 8,004,994 | B1 | 8/2011 | Darisi et al. |
| 8,009,566 | B2 | 8/2011 | Zuk et al. |
| 8,037,517 | B2 | 10/2011 | Fulp et al. |
| 8,042,167 | B2 | 10/2011 | Fulp et al. |
| 8,117,655 | B2 | 2/2012 | Spielman |
| 8,176,561 | B1 | 5/2012 | Hurst et al. |
| 8,306,994 | B2 | 11/2012 | Kenworthy |
| 8,307,029 | B2 | 11/2012 | Davis et al. |
| 8,495,725 | B2 | 7/2013 | Ahn |
| 8,726,379 | B1 | 5/2014 | Stiansen et al. |
| 8,806,638 | B1 | 8/2014 | Mani |
| 8,832,832 | B1 | 9/2014 | Visbal |
| 8,856,926 | B2 | 10/2014 | Narayanaswamy et al. |
| 8,935,785 | B2 | 1/2015 | Pandrangi |
| 9,094,445 | B2 | 7/2015 | Moore et al. |
| 9,124,552 | B2 | 9/2015 | Moore |
| 9,137,205 | B2 | 9/2015 | Rogers et al. |
| 9,154,446 | B2 | 10/2015 | Gemelli et al. |

| | | | |
|---|---|---|---|
| 9,160,713 | B2 | 10/2015 | Moore |
| 9,172,627 | B2 | 10/2015 | Kjendal et al. |
| 9,419,942 | B1 | 8/2016 | Buruganahalli et al. |
| 2001/0039579 | A1 | 11/2001 | Trcka et al. |
| 2001/0039624 | A1 | 11/2001 | Kellum |
| 2002/0016858 | A1 | 2/2002 | Sawada et al. |
| 2002/0038339 | A1 | 3/2002 | Xu |
| 2002/0049899 | A1 | 4/2002 | Kenworthy |
| 2002/0112188 | A1 | 8/2002 | Syvanne |
| 2002/0164962 | A1 | 11/2002 | Mankins et al. |
| 2002/0165949 | A1 | 11/2002 | Na et al. |
| 2002/0186683 | A1 | 12/2002 | Buck et al. |
| 2002/0198981 | A1 | 12/2002 | Corl et al. |
| 2003/0018591 | A1 | 1/2003 | Komisky |
| 2003/0035370 | A1 | 2/2003 | Brustoloni |
| 2003/0051026 | A1 | 3/2003 | Carter et al. |
| 2003/0097590 | A1 | 5/2003 | Syvanne |
| 2003/0105976 | A1 | 6/2003 | Copeland |
| 2003/0120622 | A1 | 6/2003 | Nurmela et al. |
| 2003/0123456 | A1 | 7/2003 | Denz et al. |
| 2003/0142681 | A1 | 7/2003 | Chen et al. |
| 2003/0145225 | A1 | 7/2003 | Bruton et al. |
| 2003/0154297 | A1 | 8/2003 | Suzuki et al. |
| 2003/0154399 | A1 | 8/2003 | Zuk et al. |
| 2003/0188192 | A1 | 10/2003 | Tang et al. |
| 2003/0212900 | A1 | 11/2003 | Liu et al. |
| 2003/0220940 | A1 | 11/2003 | Futoransky et al. |
| 2004/0010712 | A1 | 1/2004 | Hui et al. |
| 2004/0073655 | A1 | 4/2004 | Kan et al. |
| 2004/0088542 | A1 | 5/2004 | Daude et al. |
| 2004/0093513 | A1 | 5/2004 | Cantrell et al. |
| 2004/0098511 | A1 | 5/2004 | Lin et al. |
| 2004/0123220 | A1 | 6/2004 | Johnson et al. |
| 2004/0151155 | A1 | 8/2004 | Jouppi |
| 2004/0172529 | A1 | 9/2004 | Culbert |
| 2004/0172557 | A1 | 9/2004 | Nakae et al. |
| 2004/0177139 | A1 | 9/2004 | Schuba et al. |
| 2004/0193943 | A1 | 9/2004 | Angelino et al. |
| 2004/0199629 | A1 | 10/2004 | Bomer et al. |
| 2004/0205360 | A1 | 10/2004 | Norton et al. |
| 2004/0250124 | A1 | 12/2004 | Chesla et al. |
| 2005/0010765 | A1 | 1/2005 | Swander et al. |
| 2005/0024189 | A1 | 2/2005 | Weber |
| 2005/0071650 | A1 | 3/2005 | Jo et al. |
| 2005/0108557 | A1 | 5/2005 | Kayo et al. |
| 2005/0114704 | A1 | 5/2005 | Swander |
| 2005/0117576 | A1 | 6/2005 | McDysan et al. |
| 2005/0125697 | A1 | 6/2005 | Tahara |
| 2005/0138204 | A1 | 6/2005 | Iyer et al. |
| 2005/0138353 | A1 | 6/2005 | Spies et al. |
| 2005/0141537 | A1 | 6/2005 | Kumar et al. |
| 2005/0183140 | A1 | 8/2005 | Goddard |
| 2005/0229246 | A1 | 10/2005 | Rajagopal et al. |
| 2005/0251570 | A1 | 11/2005 | Heasman et al. |
| 2005/0283823 | A1 | 12/2005 | Okajo et al. |
| 2005/0286522 | A1 | 12/2005 | Paddon et al. |
| 2006/0048142 | A1 | 3/2006 | Roese et al. |
| 2006/0053491 | A1 | 3/2006 | Khuti et al. |
| 2006/0070122 | A1 | 3/2006 | Bellovin |
| 2006/0080733 | A1 | 4/2006 | Khosmood et al. |
| 2006/0085849 | A1 | 4/2006 | Culbert |
| 2006/0104202 | A1 | 5/2006 | Reiner |
| 2006/0114899 | A1 | 6/2006 | Toumura et al. |
| 2006/0133377 | A1 | 6/2006 | Jain |
| 2006/0136987 | A1 | 6/2006 | Okuda |
| 2006/0137009 | A1 | 6/2006 | Chesla |
| 2006/0146879 | A1 | 7/2006 | Anthias et al. |
| 2006/0195896 | A1 | 8/2006 | Fulp et al. |
| 2006/0212572 | A1 | 9/2006 | Afek et al. |
| 2006/0248580 | A1 | 11/2006 | Fulp et al. |
| 2006/0262798 | A1 | 11/2006 | Joshi et al. |
| 2007/0083924 | A1 | 4/2007 | Lu |
| 2007/0118894 | A1 | 5/2007 | Bhatia |
| 2007/0211644 | A1 | 9/2007 | Ottamalika et al. |
| 2007/0240208 | A1 | 10/2007 | Yu et al. |
| 2008/0005795 | A1 | 1/2008 | Acharya et al. |
| 2008/0043739 | A1 | 2/2008 | Suh et al. |
| 2008/0072307 | A1 | 3/2008 | Maes |
| 2008/0077705 | A1 | 3/2008 | Li et al. |

**US 10,503,899 B2**

Page 3

(56)                 **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2008/0163333 | A1 | 7/2008 | Kasralikar |
| 2008/0229415 | A1 | 9/2008 | Kapoor et al. |
| 2008/0235755 | A1 | 9/2008 | Blaisdell et al. |
| 2008/0279196 | A1 | 11/2008 | Friskney et al. |
| 2008/0301765 | A1 | 12/2008 | Nicol et al. |
| 2009/0028160 | A1 | 1/2009 | Eswaran et al. |
| 2009/0138938 | A1 | 5/2009 | Harrison et al. |
| 2009/0172800 | A1 | 7/2009 | Wool |
| 2009/0222877 | A1 | 9/2009 | Diehl et al. |
| 2009/0240698 | A1 | 9/2009 | Shukla et al. |
| 2009/0262741 | A1 | 10/2009 | Jungck et al. |
| 2009/0328219 | A1 | 12/2009 | Narayanaswamy |
| 2010/0011433 | A1 | 1/2010 | Harrison et al. |
| 2010/0011434 | A1 | 1/2010 | Kay |
| 2010/0082811 | A1 | 4/2010 | Van Der Merwe et al. |
| 2010/0095367 | A1 | 4/2010 | Narayanaswamy |
| 2010/0107240 | A1 | 4/2010 | Thaler et al. |
| 2010/0115621 | A1* | 5/2010 | Staniford ............ H04L 63/1416 |
| | | | 726/25 |
| 2010/0132027 | A1 | 5/2010 | Ou |
| 2010/0199346 | A1 | 8/2010 | Ling et al. |
| 2010/0211678 | A1 | 8/2010 | McDysan et al. |
| 2010/0232445 | A1 | 9/2010 | Bellovin |
| 2010/0242098 | A1 | 9/2010 | Kenworthy |
| 2010/0268799 | A1 | 10/2010 | Maestas |
| 2010/0296441 | A1 | 11/2010 | Barkan |
| 2010/0303240 | A1 | 12/2010 | Beachem et al. |
| 2011/0055916 | A1 | 3/2011 | Ahn |
| 2011/0055923 | A1 | 3/2011 | Thomas |
| 2011/0088092 | A1 | 4/2011 | Nguyen et al. |
| 2011/0141900 | A1 | 6/2011 | Jayawardena et al. |
| 2011/0185055 | A1 | 7/2011 | Nappier et al. |
| 2011/0270956 | A1 | 11/2011 | McDysan et al. |
| 2011/0277034 | A1 | 11/2011 | Hanson |
| 2012/0023576 | A1 | 1/2012 | Sorensen et al. |
| 2012/0106354 | A1 | 5/2012 | Pleshek et al. |
| 2012/0113987 | A1 | 5/2012 | Riddoch et al. |
| 2012/0240135 | A1 | 9/2012 | Risbood et al. |
| 2012/0264443 | A1 | 10/2012 | Ng et al. |
| 2012/0314617 | A1 | 12/2012 | Erichsen et al. |
| 2012/0331543 | A1 | 12/2012 | Bostrom et al. |
| 2013/0047020 | A1 | 2/2013 | Hershko et al. |
| 2013/0059527 | A1 | 3/2013 | Hasesaka et al. |
| 2013/0061294 | A1 | 3/2013 | Kenworthy |
| 2013/0104236 | A1 | 4/2013 | Ray et al. |
| 2013/0117852 | A1 | 5/2013 | Stute |
| 2013/0139236 | A1* | 5/2013 | Rubinstein .......... H04L 63/1483 |
| | | | 726/7 |
| 2013/0254766 | A1 | 9/2013 | Zuo et al. |
| 2013/0291100 | A1 | 10/2013 | Ganapathy et al. |
| 2013/0305311 | A1 | 11/2013 | Puttaswamy Naga et al. |
| 2014/0075510 | A1 | 3/2014 | Sonoda et al. |
| 2014/0115654 | A1 | 4/2014 | Rogers et al. |
| 2014/0150051 | A1 | 5/2014 | Bharali et al. |
| 2014/0201123 | A1 | 7/2014 | Ahn et al. |
| 2014/0215574 | A1 | 7/2014 | Erb et al. |
| 2014/0259170 | A1 | 9/2014 | Amsler |
| 2014/0281030 | A1 | 9/2014 | Cui et al. |
| 2014/0283004 | A1 | 9/2014 | Moore |
| 2014/0283030 | A1 | 9/2014 | Moore et al. |
| 2014/0317397 | A1 | 10/2014 | Martini |
| 2014/0366132 | A1 | 12/2014 | Stiansen et al. |
| 2015/0033336 | A1 | 1/2015 | Wang et al. |
| 2015/0106930 | A1 | 4/2015 | Honda et al. |
| 2015/0237012 | A1 | 8/2015 | Moore |
| 2015/0244734 | A1 | 8/2015 | Olson et al. |
| 2015/0304354 | A1 | 10/2015 | Rogers et al. |
| 2015/0334125 | A1 | 11/2015 | Bartos et al. |
| 2015/0341389 | A1 | 11/2015 | Kurakami |
| 2015/0350229 | A1 | 12/2015 | Mitchell |
| 2015/0372977 | A1 | 12/2015 | Yin |
| 2015/0373043 | A1 | 12/2015 | Wang et al. |
| 2016/0020968 | A1 | 1/2016 | Aumann et al. |
| 2016/0065611 | A1 | 3/2016 | Fakeri-Tabrizi et al. |
| 2016/0112443 | A1 | 4/2016 | Grossman et al. |
| 2016/0119365 | A1 | 4/2016 | Barel |
| 2016/0205069 | A1 | 7/2016 | Blocher et al. |
| 2016/0219065 | A1 | 7/2016 | Dasgupta et al. |
| 2016/0285706 | A1 | 9/2016 | Rao |
| 2016/0294870 | A1 | 10/2016 | Banerjee et al. |
| 2016/0366099 | A1 | 12/2016 | Jordan |
| 2017/0272469 | A1* | 9/2017 | Kraemer ............ H04L 63/1416 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CA | 2600236 A1 | 10/2006 |
| EP | 1006701 A2 | 6/2000 |
| EP | 1313290 A1 | 5/2003 |
| EP | 1484884 A2 | 12/2004 |
| EP | 1677484 A2 | 7/2006 |
| EP | 2385676 A1 | 11/2011 |
| EP | 2498442 A1 | 9/2012 |
| EP | 1864226 B1 | 5/2013 |
| KR | 20010079361 A | 8/2001 |
| WO | 2005046145 A1 | 5/2005 |
| WO | 2006093557 A2 | 9/2006 |
| WO | 2006105093 A2 | 10/2006 |
| WO | 2007109541 A2 | 9/2007 |
| WO | 2011038420 A2 | 3/2011 |
| WO | 2012146265 A1 | 11/2012 |

OTHER PUBLICATIONS

Sep. 11, 2006—(WO) Written Opinion of the International Search-ing Authority—App PCT/US05/47008.
Aug. 31, 2007—(EP) Communication Pursuant to Rules 109 and 110—App 05585761.4.1.
Jul. 3, 2008—(WO) Written Opinion of the International Searching Authority—App PCT/US06/11291.
Jun. 24, 2009—(U.S.) Office Action—U.S. Appl. No. 11/390,976.
Sep. 14, 2009—(U.S.) Office Action—U.S. Appl. No. 11/316,331.
Apr. 29, 2010—(U.S.) Interview Summary—U.S. Appl. No. 11/390,976.
Aug. 20, 2010—(AU) Office Action—App 2005328336.
Jun. 23, 2010—(U.S.) Final Rejection—U.S. Appl. No. 11/316,331.
Mar. 26, 2010—(U.S.) Final Rejection—U.S. Appl. No. 11/390,976.
Sep. 10, 2010—(AU) Office Action—App 2006230171.
Sep. 30, 2010—(U.S.) Office Action—U.S. Appl. No. 11/390,976.
Apr. 27, 2011—(WO) International Search Report and Written Opinion—App PCT/US2010/054520.
Aug. 25, 2011—(U.S.) Non Final Rejection—U.S. Appl. No. 12/871,806.
Feb. 14, 2011—(EP) Search Report—App 06758213.0.
Jun. 9, 2011—(U.S.) Notice of Allowance—U.S. Appl. No. 11/390,976.
Mar. 3, 2011—(EP) Communication Pursuant to Rules 70(2) and 70a(2)—App 06758213.0.
Mar. 4, 2011—(U.S.) Notice of Allowance—U.S. Appl. No. 11/316,331.
Nov. 11, 2011—(AU) Second Office Action—App 2006230171.
Oct. 18, 2011—(EP) Communication Pursuant to Article 94(3)—App 06 758 213.0.
Aug. 7, 2012—(U.S.) Non Final Rejection—U.S. Appl. No. 12/871,806.
Feb. 6, 2012—(U.S.) Final Rejection—U.S. Appl. No. 12/871,806.
Jun. 9, 2012—(AU) Notice of Acceptance—App 2006230171.
Jun. 26, 2012—(EP) Extended Search Report—App 05857614.1.
Nov. 20, 2012—(EP) Communication under rule 71(3)—App 06 758 213.0.
Nov. 26, 2012—(U.S.) Final Rejection—U.S. Appl. No. 12/871,806.
Apr. 4, 2013—(U.S.) Notice of Allowance—U.S. Appl. No. 12/871,806.
Apr. 18, 2013—(EP) Decision to Grant a European Patent—App 06758212.0.
Jan. 16, 2013—(CA) Office Action—App 2,594,020.
Jan. 17, 2013—(CA) Office Action—App 2,600,236.
Nov. 7, 2013 (WO) International Search Report—App. PCT/US2013/057502.
Jun. 24, 2014 (WO) International Search Report—App. PCT/US2014/023286.
Jun. 26, 2014 (WO) International Search Report—App. PCT/US2014/027723.
Mar. 24, 2014 (WO) International Search Report—App. PCT/US2013/072566.

US 10,503,899 B2

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

May 26, 2014—(CA) Office Action—App 2010297968.
Apr. 28, 2015 (WO) International Preliminary Report on Patentability—App. PCT/US2013/057502, dated Apr. 28, 2015.
Dec. 22, 2015—(U.S.) Final Office Action—U.S. Appl. No. 14/714,207.
Jan. 14, 2015—(EP) Extended Search Report—App 10819667.6.
Jul. 10, 2015—(WO) Communication Relating to the Results of the Partial International Search for International App—PCT/US2015/024691.
Jul. 14, 2015—(WO) International Preliminary Report on Patentability—App PCT/US2013/072566.
May 14, 2015—(U.S.) Non Final Rejection—U.S. Appl. No. 13/940,240.
May 25, 2015—(AU) Notice of Acceptance—App 2010297968.
Nov. 2, 2015—(AU) Office Action—App 2013372879.
Nov. 27, 2015—(U.S.) Final Rejection—U.S. Appl. No. 13/940,240.
Sep. 15, 2015 (WO) International Preliminary Report on Patentability—App.—PCT/US2014/027723.
Sep. 15, 2015 (WO) International Preliminary Report on Patentability—App. PCT/US2014/023286.
Sep. 16, 2015 (WO) International Search Report and Written Opinion—App. No. PCT/US2015/024691.
Sep. 4, 2015 (U.S.) Notice of Allowance—U.S. Appl. No. 14/702,755.
Apr. 15, 2016—(U.S.) Notice of Allowance—U.S. Appl. No. 14/855,374.
Apr. 26, 2016—(U.S.) Office Action—U.S. Appl. No. 14/745,207.
Dec. 5, 2016—(U.S.) Notice of Allowance—U.S. Appl. No. 14/714,207.
Feb. 24, 2016—(AU) Office Action—App 2014228257.
Feb. 25, 2016—(AU) Office Action—App 2014249055.
Feb. 26, 2016—(U.S.) Non Final Office Action—U.S. Appl. No. 14/253,992.
Jan. 11, 2016—(U.S.) Non Final Rejection—U.S. Appl. No. 14/698,560.
Jan. 28, 2016 (WO) International Search Report and Written Opinion—App PCT/US2015/062691.
Jul. 11, 2016—(EP) Office Action—App 14720824.3.
Jul. 20, 2016—(AU) Office Action—App 2013335255.
Jul. 22, 2016—(U.S.) Office Action—U.S. Appl. No. 14/921,718.
Jun. 9, 2016—(WO) International Search Report—PCT/US2016/026339.
Jun. 14, 2016—(U.S.) Office Action—U.S. Appl. No. 14/625,486.
Jun. 16, 2016—(CA) Office Action—App 2,888,935.
May 6, 2016—(U.S.) Office Action—U.S. Appl. No. 14/714,207.
May 13, 2016—(U.S.) Office Action—U.S. Appl. No. 13/940,240.
Nov. 21, 2016—(U.S.) Office Action—U.S. Appl. No. 14/745,207.
Oct. 5, 2016—(U.S.) Notice of Allowance—U.S. Appl. No. 14/698,560.
Oct. 26, 2016—(U.S.) Office Action—U.S. Appl. No. 13/940,240.
Sep. 13, 2016—(CA) Office Action—App 2,902,206.
Sep. 14, 2016—(CA) Office Action—App 2,897,737.
Sep. 26, 2016—(CA) Office Action—App 2,902,158.
Apr. 12, 2017—(U.S.) Office Action—U.S. Appl. No. 141757,638.
Aug. 15, 2017 (WO) International Preliminary Report on Patentability—App. PCT/US2015/062691.
Aug. 21, 2017 (AU) First Examination Report—App. 2015248067.
Feb. 10, 2017—(U.S.) Notice of Allowance—U.S. Appl. No. 14/625,486.
Feb. 15, 2017—(U.S.) Notice of Allowance—U.S. Appl. No. 14/921,718.
Jul. 20, 2017 (US) Complaint for Patent Infringement—Case No. 217-cv-00383-HCN-LRL, Document 1, 38 pages.
Jun. 7, 2017—(U.S.) Office Action—U.S. Appl. No. 14/745,207.
Jun. 7, 2017—(WO) International Search Report and Written Opinion—App PCT/US2016/067111.
Mar. 6, 2017—(WO) International Search Report and Written Opinion—App PCT/US2016/068008.
Nov. 21, 2017 (U.S.) Notice of Allowance—U.S. Appl. No. 14/690,302.
Nov. 3, 2017 (U.S.) Non Final Office Action—U.S. Appl. No. 15/413,834.
Oct. 17, 2017 (WO) International Preliminary Report on Patentability—App. PCT/US2016/026339.

Sep. 5, 2017 (US) Defendant Ixia's Partial Answer to Complaint for Patent Infringement—Case No. 2:17-cv-00383-HCN-LRL, Document 29, 14 pages.
Sep. 5, 2017 (US) Memorandum in Support of Defendant's Ixia and Keysight Techonologies, Inc's Motion to Dismiss for Unpatentability Under 35 U.S.C. § 101—Case No. 2:17-cv-00383-HCM-LRL, Document 21, 29 pages.
Sep. 5, 2017 (US) Request for Judicial Notice in Support of Defendants Ixia and Keysight Technologies, Inc's Motion to Dismiss for Unpatentability under 35 U.S.C. § 101—Case No. 2:17-cv-00383-HCN-LRL, Document 22, 3 pages.
Sep. 29, 2017 (CA) Examination Report—App. 2,772,630.
Apr. 17, 2018 (U.S.) Non-Final Office Action—U.S. Appl. No. 15/610,995.
Jul. 5, 2018 (U.S.) Non-Final Office Action—U.S. Appl. No. 15/413,750.
Mar. 15, 2018 (EP) Second Communication pursuant to Article 94(3) EPC—App. 13765547.8.
Mar. 16, 2018 (EP) Communication Pursuant to Rule 164(2)(b) and Aritcle 94(3) EPC—App. 15722292.8.
Mar. 21, 2018 (AU) First Examination Report—App. 2015382393.
Mar. 8, 2018 (U.S.) Non-Final Office Action—U.S. Appl. No. 14/745,207.
May 25, 2018 (U.S.) Notice of Allowance—U.S. Appl. No. 15/413,834.
A. Feldmann et al., "Tradeoffs for Packet Classification", Proceedings of the IEEE INFOCOM, 397-413, 2000.
A. Hari et al., "Detecting and Resolving Packet Fitter Conflicts", Proceedings of IEEE INFOCOM, 1203-1212, 2000.
Acharya et al, "OPTWALL: A Hierarchical Traffic-Aware Firewall," Department of Computer Science, Telecommunications Program, University of Pittsburgh, pp. 1-11 (2007).
Bellion, "High Performance Packet Classification", http://www.hipac.org (Publication Date Unknown).
C. Benecke, "A Parallel Packet Screen for High Speed Networks", Proceedings of the 15th Annual Computer Security Applications Conference, 1999.
Chen, et al, "Research on the Anomaly Discovering Alogrithm of the Packet Filtering Rule Sets," Sep. 2010, First International Conference on Pervasive Computing, Signal Processing and Applications, pp. 362-366.
D. Comer, "Analysis of a Heuristic for Full the Minimization", ACM Transactions on Database Systems, 6(3): 513-537, Sep. 1981.
D. Decasper et al., "Router Plugins: A Software Architecture for Next-Generation Routers", IEEE/ACM Transactions on Networking, 8(1): Feb. 2000.
D. Eppstein et al., "Internet Packet Filter Management and Rectangle Geometry", Proceedings of the Symposium on Discrete Algorithms, 827-835, 2001.
E. Al-Shaer et al., "Firewall Policy Advisor for Anomaly Discovery and Rule Editing", Proceedings of the IFIP/IEEE International Symposium on Integrated Network Management, 2003.
E. Al-Shaer et al., "Modeling and Management of Firewall Policies", IEEE Transactions on Network and Service Management, 1(1): 2004.
E. Fulp et al., "Network Firewall Policy Tries", Technical Report, Computer Science Department, Wake Forest University, 2004.
E. Fulp, "Optimization of Network Firewall Policies Using Ordered Sets and Directed Acydical Graphs", Technical Report, Computer Scient Department, Wake Forest University, Jan. 2004.
E. Fulp, "Preventing Denial of Service Attacks on Quality of Service", Proceedings of the 2001 DARPA Information Survivability Conference and Exposition II, 2001.
E.L. Lawler, "Sequencing Jobs to Minimize Total Weighted Completion Subject to Precedence Constraints", Annals of Discrete Mathematics, 2: 75-90, 1978.
E.W. Fulp, "Firewall Architectures for High Speed Networks", U.S. Department of Energy Grant Application, Funded Sep. 2003.
Fulp, "Trie-Based Policy Representations for Network Firewalls," Proceedings of the IEEE International Symposium on Computer Communications (2005).
Fulp, Errin: "Errin Fulp," XP002618346, www.cs.wfu.edu/fulp/ewfPub.html, pp. 1-5 (Copyright 2010).

US 10,503,899 B2

Page 5

(56)          **References Cited**

OTHER PUBLICATIONS

G. Brightwell et al., "Counting Linear Extensions is #P-Complete", Proceedings of the Twenty-Third Annual ACM Symposium on Theory of Computing, 1991.

G.V. Rooij, "Real Stateful TCP Packet Filtering in IP Filter", Proceedings of the 10th USENIX Security Symposium, 2001.

Greenwald, Michael; "Designing an Academic Firewall: Policy, Practice, and Experience with SURF"; IEEE, Proceedings of SNDSS, 1996.

J. Xu et al., "Design and Evaluation of a High-Performance ATM Firewall Switch and Its Applications", IEEE Journal on Selected Areas in Communications, 17(6): 1190-1200, Jun. 1999.

J.K. Lenstra et al., "Complexity of Scheduling Under Precedence Constraints", Operations Research, 26(1): 22-35,1978.

Kindervag, et al. "Build Security Into Your Network's DNA: The Zero Trust Network Architecture," Forrester Research Inc.; Nov. 5, 2010, pp. 1-26.

L. Qui et al., "Fast Firewall Implementations for Software and Hardware-Based Routers", Proceedings of ACM Sigmetrics, Jun. 2001.

Lee et al., "Development Framework for Firewall Processors," IEEE, pp. 352-355 (2002).

M. Al-Suwaiyel et al., "Algorithms for Trie Cornpaction", ACM Transactions on Database Systems, 9(2): 243-263, Jun. 1984.

M. Christiansen et al., "Using IIDDsfor Packet Filtering", Technical Report, BRICS, Oct. 2002.

M. Degermark et al., "Small Forwarding Tables for Fast Routing Lookups", Proceedings of ACM SIGCOMM, 4-13, 1997.

Mizuno et al., A New Remote Configurable Firewall System for Home-use Gateways, Jan. 2005. Second IEEE Consumer Communications and Networking Conference, pp. 599-601.

Moore, S, "SBIR Case Study: Centripetal Networks: How CNI Leveraged DHS S&T SBIR Funding to Launch a Successful Cyber Security Company," 2012 Principal Investigators' Meeting, Cyber Security Division, Oct. 10, 2014.

O. Paul et al., "A full Bandwidth ATM Firewall", Proceedings of the 6th European Symposium on Research in Computer Security ESORICS'2000, 2000.

P. Warkhede et al., "Fast Packet Classification for Two-Dimensional Conflict-Free Filters", Proceedings of IEEE INFOCOM, 1434-1443, 2001.

Palo Alto Networks; "Designing a Zero Trust Network With Next-Generation Firewalls"; pp. 1-10; last viewed on Oct. 21, 2012.

R. Funke et al., "Performance Evaluation of Firewalls in Gigabit-Networks", Proceedings of the Symposium on Performance Evaluation of Computer and Telecommunication Systems, 1999.

R. Rivest, "On Self-Organizing Sequential Search Heuristics", Communications of the ACM, 19(2): 1976.

R.L. Graham et al., "Optimization and Approximation in Deterministic Sequencing and Scheduling: A Survey", Annals of Discrete Mathematics, 5: 287-326, 1979.

Reumann, John; "Adaptive Packet Filters"; IEEE, 2001, Department of Electrical Engineering and Computer Science, The University of Michigan, Ann Arbor, MI.

S,M. Bellovin et al., "Network Firewalls", IEEE Communications Magazine, 50-57, 1994.

S. Goddard et al., "An Unavailability Analysis of Firewall Sandwich Configurations", Proceedings of the 6th IEEE Symposium on High Assurance Systems Engineering, 2001.

S. Suri et al., "Packet Filtering in High Speed Networks", Proceedings of the Symposium on Discrete Algorithms, 969-970, 1999.

Singh, Rajeev et al. "Detecting and Reducing the Denial of Service attacks in WLANs", Dec. 2011, World Congress on Information and Communication TEchnologies, pp. 968-973.

Statement Re: Related Application, dated Jul. 24, 2015.

Tarsa et al., "Balancing Trie-Based Policy representations for Network Firewalls," Department of Computer Science, Wake Forest University, pp. 1-6 (2006).

U. Ellermann et al., "Firewalls for ATM Networks", Proceedings of INFOSEC'COM, 1998.

V. Srinivasan et al., "Fast and Scalable Layer Four Switching", Proceedings of ACM SIGCOMM, 191-202, 1998.

V.P. Ranganath, "A Set-Based Approach to Packet Classification", Proceedings of the IASTED International Conference on Parallel and Distributed Computing and Systems, 889-894, 2003.

W.E. Leland et al., "On the Self-Similar Nature of Ethernet Traffic", IEEE Transactions on Networking, 2(1); 15, 1994.

W.E. Smith, "Various Optimizers for Single-Stage Productions", Naval Research Logistics Quarterly, 3: 59-66, 1956.

X. Gan et al., "LSMAC vs. LSNAT: Scalable Cluster-based Web servers", Journal of Networks, Software Tools, and Applications, 3(3): 175-185, 2000.

Jul. 13, 2018 (U.S.) Notice of Allowance—U.S. Appl. No. 15/414,117.

Jul. 27, 2018 (U.S.) Non-Final Office Action—U.S. Appl. No. 15/382,806.

Sourcefire 3D System User Guide, Version 4.10, Mar. 16, 2011, 2123 pages.

Jul. 11, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01386.

Ylonen, et al, "The Secure Shell (SSH) Transport Layer Protocol," SSH Communication Security Corp, Network Working Group RFC 4253, Jan. 2006, 32 pages.

Jul. 20, 2018 (US) Declaration of Dr. Stuart Staniford in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,160,713—IPR2018-01437.

Jul. 20, 2018 (US) Declaration of Dr. Stuart Staniford in Support of Petition for Inter Partes Review of U.S. Pat. No. 9,124,552—IPR2018-01436.

Jul. 26, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of Second Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01444.

Nichols, et al. "Definition of the Differentiated Services Field (DS Field) in the IPv4 and IPv6 Headers," Network Working Group RFC 2474, Dec. 1998, 20 pages.

Jul. 26, 2018 (US) Declaration of Kevin Jeffay, PhD in Support of First Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01443.

Perkins, "IP Encapsulation with IP," Network Working Group RFC 2003, Oct. 1996, 14 pages.

Jul. 12, 2018 (U.S.) Petition for Inter Partes Review of U.S. Pat. No. 9,565,213—IPR2018-01386.

Jul. 20, 2018 (U.S.) Petition for Inter Partes Review of U.S. Pat. No. 9,160,713—IPR2018-01437.

Jul. 20, 2018 (U.S.) Petition for Inter Partes Review of U.S. Pat. No. 9,124,552—IPR2018-01436.

Blake, et al, "An Architechture for Differentiated Services," Network Working Group RFC 2475, Dec. 1998, 36 pages.

Jul. 27, 2018 (US) Second Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01444.

Jul. 27, 2018 (US) First Petition for Inter Partes Review of U.S. Pat. No. 9,137,205—IPR2018-01443.

* cited by examiner

Case: 23-1731    Document: 14    Page: 114    Filed: 08/21/2023

Fig. 1



• Illustrative functional diagram of a Cyber Threat Intelligence (CTI) operational system

Case: 23-1731     Document: 14     Page: 115     Filed: 08/21/2023

## Fig. 2



- Illustrative network environment for a CTI operational system with cyberanalysis workflow acceleration

IPR2021-01158 Page 00007

## FIG. 3



Illustrative functional environment for a cyberanalysis workflow application process

Case: 23-1731    Document: 14    Page: 117    Filed: 08/21/2023

FIG. 4

| Reportability Likelihood | Indicator Type | Indicator Age (days) | CTI Score (normalized) |
|---|---|---|---|
| 0.8 | URL | Don't Care | Don't Care |
| 0.7 | FQDN | [0, 30) | High |
| 0.6 | FQDN | [30, 60) | Medium |
| 0.5 | FQDN | [60, 180) | Low |
| 0.4 | IP | [0, 30) | High |
| 0.3 | IP | [30, 60) | Medium |
| 0.2 | IP | [60, 180) | Low |
| 0.1 | IP or FQDN | [180, inf) | Don't Care |

Illustrative human-designed (H/D) heuristic algorithm for estimating reportability likelihood in a cyberanalysis workflow application process

IPR2021-01158 Page 00009

Appx61

Case: 23-1731　　Document: 14　　Page: 118　　Filed: 08/21/2023

FIG. 5



170

171

172

Training Data Store

INPUT: Analyzed Events: {Positive Examples, Negative Examples}

Machine Learning Algorithm Generator

OUTPUT to Machine-Learned (M/L) Algorithm 134

Illustrative machine learning system for creating M/L algorithms that estimate reportability likelihoods of threat events

IPR2021-01158 Page 00010

U.S. Patent     Dec. 10, 2019     Sheet 6 of 7     US 10,503,899 B2

FIG. 6a

| Feature/Characteristic Name | Numeric Value Type | Description |
|---|---|---|
| CTI-Prvdr-1 | Boolean | 1 if this CTI Provider has the matching indicator/signature/pattern in its CTI database; 0 otherwise |
| CTI-Prvdr-2 | Boolean | " |
| ... | | |
| CTI-Prvdr-N | Boolean | " |
| Norm-PolyGram-Entropy-LL-e2LD | [0,1] | Normalized polygram entropy of the leading label of the effective 2nd-level domain |
| Norm-PolyGram-Entropy-LL-e3LD | [0,1] | Normalized polygram entropy of the leading label of the effective 3rd-level domain (if present) |
| Numeric-Head-LL-e2or3LD | Boolean | 1 if the leading label of the effective 2nd-level and/or 3rd-level domain has a numeric head, i.e., begins with numeric characters; 0 otherwise |
| String-Length-LL-e{2,3}LD-Bin-X-Y | Boolean | 1 if the string length of the leading label of the effective 2nd-level and/or 3rd-level domain is in the bin range [X,Y]; 0 otherwise. Note: There will be multiple features of this type, each with a different, non-overlapping bin range. |
| TLD-Category-{g, s, cc, other} | Boolean | 1 if the top-level-domain is in the major category type; 0 otherwise. Note: There may be four (4) features of this type, for the four categories gTLD, sTLD, ccTLD, other. |

Feature vector characteristics for estimating reportability likelihood in cyberanalysis workflow acceleration

FIG. 6b

| Feature/ Characteristic Name | Numeric Value Type | Description |
|---|---|---|
| Time-of-Day-Bin-X-Y | Boolean | 1 if the Time-of-Day is in the bin range [X,Y]; 0 otherwise. Note: There will be multiple features of this type, each with a different, non-overlapping bin range. |
| Weekend-or-Holiday | Boolean | 1 if the event occurs during a weekend or holiday; 0 otherwise. |
| Flow-Byte-Count-Bin-X-Y | Boolean | 1 if the event's flow byte count is in the bin range [X,Y]; 0 otherwise. Note: There will be multiple features of this type, each with a different, non-overlapping bin range. |
| Percentage-Digits-FQDN | [0,1] | Percentage of digits (numeric characters) in the event's FQDN |
| Percentage-Hyphens-FQDN | [0,1] | Percentage of hyphen characters in the event's FQDN |
| Percentage-NonCompliant-Characterrs-FQDN | [0,1] | Percentage of characters in the event's FQDN that are non-compliant with RFC 1035 |
| Direction-and-Breach-Category-X | Boolean | 1 if the event matches the category X of direction and breach type of the event; 0 otherwise. The four (4) categories for X are the elements of the cross product of {Intrusion, Exfiltration} X {Allowed, Blocked} |

IPR2021-01158 Page 00012

US 10,503,899 B2

1

# CYBERANALYSIS WORKFLOW ACCELERATION

## BACKGROUND

Network security is becoming increasingly important as the information age continues to unfold. Network threats may take a variety of forms (e.g., unauthorized requests or data transfers, viruses, malware, large volumes of network traffic designed to overwhelm network resources, and the like). Many organizations subscribe to network-threat services that periodically provide information associated with network threats, for example, reports that include listings of network-threat indicators (e.g., network addresses, uniform resource identifiers (URIs), and the like), or threat signatures (e.g., malware file identifiers), or threat behaviors (e.g., characteristic patterns of advanced persistent threats). The information provided by such services may be utilized by organizations to identify threats against their networks and associated assets. For example, network devices may monitor network communications and identify any communications between endpoints with network addresses that correspond to threat indicators.

Once identified, these communications events may be logged, and the events logs may be provided to a cyberanalysis system or human cyberanalysts for further investigation into the nature and severity of, and potential remedial actions for, the threats events. Typically, the cyberanalysis system or cyberanalysts will determine that only a small portion of these logged threat events will be reportable, in the sense that the events should be reported to the proper authorities who may be responsible for executing the associated remedial actions and for ensuring the security of the network, and who may be responsible for enforcing regulatory compliances or reporting compliance violations. In many modern enterprise networks, however, the volume and creation rate of network threat event logs often overwhelms the human cyberanalysts' capacities for investigating all of the events. Thus, it is imperative that cyberanalysts' work be assigned efficiently. To that end, the cyberanalysis system or cyberanalysts should investigate only those events that have a high probability of being reportable events, and not waste time and effort investigating threat events that are unlikely to be reportable. Accordingly, there is a need for cyberanalysis workflow acceleration.

## SUMMARY

The following presents a simplified summary in order to provide a basic understanding of some aspects of the disclosure. It is intended neither to identify key or critical elements of the disclosure nor to delineate the scope of the disclosure. The following summary merely presents some concepts of the disclosure in a simplified form as a prelude to the description below.

Aspects of this disclosure relate to cyberanalysis workflow acceleration. In accordance with embodiments of the disclosure, a TCP/IP network communications monitoring device may receive threat detection rules configured to cause the monitoring device to identify communications events that correspond to the threat detection rules. These rules may also include actions that may be applied by, the monitoring device, to packets that match the rules. For example, the rules may cause the monitoring device to block, allow, modify/transform, log, capture, or perform other actions to a packet based on the rules. The monitoring device may receive TCP/IP packets that compose endpoint-to-endpoint

2

communications and, for each packet and the packet's associated communication, the monitoring device may determine that the packet and/or associated communication correspond to criteria specified by one or more threat detection rules. The criteria may correspond to one or more of the network-threat indicators, or one or more of the network threat signatures, or one or more of the network threat behavior patterns.

Upon threat detection, the monitoring device may log the packet, may aggregate the packet log into an event log for the associated communication, and may designate the communication as a threat event. The log may also include context information, such as the detection criteria, environmental information (e.g., time stamps, interface IDs, directionality), any actions applied to the packet by the monitoring device, or modifications to the packet made by the monitoring device. The information stored in these event logs is intended to facilitate a cyberanalysis of the risk and effects of the threat event, as well as any remedial actions that may be taken to mitigate the threat. The monitoring device may also capture the packets. Copies of captured packets may be stored in raw/unprocessed form. Each of the packets that compose the communication may be stored together in order to further facilitate a cyberanalysis of the threat event.

As the monitoring device produces event logs, the logs may be stored as tasks in a work queue, in the order of arrival time. The work queue may be presented to a cyberanalyst or cyberanalysis system via a user interface designed to assist event analysis. Via the user interface, the cyberanalyst or cyberanalysis system may select the event log at the head of the queue and begin to investigate it, thereby initiating the cyberanalysis workflow process on the event. The workflow may proceed as follows: the cyberanalysis system or the cyberanalyst reviews the event's information and may conduct an investigation; may make a determination of the event's type and severity, such as determining if the event caused critical asset damage or loss; may determine if there may be any mitigating or remedial actions, such as determining whether to remove malware from a host; and may report the event and any mitigating or remedial actions as a "finding" to the proper authorities, such as management and/or network security operations and/or regulatory agencies, or, the cyberanalysis system or the cyberanalyst may decide that the event is not a reportable finding, either of which may complete the workflow process. The cyberanalysis system may review and summarize event information received by the cyberanalysis system. The summary and/or event information may be presented or transmitted to a cyberanalyst user device with an inquiry to provide or determine any missing information, and may include suggested event type and severity determinations and suggested mitigating or remedial actions. If the event is not a reportable finding, the cyberanalyst's work is considered to have been "wasted" effort. Any time spent investigating an event that is not a reportable finding may be viewed as an inefficiency that may adversely affect the quality of cybersecurity because of, for example, opportunity costs. That is, the time spent investigating the non-reportable event may instead have been used to investigate a reportable finding.

To address reportable findings, a management device may need to take action on the finding, such as reporting the finding to authorities by transmitting reporting messages to authority network devices in order to be compliant with applicable regulations. Network security operations may be responsible for executing the mitigating actions associated with the finding. Upon completion of a single workflow

US 10,503,899 B2

**3**

process, the cyberanalysis system or the cyberanalyst may transmit a message to initiate a new workflow process by cycling back to the selection of a next event to analyze, execute a workflow on the next event, determine that the next event is either reportable or not reportable. This workflow cycle may be repeated until the cyberanalyst completes their work session or until the work queue has been emptied.

A major issue with cybersecurity operations is that in a typical cybersecurity environment with cyberanalysts who use conventional cyberanalysis applications and tools, the threat-event generation rate, or equivalently the work queue arrival rate, may far exceed a cyberanalyst's service rate for each event. If the cyberanalysis workflow cycle proceeds too slowly, the backlog, or queue, of events to be serviced may grow until the queue's maximum size is exceeded, at which time events may be dropped from the queue. Dropped events may never be investigated, and thus it may be the case that some potentially reportable events may never be discovered. This compromises cybersecurity.

One approach to addressing the issue is to increase the service rate of a threat event work queue. One way to do this is to add more cyberanalysts to service a threat event queue. In typical environments, however, it is not practical to increase the number of cyberanalysts sufficiently such that the queue's service rate matches the queue's event arrival rate.

Another way to increase the service rate is to reduce the average workflow cycle time, or equivalently to reduce the average service time per enqueued event, or task; that is, to accelerate the workflow. In a typical environment, most of the events may be determined to be low-risk, or false positives, and therefore not reportable. Thus, if there is a way to ensure that a cyberanalyst does not spend any time investigating events that would be deemed not reportable, then the cycle time is zero for such events, and the average workflow cycle time can be significantly reduced. Conversely, if there is a way to ensure that a cyberanalyst only investigates events that will be determined to be reportable, then the average workflow cycle time can be significantly reduced. In terms of the event queue, instead of ordering events in the queue by arrival time, which results in the oldest events being at the head of the queue, the events in the queue may be ordered, or sorted, by the likelihood of reportability (a probability value in [0,1]), which results in the most likely reportable events being at the head of the queue. To order the events in the queue by reportability likelihood, an algorithm that computes an event's reportability likelihood may be applied to each event arriving at the queue, and then subsequently the event may be inserted into the queue in sorted order. Events with a low likelihood of reportability may never be investigated by cyberanalysts and may be removed from the queue; then service time for such events is zero, and thus the average workflow cycle time for queued events is reduced, resulting in workflow acceleration.

A critical component of cyberanalysis workflow acceleration is the design of algorithms that compute an event's reportability likelihood. Before describing the nature of such algorithms, observe that if algorithms existed that computed an event's reportability likelihood with high accuracy, then there would be little need for human cyberanalysts to perform investigations; they could be wholly replaced by robots. To date, such high-accuracy algorithms have not been designed, and it is generally believed that it is infeasible for humans to design highly accurate algorithms using explicit programming methods. Also, algorithms that may be considered accurate for a particular network or area of the

**4**

world may not be considered accurate when applied globally to events in all cybersecurity environments. That is, events considered reportable in one environment may not be considered reportable in a different environment, due to differing considerations about what events may be considered reportable. For example, consider two political nations A and B that may be mutually hostile or even in a state of war. Suppose that a malware distribution server M attached to a network that is controlled and operated by nation A's military. Any networked communications with M may potentially be a malware distribution and therefore should be considered a threat risk. However, a communication between malware distribution server M and a host computer attached to a network controlled by nation A may not be considered a reportable event by nation A; conversely, a communication between malware distribution server M and a host computer attached to a network controlled by nation B may likely be considered a reportable event by nation B.

There may be two types of algorithms used to determine an event's estimated reportability likelihood: (1) human-designed (H/D) heuristic algorithms that may be explicitly programmed; and (2) machine-designed, or machine-learned (M/L), algorithms that may be produced by a machine learning system. To determine estimates for an event's reportability likelihood, H/D algorithms may classify event characteristics and/or mathematically combine measures of event characteristics, such as the fidelity of the event's threat indicator (URIs have higher fidelity than domain names, and domain names have higher fidelity than IP addresses), the age of the indicator, the threat intelligence provider(s) that supplied the indicator, the reputation of the threat intelligence provider(s), the reputation or risk score assigned by the threat intelligence provider(s) to the threat indicator, or other human-selected event characteristics. To determine an event's reportability likelihood, an M/L algorithm similarly combines event characteristics by correlating event characteristics with previously identified threat events. In contrast to H/D algorithms, an M/L algorithm may use many more characteristics and may combine those characteristics in more complex ways, e.g., by computing non-linear multi-variable functions, that may not be readily designed or explicitly programmed or well-understood by humans. The characteristics and combinations that result in accurate determinations of reportability may be learned by machine-learning systems that use approaches such as artificial neural networks (ANNs), genetic programming (GP), and the like, which typically use supervised learning methods. A machine learning system produces an M/L algorithm that computes a reportability likelihood value for a threat event.

Note that some of the event characteristics used by both the H/D algorithms and the M/L algorithms are novel and are considered to be part of the disclosure.

To produce effective M/L algorithms, machine learning systems that use supervised learning often require a significant volume of training data. The training data consists of threat event logs that have been categorized (by human cyberanalysts) into reportable findings (positive examples) and non-reportable events (negative examples). Thus, a potential issue with using M/L algorithms for cyberanalysis workflow acceleration is self-deadlock due to insufficient training data. That is, generating sufficient volumes of training data in a practical amount of time to produce highly accurate M/L algorithms for workflow acceleration may itself require workflow acceleration.

To avoid this potential deadlock, during the time that the M/L algorithm is not sufficiently accurate due to insufficient

US 10,503,899 B2

5

training, H/D heuristic algorithms may be used to determine reportability likelihoods of events and thereby achieve some degree of cyberanalyst workflow acceleration while generating training data. The training data may be used to generate M/L algorithms that, over time, may become very accurate at determining reportability likelihood. Then the M/L algorithms may be applied to events in the queue to order the events by reportability likelihood (possibly in combination with the H/D algorithms for reportability likelihood). Cyberanalysts investigate events at the head of the queue (which may be the events most likely to be reportable), and conclude their investigation, or workflow cycle, by labeling the event as either reportable or not reportable. Each event that a cyberanalysis system or cyberanalyst has investigated and labeled as reportable or not reportable may be fed back into the machine learning system as training data, which will be used to create an even more accurate M/L algorithm. Events in the sorted queue that have a reportability likelihood less than some threshold (which may be subjectively determined by the cyberanalyst) may be dropped from the queue, and dropped events may never investigated. As noted above, dropping events in the queue accelerates workflow.

Another reason to use H/D algorithms in combination with M/L algorithms to improve workflow acceleration is to address irregular and idiosyncratic events. A threat event may occur that will be deemed a reportable event when investigated by a cyberanalyst, but that does not correlate well with the patterns of previous reportable events used as training data for the M/L algorithm. Thus, the M/L algorithm will assign the event a low likelihood of reportability, whereas the H/D algorithm may assign it a higher likelihood of reportability. To make the overall system robust to such anomalies or to changes in threat event patterns (as is often the case in cybersecurity), reportability likelihoods computed by H/D algorithms may be combined with reportability likelihoods computed by M/L algorithms such that the combined likelihood is always greater than or equal to the larger of the H/D likelihood and the M/L likelihood (but always less than or equal to 1). Thus, even if the M/L likelihood is low, the combined reportability likelihood value used to sort the event in the queue should be greater than or equal to the H/D score.

The reportability likelihoods computed by different algorithms may be weighted. The H/D algorithms may be combined with reportability likelihoods computed by M/L algorithms such that the combined reportability likelihood is weighted to emphasize one of the algorithms. The system may be weighted to emphasize H/D algorithm. The system may use the H/D algorithm to determine a combined reliability until the amount of training data used to refine the M/L algorithm has reached a threshold. As the amount of training data increases, the weighting may be shifted to balance between the H/D likelihood and the M/L likelihood.

Also, the historical data/training data used to generate M/L algorithms may be specific to a particular system/organization, particular network segment, or to a particular network analyst. For example, it's possible that a threat event(s) considered significant (i.e., worthy of a cyberanalyst's time & effort) in one market segment/critical infrastructure segment is not considered to be significant in a different market segment/critical infrastructure segment. Similarly, within a given segment, a threat event considered significant by one organization in a given segment is not considered significant by another organization in the same given segment. In addition, a threat event considered significant by one cyberanalyst is not considered significant by another individual cyberanalyst. As such, the M/L algo-

6

rithms may vary based on the market/network segment, critical infrastructure segment, organization, or cyberanalysts providing the training data for that algorithm.

Thus, the training data used to develop correlation measurement algorithms that are "tuned" to a given segment, or organization, or individual cyberanalysts. This also means that multiple correlation measurement algorithms may be used at the same time, each algorithm being machine-learned/trained on a different set of training data.

A TCP/IP communications monitoring device, called a cyber threat intelligence (CTI) gateway, may be configured to detect and log communications that match threat indicators, signatures, behavioral patterns, and the like. When the device detects a threat communication, or threat event, the device may log the event and forward the event log to a work queue that contains tasks for the cyberanalysis system or cyberanalysts to investigate. Before inserting the event log in the queue, the event's reportability likelihood, a probability value between 0 and 1, may be individually computed by both an H/D algorithm and an M/L algorithm. The H/D algorithm's likelihood value and the M/L algorithm's likelihood value may be combined to produce an integrated reportability likelihood value, named R. The event log may be inserted into the work queue in sorted order, with the sorting criterion being the value of R for each event log in the queue, and with larger R values near the head of the queue. A device retrieves, pops, or removes the event log at the head of the queue (which may be the event log with the largest value of R among all the event logs in the queue) and transmits the event log to the cyberanalysis system or cyberanalyst to investigate it, and the cyberanalysis system or cyberanalyst determines whether the event is reportable or not reportable. If reportable, then the the cyberanalysis system or cyberanalyst user device may create a report for the event which may include a recommendation for remedial action, or the cyberanalyst system or cyberanalyst may execute or recommend remedial action and include that information in the report. The event log may be forwarded to the machine learning system to be used as training data, in order to further improve the accuracy of the M/L algorithm. The report may be transmitted to the proper authorities who may be responsible for ensuring network security, executing the remedial actions, complying with applicable regulations, reporting compliance violations, and the like.

The workflow process and monitoring and logging processes may be repeated continually. The monitoring device detects and logs threat communication events, and forwards the events to the work queue. Events may be inserted into the queue in sorted order according to their R values, which may be computed by HID and MIL algorithms. The cyberanalysis system or cyberanalysts may retrieve, request, or be transmitted events from the head of the queue, investigate the events, and label them as reportable or not reportable. Investigated events, both reportable and not reportable, may be sent to the machine learning system for use as training data for creating more accurate M/L algorithms. The cyberanalysis system or cyberanalysts investigate event logs at the head of the queue until the R values fall below a threshold (which may be subjective). Event logs with an R value below some threshold may be dropped from the queue, and dropped event logs may never be investigated by cyberanalysts.

The above process accelerates workflow by reducing the average service rate, or investigation time, per event in the queue. The cyberthreat intelligence operation system may ensure cyberanalysts only investigate events with high R

US 10,503,899 B2

7                                                                8

values, and do not spend any time investigating events with low R values (events with R values below some threshold).

## BRIEF DESCRIPTION OF THE DRAWINGS

The present disclosure is pointed out with particularity in the appended claims. Features of the disclosure will become more apparent upon a review of this disclosure in its entirety, including the drawing figures provided herewith.

Some features herein are illustrated by way of example, and not by way of limitation, in the figures of the accompanying drawings, in which like reference numerals refer to similar elements, and wherein:

FIG. **1** depicts an illustrative functional diagram of a cyber threat intelligence (CTI) operational environment for cyberanalysis workflow acceleration, in accordance with one or more aspects of the disclosure;

FIG. **2** depicts an illustrative TCP/IP network environment for a CTI operational system with cyberanalysis workflow acceleration in accordance with one or more aspects of the disclosure;

FIG. **3** depicts an illustrative functional environment for a cyberanalysis workflow application process in accordance with one or more aspects of the disclosure;

FIG. **4** depicts a representative human-designed (H/D) heuristic algorithm for determining reportability likelihood for a communications event collected by a cyber threat intelligence gateway, in accordance with one or more aspects of the disclosure;

FIG. **5** depicts a machine learning system for creating machine-learned (M/L) algorithms for determining reportability likelihood for a communications event collected by a cyber threat intelligence gateway, in accordance with one or more aspects of the disclosure;

FIGS. **6a** and **6b** list features of communications events logs and associated measures that may be used as input to machine learning systems and to M/L algorithms for determining reportability likelihoods for communications events collected by cyber threat intelligence gateways, in accordance with one or more aspects of the disclosure.

## DETAILED DESCRIPTION

In the following description of various illustrative embodiments, reference is made to the accompanying drawings, which form a part hereof, and in which is shown, by way of illustration, various embodiments in which aspects of the disclosure may be practiced. It is to be understood that other embodiments may be utilized, and structural and functional modifications may be made, without departing from the scope of the disclosure. In addition, reference is made to particular applications, protocols, and embodiments in which aspects of the disclosure may be practiced. It is to be understood that other applications, protocols, and embodiments may be utilized, and structural and functional modifications may be made, without departing from the scope of the disclosure.

Various connections between elements are discussed in the following description. These connections are general and, unless specified otherwise, may be direct or indirect, wired or wireless, physical or logically defined. In this respect, the specification is not intended to be limiting.

FIG. **1** depicts an illustrative functional diagram of a cyber threat intelligence (CTI) operational environment for cyberanalysis workflow acceleration in accordance with one or more aspects of the disclosure. Referring to FIG. **1**, the CTI operational system **100** may include functional com-

ponents of a typical cyber threat intelligence (CTI) operational cycle. CTI Requirement Component **110** gathers cyber threat intelligence from various providers in the form of: threat indicators, for example IP addresses, domain names, and URIs of Internet-attached endpoints that may be controlled by malicious actors; threat signatures, for example an MD5 hash of a malware file; and threat behavioral patterns, for example a file with an .mp3 extension that makes system calls. CTI Requirement Component **110** distributes the CTI to the Collection Component **120**, which may be implemented by CTI gateways. CTI gateways may be network appliances that inspect network communications for matches with the CTI. The Collection Component or CTI-Gateway **120** may be located within network A **150**, at or near the interface between network A **150** and network B **160**. For example, suppose a host desktop computer attached to network A **150**, for example an enterprise local-area network (LAN), sends a web Hypertext Transfer Protocol (HTTP) request with the Uniform Resource Locator (URL) http://www.malware-server.net/directory-aaa/a87gah.exe to a web server www.malware-server.net attached to Network B **160**, which may be the Internet. If the Collection Component or CTI-Gateway **120** is searching network communications for the threat indicator www.malware-server.net, then it will detect the HTTP request and may log the resultant HTTP session as a threat event. Collection Component or CTI-Gateway **120** sends threat event logs to Cyberanalysis Application System **130**. The Cyberanalysis Application System **130** may include functions executed by cyberanalysts using threat event analysis applications such as security information and event management (STEM) applications to investigate the events and determine if the events should be reported to authorities. The reports may include remedial actions. Cyberanalysis Application System **130** sends any reportable findings to Authority System Network Devices **140**. The Authority System Network Devices **140** may be implemented by entities with the authority to execute the remedial actions, for example, to disconnect a host computer from a network and sweep it for malware. Cyberanalysis Application System **130** also transmits any reportable event findings and any non-reportable events to Machine Learning System **170**, where they may be stored and may be used as training data.

In a CTI operational system **100**, often the Cyberanalysis Application System **130** is a bottleneck. The generation rate of threat event logs by Collection Component **120**, or equivalently the arrival rate of threat event logs to the Cyberanalysis Application System **130**, significantly exceeds the rate at which the Cyberanalysis Application System **130** processes the threat event logs, or the rate at which the cyberanalysts investigate the threat events. The result is that only a small percentage of the events may be investigated. Furthermore, often only a small percentage of the events that may be investigated, often only a small percentage of investigated events may be determined to be reportable findings. For example, in a typical enterprise network environment, there may be many port scanning attacks on the enterprise's public-facing servers, which may be readily blocked by, for example, a network firewall. These blocked scanning attack events may be logged and sent to the Cyberanalysis Application System **130**, but because the attacks may be common and were blocked, the cyberanalysts will not report them to authorities. The CTI operational system **100** mitigates the bottleneck by computing reportability likelihood values for the events, and ordering the events in the work queue by reportability likelihood, so that cyberanalysts only investigate events with a high likelihood of being reportable. This

US 10,503,899 B2

9

significantly reduces the average service time for investigating events, thereby accelerating cyberanalysis workflow.

FIG. 2 depicts an illustrative system diagram of a network environment for cyberanalysis workflow acceleration in accordance with one or more aspects of the disclosure. Referring to FIG. 2, the CTI operational system 100 may include one or more networks. For example, the CTI operational system 100 may include network A 150 and network B 160. Network A 150 may comprise one or more networks (e.g., Local Area Networks (LANs), Wide Area Networks (WANs), Virtual Private Networks (VPNs), Software-Defined Networks (SDNs), or combinations thereof) associated with, for example, one or more individuals or entities (e.g., governments, corporations, service providers, or other organizations). Network B 160 may comprise one or more networks (e.g., LANs, WANs, VPNs, SDNs, or combinations thereof) that interfaces network A 150 with one or more other networks (not illustrated in FIG. 2). For example, network B 160 may comprise the Internet, or a similar network, or portions thereof, which interconnects many public and private networks such as network A 150.

The CTI operational system 100 may also include one or more hosts, such as computing or network devices (e.g., servers, desktop computers, laptop computers, tablet computers, mobile devices, smartphones, routers, gateways, switches, access points, or the like). For example, network A 150 may include endpoints Host-A1 152 and Host-A2 154, as well as host infrastructure (not shown in FIG. 2) for supporting systems such as a Cyberanalysis Applications System 130 and a Machine Learning System 170. Hosts 152 and 154 may support, for example, HTTP client applications (web browsers) that access HTTP servers (web sites) attached to the Internet. Network A 150 may also include a plurality of Collection Component or CTI Gateway devices 120, which may typically be located at or near the network perimeter and which inspect network traffic transiting across network links 106 connecting networks such as network A 150 and network B 160. The Collection Components or CTI Gateway devices 120 may detect threat events that correspond to CTI, and log and capture the events, and send the logs to the Cyberanalysis Applications System 130, for investigation by cyberanalysts.

Network B 160 may include endpoints Host-B1 162 and Host-B2 164, and as well as host infrastructure (not shown in FIG. 2) for supporting CTI Providers systems 112 and 114. Host devices 162 and 164 may support, for example, HTTP server applications (web sites) that may be operated or controlled by malicious actors that may compromise endpoints with HTTP clients, for example host devices 152 and 154, that establish sessions with the HTTP servers. CTI providers systems 112 and 114 may be associated with services that monitor network threats (e.g., threats associated with threat hosts 162 and 164) and disseminate, to subscribers such as Collection Components or CTI Gateways 120 and Cyberanalysis Applications Systems 130, cyber threat intelligence reports. The cyber threat intelligence reports may include network-threat indicators (e.g., network addresses, ports, fully qualified domain names (FQDNs), uniform resource locators (URLs), uniform resource identifiers (URIs), or the like) associated with the network threats; network threat signatures (e.g., MD5 hashes of malware files); and network threat behavior patterns (e.g., files with data extensions that may be executing processes, communications indicative of I2P nodes, and the like), as well as other information associated with the network threats, for example, the type of threat (e.g., phishing malware, botnet malware, or the like); geographic informa-

10

tion (e.g., International Traffic in Arms Regulations (ITAR) country, Office of Foreign Assets Control (OFAC) country, geoIP data, or the like), anonymous networks and darknets (e.g., Tor network, I2P network, and the like), and malicious actors (e.g., the Russian Business Network (RBN), the Syrian Electronic Army (SEA), APT1, and the like).

FIG. 3 depicts an illustrative environment for a cyberanalysis workflow application process in accordance with one or more aspects of the disclosure. Referring to FIG. 3, the Cyberanalysis Application System 130 corresponds to the Cyberanalysis Application System 130 depicted in FIGS. 1 and 2. The Cyberanalysis Application System 130 may include one or more processors, memories, and/or network interfaces. The functions and steps described herein may be embodied in computer-usable data or computer-executable instructions, such as in one or more program modules, executed by one or more computers or other devices to perform one or more functions described herein. Generally, program modules include routines, programs, objects, components, data structures, etc. that perform particular tasks or implement particular abstract data types when executed by one or more processors in a computer or other data processing device. The computer-executable instructions may be stored on a computer-readable medium such as a hard disk, optical disk, removable storage media, solid-state memory, RAM, etc. As will be appreciated, the functionality of the program modules may be combined or distributed as desired in various embodiments. In addition, the functionality may be embodied in whole or in part in firmware or hardware equivalents, such as integrated circuits, application-specific integrated circuits (ASICs), field programmable gate arrays (FPGA), and the like. Particular data structures may be used to more effectively implement one or more aspects of the disclosure, and such data structures are contemplated to be within the scope of computer executable instructions and computer-usable data described herein.

The input to Cyberanalysis Application System 130 is threat event logs produced by the Collection Component or CTI-Gateway system 120 (external to Cyberanalysis Application System 130), which corresponds to the Collection Component 120 depicted in FIG. 1 and the Collection Component or CTI Gateway system 120 depicted in FIG. 2. The Collection Component or CTI-Gateway 120 produces threat event logs, which may be derived from communications that match CTI supplied by CTI providers such as CTI Providers 112 and 114 depicted in FIG. 2, and which may be currently being applied by the Collection Component or CTI-Gateway 120 to network communications between networks such as network A 150 and network B 160 depicted in FIG. 2.

The event logs may be received and processed by CTI Enrichment apparatus 131. CTI Enrichment apparatus 131 adds additional data to the threat logs that is derived from CTI providers and that may be used to compute reportability likelihood determinations. This data enrichment may include, for example, the names of all the CTI providers that supplied the indicator(s), signature(s), or behavioral qjpattern(s) that caused the Collection Component or CTI Gateway 120 to create the event log; the CTI providers' reputation or risk scores for the indicator(s), signature(s), or behavioral pattern(s); the age of the indicator(s), signature(s), or behavioral pattern(s); the class or category of the potential threat; the actors who created the threat; the behavior of the threat and the asset damage it may cause; and the like.

The enriched event logs may be received and processed by the Reportability Likelihood Estimator apparatus 132. The Reportability Likelihood Estimator 132 computes a

US 10,503,899 B2

11

likelihood, or probability value in [0,1], that the cyberanalysts or cyberanalysis system will determine that the event is a reportable finding. The Reportability Likelihood Estimator **132** uses two types of algorithms to determine estimated reportability likelihoods: (1) heuristic, human-designed (H/D) algorithms; and (2) machine-learned (M/L) algorithms. The two types of algorithms may provide complementary benefits. Human cyberanalysts expect that H/D algorithms may be, on average, not as accurate as well-trained M/L algorithms at determining estimated likelihoods, because determining reportability of events requires human-level intelligence, intellectual skills, reasoning, and context awareness and understanding that may be not easily emulated by algorithms that have been designed and explicitly programmed by humans using conventional computer programming languages and methodologies. An H/D algorithm does not automatically learn and thus does not improve its performance over time as an estimator. Conversely, well-trained M/L algorithms will recognize complex patterns in event characteristics that discriminate between events that may be reportable findings and events that may not be reportable findings. In effect, an M/L algorithm has learned how to emulate the human cyberanalyst's reasoning, much of which is implicit knowledge that is difficult for humans to explicitly program as computer logic. However, M/L algorithms' accuracy at estimating reportability likelihoods is directly correlated with the quality of the training data used as input to the machine learning system **170** in FIG. **2**. High-quality training data consists of large sets of reportable findings (positive examples) and non-reportable events (negative examples), which have event characteristics that cover a broad range of possible values. Thus, until an M/L algorithm has been well-trained with large sets of positive and negative examples that may be a sufficiently dense sampling of the feature space of possible events, then an M/L algorithm is not expected to give accurate estimation determinations.

Over time, as cumulatively more positive and negative examples may be added to the training data for the machine learning system (**170** in FIG. **2**), the M/L algorithm's accuracy at determining reportability likelihoods will improve. Until then, it may be the case that for a given new event that is received by the Reportability Likelihood Estimator **132**, the H/D algorithm processor **133** is more accurate than the M/L algorithm processor **134**. To account for deficiencies in the training data and the time it may take to create sufficient training data that will result in accurate estimation determinations by the M/L algorithm processor **134**, some way of combining a determination produced by the M/L algorithm processor **134** and a determination produced by the H/D algorithm processor **133** is needed. The Reportability Likelihood Estimator **132** combines the two determinations to produce a single likelihood determination, called the R-value. Algorithms for combining the two determinations to produce the R-value can take many forms, but one constraint is they should preserve the property that the R-value is a probability, that is, the R-value is in [0, 1]. The calculated R-value may have the property that R-value is greater than or equal to both of the estimation determinations produced by the H/D **133** and M/L **134** algorithm processors (and because it is a likelihood, or probability, R-value is in [0,1]). For example, the Reportability Likelihood Estimator **132** may use a simple combining algorithm to set R-value to the larger of the output of the H/D **133** and M/L **134** algorithm processors. The Reportability Likelihood

12

Estimator **132** may add the calculated R-value to the enriched event log and forwards the log to the Cyberanalysis Work Queue system **135**.

The Cyberanalysis Work Queue system **135** receives the enriched event log (with an assigned R-value) and inserts the enriched event log, which may now be viewed as a task for the cyberanalysts or cyberanalysis system, into the Cyberanalyst Work Queue in R-value sorted order. For example, an event log A with an R-value of X will be located closer to the front, or head, of the queue than an event log B with an R-value of Y, if X is larger than or equal to Y. Thus, the task at the head of the queue has the greatest R-value of all tasks in the queue; and the task at the tail of the queue has the lowest R-value of all tasks in the queue.

A Forensics Analysis Application device **136**, such as a SIEM application, retrieves, or pops/removes, the task at the head of the queue, receives the task, and presents the task via an interface (e.g. a graphical user interface displayed on a display) to the human cyberanalyst. The cyberanalyst may use the Forensics Analysis Application device **136** to investigate the event. The cyberanalyst may enter a decision unit **137** in the Forensics Analysis Application regarding whether the event is a reportable finding or a non-reportable finding, and labels the event log accordingly. If YES, the event, or reportable finding, is transmitted to and received by a Report Generator application system **138**, which creates a report that may include remedial actions. The report generated by Report Generator **138** is sent to Authority System Network Devices **140** (which may be external to Cyberanalysis Application System **130** and which corresponds to Authority System Network Devices **140** in FIG. **1**), which may be operated by entities who may be responsible for any compliance enforcement and/or who may be authorized to execute the remedial actions. In Step **8**, the Analyzed Event, which may be either a reportable finding (positive example) or a non-reportable event (negative example) is stored in a Training Data Store **171**, which is a component of the Machine Learning System **170** (depicted in FIGS. **1**, **2**, and **5**).

The Cyberanalysis Application System **130** repeatedly processes tasks from the head of the queue until either the work queue is empty, or the cyberanalyst decides to stop working because the R-value of the task at the head of the queue is below some threshold value, such that further work will decrease cyberanalyst work efficiency to unacceptable levels. When the latter situation occurs, the Cyberanalysis Application System **130** or proper authority may drop the tasks remaining in the queue. The dropped tasks may be archived and may be investigated at a later time, for example, when sufficient cyberanalyst work capacity is available or when further analysis by an improved M/L algorithm indicates an increased R-value. When a new task (event log) arrives that has an R-value greater than the threshold, the Cyberanalysis Application System **130** may automatically transmit an alert to the cyberanalysts, for example via a user interface notification, text message, e-mail, telephone call, and the like.

FIG. **4** depicts an exemplary human-designed (H/D) heuristic algorithm decision table (which may be implemented in the H/D algorithm processor **133** in FIG. **3**) for determining a reportability likelihood for a communications event collected by a cyber threat intelligence gateway, in accordance with one or more aspects of the disclosure. In this case, the cyber threat intelligence (CTI) category is threat indicators in the form of network addresses (e.g., IP addresses, fully-qualified domain names (FQDNs), and URLs). The output of the HID algorithm processor **133** is a

IPR2021-01158 Page 00018

US 10,503,899 B2

**13**

Reportability Likelihood value in [0, 1], shown in the leftmost column of the table. The input to the algorithm processor **133** is an enriched event log, which contains fields for the "Indicator_Type", the "Indicator_Age", and the "CTI_Score". Indicator_Type values include "IP" for an IP address indicator, "FQDN" for an FQDN indicator, and "URL" for a URL indicator. The Indicator_Age and CTI_Score fields and values may be created by CTI Enrichment **131** (shown in FIG. **3**). Indicator_Age values may be ranges with units of days. CTI_Score values may be one of {High, Medium, Low}. To determine a reportability likelihood, the H/D algorithm may use conditional logic and Boolean logic applied to the event field values. For example, the second row of the table may represent a computer program statement "IF ((Indicator_Type==FQDN) AND ((0<=Indicator_Age<30) OR (CTI_Score==High))) THEN Reportability_Likelihood:=0.7". For example, the eighth row of the table may represent a computer program statement "IF (((Indicator_Type==FQDN) OR (Indicator_Type==IP)) AND (180<=Indicator_Age)) THEN Reportability_Likelihood:=0.1".

The H/D algorithm utilizes a correlation between an event's reportability likelihood and the fidelity and age of the CTI indicator that matched the event's network address. This correlation is heuristic knowledge provided by (human) cyberanalysts that is captured in the H/D algorithm of FIG. **4**. The fidelity of an indicator maps directly to the Indicator_Type value. Indicators with an Indicator_Type value of "URL" have the highest fidelity, because a URL maps to a single networked (malicious) resource (e.g., a malware executable file). Because of this one-to-one mapping of threat indicator to threat resource, the likelihood that the associated event will be reportable should be high. Indicators with an Indicator_Type value of "FQDN" have lower fidelity than "URL" because a single FQDN can map to multiple URLs, or multiple networked resources, some portion of which may be non-malicious. Because of this one-to-many mapping of a single threat indicator to potentially multiple resources, some portion of which may not be malicious, the likelihood that the associated event will be reportable should be lower than the reportability likelihood for an event that was detected by a URL indicator. Similarly, indicators with an Indicator_Type value of "IP" have lower fidelity than "FQDN" and (transitively) "URL" because a single IP Address can map to multiple FQDNs, or multiple networked resources, some portion of which may be non-malicious.

Indicator_Type value, or equivalently fidelity, may be viewed as the primary sorting criteria, and Indicator_Age may be viewed as the secondary sorting criteria. Referencing FIG. **4**, for Indicator_Type values "FQDN" and "IP", the age of the indicator factors into reportability likelihood. The indicator's age is the quantity of days since the indicator was first reported by the cyber threat intelligence provider to the present day. Reportability likelihood decreases as the age of the indicator increases. CTI_Score values, assigned by the CTI provider, may also be used as a secondary sorting criteria. For the HID algorithm represented in FIG. **4**, CTI_Score and Indicator_Age may be treated equivalently, and thus may substitute for each other in the case that the CTI provider does not supply values for either Indicator_Age or CTI_Score.

FIG. **5** depicts an exemplary machine learning system **170** (which corresponds to the machine learning system **170** in FIG. **1** and FIG. **2**), which creates machine-learned (M/L) algorithms (such as an algorithm for the M/L algorithm processor **134** in FIG. **3**) for determining reportability like-

**14**

lihood for a communications event collected by a cyber threat intelligence gateway, in accordance with one or more aspects of the disclosure. The input for the machine learning algorithm generation engine **172** is enriched event logs that have been previously analyzed by cyberanalysts, labeled as either reportable findings (positive examples) or non-reportable events (negative examples), and stored in a Training Data Store **171** for later use as training data for a machine learning algorithm generation engine such as **172**. The output of the machine learning algorithm generation engine **172** is a machine-learned (M/L) algorithm for MIL algorithm processor **134**, which corresponds to MIL algorithm processor **134** in FIG. **3**, that determines the reportability likelihood of threat events.

The machine learning algorithm generation engine **172** may be any supervised learning algorithm, such as artificial neural networks, genetic programming, and the like. Training data for supervised learning algorithms is composed of labeled training examples; in the present disclosure, the training examples may be analyzed event logs labeled as either reportable findings (positive examples, with label value +1) or non-reportable events (negative examples, with label value 0). The machine learning algorithm's objective is to learn the function F that maps each input, which is a training example in the training data, to its output, which is +1 for positive training examples and 0 for negative training examples. After the machine learning algorithm generation engine **172** has generated the M/L algorithm that accurately maps positive training examples to +1 and negative training examples to 0, then the M/L algorithm processor **134** may be used to determine reportability likelihoods of newly generated event logs. That is, the M/L algorithm processor **134** may be used to analyze event logs that were not used as training examples in the training data. M/L algorithm processor **134** may then be embedded in a Reportability Likelihood Estimator **132** (ref. FIG. **3**) that may be a component in a Cyberanalysis Applications System **130** (ref. FIG. **3**).

Note that the choice of label values 0 and +1 for the training examples is deliberate, and part of this disclosure. Because these label values may be used during training, the resultant M/L algorithm processor **134** will output a value between 0 and +1 inclusive, or [0, 1], when the M/L algorithm processor **134** is being used to evaluate an event log (input) that was not a training example. Thus, the output of M/L algorithm **134** may be interpreted as a probability, or likelihood, that the input event log is a reportable finding.

The accuracy of a determination of the M/L algorithm processor **134** depends in part on the quality of the training data used by the machine learning algorithm generation engine **172** to create the M/L algorithm processor **134**. The quality of the training data, and ultimately the accuracy of the determination, depends on the quality of the feature vector derived from the event log. The feature vector for an event log, and not the raw data of the event log, is the actual input to the machine learning algorithm generation engine **172** and the M/L algorithm processor **134**. A feature vector is an array of numeric values, with each numeric value being a measure of some feature, or characteristic, of the event. For example, the size, measured in bytes, of the file that was transferred by the communications event is a characteristic that may compose an element or elements in the feature vector. A high quality feature vector is one that incorporates a large set of highly uncorrelated event characteristics that (a) causes the machine learning algorithm generation engine **172** to rapidly converge on the M/L algorithm during training; and (b) causes the M/L algorithm processor **134** to produce accurate reportability likelihoods.

| 15 | 16 |
|---|---|

The present disclosure includes features, or characteristics, of a feature vector for use in determining reportability likelihoods for cyberanalysis workflow acceleration. FIGS. 6a and 6b lists these characteristics and associated information. Note that in general, these features and their associated values may be designed to measure or quantify a human's perception of the threat risk, and therefore reportability likelihood, of an event, based on the values of fields in the event log.

"CTI-Prvdr-{1,N}" are the names of the N CTI provider entities (ref. 112 and 114 in FIG. 2) that are supplying CTI, e.g., threat indicators, signatures, and behavioral patterns, to the Collection Component or CTI-Gateway 120 and Cyberanalysis Applications System 130 (ref. FIG. 2). This CTI provider information is added to the event log by CTI Enrichment 131 (ref. FIG. 3). The numeric value of a CTI-Prvdr-X feature is 1 if the CTI Provider has the indicator/signature/pattern that matched the event in its CTI database; otherwise, the value is 0. For example, suppose there are eight (8) CTI provider entities in total (and therefore eight features CTI-Prvdr-1, CTI-Prvdr-2, . . . CTI-Prvdr-8), and for a given event, three (3) CTI provider entities CTI-Prvdr-2, CTI-Prvdr-5, and CTI-Prvdr-7 have the indicator/signature/pattern that matched the event in their CTI databases; then the associated feature vector is (0, 1, 0, 0, 1, 0, 1, 0).

"Norm-PolyGram-Entropy-LL-e2LD" is a normalized measure of the information entropy of the polygram probability distribution of the leading label of the effective 2nd-level domain of the fully qualified domain name (FQDN) that may be included in the event log, for example, if the associated communications event is an HTTP session between an HTTP client (e.g., a web browser application) and an HTTP server (e.g., a web server) with an FQDN (e.g., www.company-web-server.com) found in a domain name system such as the Internet's DNS. Informally, "Norm-PolyGram-Entropy-LL-e2LD" measures the human-perceived randomness of a domain name, which may capture a cyberanalyst's intuition that such a domain name may be indicative of a reportable event. Because domain names of legitimate, non-malicious Internet-attached hosts may often be created by humans and formed from human-readable words (e.g., www.company-web-server.com), whereas domain names of malicious Internet-attached hosts may often be machine-generated random strings and therefore not recognized as words by humans (e.g., www.4aiu68dh3fj.com), this measure may have some value as a feature for an M/L algorithm 134 to learn to discriminate between events that may be reportable findings and events that may not be reportable.

More formally, the 2nd-level domain name (2LD) of an FQDN, for example such as "www.company-web-server.com" is "company-web-server.com", and the leading label (LL) of the 2LD is "company-web-server". The effective 2nd-level domain (e2LD), for example, of the FQDN www.company-web-server.co.uk is "company-web-server.co.uk". For FQDNs such as "www.company-web-server.co.uk", the e2LD "company-web-server.co.uk" better captures domain ownership than the 2LD "co.uk", and is therefore a better feature for use in the present disclosure than 2LD. Note that the 2LD and e2LD of "www.company-web-server.com" are the same, i.e., "company-web-server.com". Note also that for some FQDNs, for example 447a7a44.ksfcradio.com, the leading label of the e3LD ("447a7a44"), when an e3LD exists, may be the better feature than the leading label of the e2LD; similarly, for the e4LD for some FQDNs, for example

447a7a44.web.ksfcradio.com. Hence, additional features "Norm-PolyGram-Entropy-LL-e3LD" and/or "Norm-PolyGram-Entropy-LL-e4LD" may also be used, when they exist.

The information-theoretic entropy value for a set of N probabilities $P=\{p_1, p_2, p_3, \ldots, p_N\}$ is computed as Entropy $(P)=-\Sigma_i\ p_i\ \log_2\ p_i$ (for i=1 . . . N), where $\log_2$ is the base-2 logarithm function. For the present disclosure, one way to apply the Entropy( ) function to leading labels of domain names is first to choose the probability distribution to be the relative frequencies, or probabilities, of occurrence of alphabetical characters in English text. For example, it is well-known that the letter "e" is the most common alphabetical character used in English text, and its empirical probability value is approximately 13%. Then, apply this distribution to each of the alphabetical characters, or unigrams, in the leading label of the effective 2nd level domain. For example, for the domain name "www.mysite.com" with "mysite" being the leading label of the effective 2nd level domain, $P_{ex1}=\{p("m"), p("y"), p("s"), p("i"), p("t"), p("e")\}$, where the probability values p("[letter]") may be selected from some empirical probability distribution of alphabetical characters, or letters, in English text. Then compute Entropy $(P_{ex1})$.

An issue with using the above Entropy($P_{ex1}$) computation in the feature "Norm-PolyGram-Entropy-LL-e2LD" is that the Entropy($P_{ex1}$) value is the same for "www.mysite.com" as for "www.eytmsi.com"; thus, it does not discriminate between random character strings and character strings for English words, or in the context of the present disclosure, it does not quantify the human perception that "eytmsi" is random, and therefore suspect, but "mysite" is human readable. To better achieve discrimination and capture human perception, probability distributions for bigrams (consecutive pairs of characters) or trigrams (consecutive triples of characters), or generally polygrams, in English text may be used instead of probability distributions for unigrams. For example, the set of bigrams of "mysite" is {"my", "ys", "si", "it", "te"}, and the set of trigrams is {"mys", "ysi", "sit", "ite"}. Also, the set of bigrams of "eytmsi" is {"ey", "yt", "tm", "ms", "si"} Then for $P_{ex2}=\{p("my"), p("ys"), p("si"), p("it"), p("te")\}$ and $P_{ex3}=\{p("ey"), p("yt"), p("tm"), p("ms"), p("si")\}$, where the probability values p("[bigram]") may be selected from some empirical probability distribution of bigrams in English text, Entropy ($P_{ex3}$)>Entropy($P_{ex2}$), which measurably quantifies the concept that the human-perceived randomness of "eytmsi" is greater than that of "mysite". Thus, when computing this feature "Norm-PolyGram-Entropy-LL-e2LD", bigrams or trigrams (or more generally, polygrams), should be used instead of unigrams.

Because domain name labels may be allowed to include numeric characters, as well as hyphens, it may be useful to remove non-alphabetical characters from the labels before applying the Entropy( ) function to a label's probability distribution of its polygrams. Alternatively, an empirical probability distribution of polygrams for labels of domain names created by humans for legitimate purposes may be used.

Finally, a normalization may be applied to the Entropy( ) computation to account for differences in string length, because in general, longer strings will have greater Entropy( ) values than shorter strings. For example, a human will perceive that the domain name www.ajiduvb.com has the same or similar randomness as www.ajiduvbgvxtz.com, whereas the Entropy( ) value for www.ajiduvbgyxtz.com will be approximately twice that of www.ajiduvb.com. To

IPR2021-01158 Page 00020

US 10,503,899 B2

17

normalize for differences in string length, divide the Entropy( ) value by the base-2 logarithm ($\log_2$ in common notation), of the size of the set of bigrams, or trigrams, or more generally polygrams. For example, the set of bigrams $P_{ex2}=\{\text{"my", "ys", "si", "it", "te"}\}$ of "mysite" has size=5, so divide Entropy($P_{ex2}$) by $\log_2(5)$ to normalize.

"Numeric-Head-LL-e2or3LD" is a Boolean-valued feature that is 1 (True) if the first character of the leading label of the effective 2nd-level domain or of the effective 3rd-level domain is a numeric character (a decimal digit); and 0 (False) otherwise. Humans that are creating legitimate domains tend not to use numeric characters at the beginning (head) of a domain name; and thus a human cyberanalyst may perceive that a domain name label with a numeric head is suspicious.

"String-Length-LL-e2LD-Bin-X-Y" and "String-Length-LL-e3LD-Bin-X-Y" are Boolean-valued features that may be 1 (True) if the string length, measured in bytes, of the leading labels of the effective 2nd-level domain or of the effective 3rd-level domain are in the range [X, Y] inclusive; and 0 (False) otherwise. A bin partitioning, for example, of string lengths may be [1,4], [5-8], [9-16], [17-32], [33, 63], and [64, inf]. The last bin [64, inf] is for illegally long labels, which should not exceed 63 bytes (RFC 1035). With this exemplary bin partitioning, there will be six (6) features with names "String-Length-LL-e2LD-Bin-X-Y" with "X-Y" values corresponding to the partition bounds.

"TLD-Category-{g, s, cc, other}" are Boolean-valued features that may be 1 (True) if the top-level domain of the FQDN that may be included in the event log is in one of the IANA-defined top-level domain groups gTLD, or sTLD, or ccTLD, or other; and 0 (False) otherwise.

"Time-of-Day-Bin-X-Y" are Boolean-valued features that may be 1 (True) if the time-of-day that the event occurred is in the range [X, Y); and 0 (False) otherwise. A bin partitioning, for example, of times-of-day with cyber relevance may be [0200, 0600), [0600-0800), [0800, 1000), [1000, 1200), [1200, 1400), [1400, 1600), [1600, 1800), [1800, 2200), and [2200, 0200). With this exemplary bin partitioning, there will be nine (9) features with names "Time-of-Day-Bin-X-Y" with "X-Y" values corresponding to the partition bounds.

"Weekend-or-Holiday" is a Boolean-valued feature that is 1 (True) if the day the event occurred was a weekend or holiday; and 0 (False) otherwise.

"Flow-Byte-Count-Bin-X-Y" are Boolean-valued features that may be 1 (True) if the size, measured in bytes, of the content information, for example, the payloads of the TCP or UDP packets, of the event is in the range [X, Y); and 0 (False) otherwise. A bin partitioning, for example, of sizes may be [0,8), [8,64), [64,512), [512, 4K), [4K, 32K), [32K, 256K), and [256K, inf). With this exemplary bin partitioning, there will be seven (7) features with names "Flow-Byte-Count-Bin-X-Y" with "X-Y" values corresponding to the partition bounds.

The "Percentage-Digits-FQDN" feature's value is in [0, 1] and is the percentage of numeric characters in the FQDN.

The "Percentage-Hyphens-FQDN" feature's value is in [0, 1] and is the percentage of hyphen characters in the FQDN.

The "Percentage-NonCompliant-Characters-FQDN" feature's value is in [0, 1] and is the percentage of characters in the FQDN that may be non-compliant with RFC 1035, which says that characters should be alphabetical, numeric, hyphen "-", or dot ".".

"Direction-and-Breach-Category-X" are Boolean-valued features that may be 1 (True) if the event matches the

18

directionality and breach of the category X; and 0 (False) otherwise. Directionality is one of Intrusion or Exfiltration, i.e., an inbound attack initiated from outside the protected network, or an outbound attack initiated from inside the protected network; and Breach is one of Allowed or Blocked, i.e., was the communication allowed (Allowed) to cross the network perimeter, or was the communication prevented (Blocked) from crossing the network perimeter by, for example, a network firewall or a CTI gateway. Thus, there may be four possible categories for X, namely {Intrusion, Allowed}, {Intrusion, Blocked}, {Exfiltration, Allowed}, and {Exfiltration, Blocked}, and therefore four (4) features named "Direction-and-Breach-Category-{X}". These features may affect reportability likelihood determinations because, for example, a cyberanalyst may be less likely to report an Intrusion event that was Blocked than to report an Exfiltration event that was Allowed.

Although not required, one of ordinary skill in the art will appreciate that various aspects described herein may be embodied as a method, an apparatus, or as one or more computer-readable media storing computer-executable instructions. Accordingly, those aspects may take the form of an entirely hardware embodiment, an entirely software embodiment, an entirely firmware embodiment, or an embodiment combining software, hardware, and firmware aspects in any combination.

As described herein, the various methods and acts may be operative across one or more computing devices and one or more networks. The functionality may be distributed in any manner, or may be located in a single computing device (e.g., a server, a client computer, etc.).

Aspects of the disclosure have been described in terms of illustrative embodiments thereof. Numerous other embodiments, modifications, and variations within the scope and spirit of the appended claims will occur to persons of ordinary skill in the art from a review of this disclosure. For example, one of ordinary skill in the art will appreciate that the steps illustrated in the illustrative figures may be performed in other than the recited order, and that one or more steps illustrated may be optional.

What is claimed is:

**1.** A method comprising:

receiving a plurality of event logs;

determining, by a computing device, a reportability likelihood for each event log based on at least one algorithm, wherein the reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator;

sorting an event queue of the plurality of event logs based on the reportability likelihood of each of the plurality of event logs; and

transmitting, by the computing device and to an analysis system, the plurality of event logs sorted in the event queue based on the reportability likelihood of each of the plurality of event logs.

**2.** The method of claim **1**, wherein the reportability likelihood is a combined reportability likelihood, and wherein the determining, by the computing device, the reportability likelihood for each event log based on the at least one algorithm comprises:

IPR2021-01158 Page 00021

US 10,503,899 B2

19

determining, by the computing device, a first reportability likelihood for each event log based on a static algorithm;

determining, by the computing device, a second reportability likelihood for each event log based on a machine-learned algorithm; and

determining, by the computing device, the combined reportability likelihood for each event log based on the first reportability likelihood and the second reportability likelihood.

**3.** The method of claim **2**, further comprising:

receiving, from the analysis system, report data generated based on analyzed event logs; and

updating training data for a machine learning system based on the report data generated based on the analyzed event logs.

**4.** The method of claim **2**, wherein the machine-learned algorithm determines, for each event log, the second reportability likelihood for the event log based on at least one of: a domain name associated with the event log, an entropy value of the domain name associated with the event log, a number of labels of the domain name associated with the event log, a string length of the domain name associated with the event log, a size of data associated with the event log, or an event occurrence time associated with the event log.

**5.** The method of claim **2**, wherein the machine-learned algorithm is continually updated based on correlation data derived from analyzed event logs.

**6.** The method of claim **2**, wherein the static algorithm is a human designed algorithm, wherein the static algorithm is set based on an operator input.

**7.** The method of claim **1**, further comprising:

receiving, from the analysis system, report data generated based on analyzed event logs; and

updating training data for the at least one algorithm based on the report data generated based on the analyzed event logs.

**8.** The method of claim **1**, further comprising:

receiving a plurality of packets;

determining, based on threat intelligence data, a plurality of potential threat communications events;

generating, based on the plurality of potential threat communications events, the plurality of event logs; and

storing the plurality of event logs to the event queue.

**9.** The method of claim **8**, further comprising:

receiving, from the analysis system, report data generated based on analyzed event logs; and

updating, based on the report data generated based on the analyzed event logs, packet rule dispositions for determining packets to be one of the plurality of potential threat communications events.

**10.** The method of claim **1**, wherein the reportability likelihood is a probability that a potential threat communication is associated with an actual threat.

**11.** A method comprising:

receiving, by a computing device, a plurality of event logs;

determining, by the computing device, a first reportability likelihood for each event log based on a human designed algorithm;

determining, by the computing device, a second reportability likelihood for each event log based on a machine-learned algorithm;

20

determining, by the computing device, a combined reportability likelihood for each event log based on the first reportability likelihood and the second reportability likelihood;

sorting the plurality of event logs based on the combined reportability likelihoods of each of the plurality of event logs; and

storing, in an event queue, the plurality of event logs sorted in the event queue based on the combined reportability likelihood of each of the plurality of event logs,

wherein the combined reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator.

**12.** The method of claim **11**, further comprising:

receiving, from an analysis system, report data generated based on analyzed event logs; and

updating training data for a machine learning system based on reportability findings of analyzed event logs.

**13.** The method of claim **11**, wherein the machine-learned algorithm determines, for each event log, the second reportability likelihood for the event log based on at least one of: a domain name associated with the event log, an entropy value of the domain name associated with the event log, a number of labels of the domain name associated with the event log, a string length of the domain name associated with the event log, a size of data associated with the event log, or an event occurrence time associated with the event log.

**14.** The method of claim **11**, wherein the machine-learned algorithm determines the second reportability likelihood based on a correlation between an event and historical reportable events.

**15.** One or more non-transitory computer-readable media having instructions stored thereon that, when executed by one or more computing devices, cause the one or more computing devices to:

receive a plurality of event logs;

determine a reportability likelihood for each event log based on at least one algorithm, wherein the reportability likelihood for each event log is based on at least one of: a fidelity of an event threat indicator, a type of the event threat indicator, an age of the event threat indicator, threat intelligence provider data associated with the event threat indicator, reputation data of at least one threat intelligence provider, or a risk score of the event threat indicator;

sort the plurality of event logs based on the reportability likelihood of each of the plurality of event logs; and

store, in an event queue, the plurality of event logs sorted in the event queue based on the reportability likelihood of each of the plurality of event logs.

**16.** The one or more non-transitory computer-readable media of claim **15**, wherein the reportability likelihood is a combined reportability likelihood, the one or more non-transitory computer-readable media having instructions stored thereon to determine the reportability likelihood for each event log based on the at least one algorithm that, when executed by one or more computing devices, cause the one or more computing devices to:

determine a first reportability likelihood for each event log based on a static algorithm;

US 10,503,899 B2

21

determine a second reportability likelihood for each event log based on a machine-learned algorithm; and

determine the combined reportability likelihood for each event log based on the first reportability likelihood and the second reportability likelihood.

**17**. The one or more non-transitory computer-readable media of claim **16**, wherein the machine-learned algorithm determines, for each event log, the second reportability likelihood for the event log based on at least one of: a domain name associated with the event log, an entropy value of the domain name associated with the event log, a number of labels of the domain name associated with the event log, a string length of the domain name associated with the event log, a size of data associated with the event log, or an event occurrence time associated with the event log.

**18**. The one or more non-transitory computer-readable media of claim **16**, wherein the machine-learned algorithm determines the second reportability likelihood based on a correlation between an event and historical reportable events.

22

**19**. The one or more non-transitory computer-readable media of claim **15**, having instructions stored thereon that, when executed by the one or more computing devices, further cause the one or more computing devices to:

receive, from an analysis system, report data generated based on analyzed event logs; and

update training data for the at least one algorithm based on reportability findings of analyzed event logs.

**20**. The one or more non-transitory computer-readable media of claim **15**, having instructions stored thereon that, when executed by the one or more computing devices, further cause the one or more computing devices to:

receive a plurality of packets;

determine, based on threat intelligence data, a plurality of potential threat communications events;

generate, based on the plurality of potential threat communications events, the plurality of event logs; and

store the plurality of event logs to the event queue.

\* \* \* \* \*

**IPR2021-01158 Page 00023**

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(b)</u>

1.     This brief complies with the type-volume limitation of Fed. Cir. R. 32(b)(1) because this brief contains 9,236 words, exclusive of the items exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century 14 point font.

Dated:  August 21, 2023                    <u>*/s/ James Hannah*</u>
                                           James Hannah